## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED TO PROTECT DEMOCRACY**<br>2010 Pennsylvania Avenue NW #163<br>Washington, D.C. 20006 | ) ) ) ) | |
| **THE PROTECT DEMOCRACY<br>PROJECT, INC.**<br>2010 Pennsylvania Avenue NW #163<br>Washington, D.C. 20006 | ) ) ) ) ) ) | **Civil Action No. 1:17-cv-02016** |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| **PRESIDENTIAL ADVISORY<br>COMMISSION ON ELECTION<br>INTEGRITY**<br>1650 Pennsylvania Avenue NW<br>Eisenhower Executive Office Building<br>Rm. 268<br>Washington, D.C. 20504 | ) ) ) ) ) ) ) ) | |
| **THE OFFICE OF MANAGEMENT AND<br>BUDGET**<br>725 17th Street NW<br>Washington, D.C. 20503 | ) ) ) ) ) | |
| **MICK MULVANEY, in his official<br>capacity as Director of the Office of<br>Management and Budget**<br>725 17th Street NW<br>Washington, D.C. 20503 | ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
## IN THE NATURE OF MANDAMUS

## PRELIMINARY STATEMENT

1.      Federal law protects the American people from unconstrained governmental efforts to collect their information.  In particular, the Paperwork Reduction Act ("PRA"), 44 U.S.C. §§ 3501 *et seq.*, governs the processes to which federal agencies must adhere when they seek to collect information from the public, including from state officials.  The statute imposes a framework for ensuring that the government explains its need for the requested data, minimizes unnecessary burdens, establishes adequate structures for maintaining data securely, protects privacy interests, and gives the public a meaningful opportunity to comment in advance of the government's data collection.

2.      On June 28, 2017, the Presidential Advisory Commission on Election Integrity ("the Commission") asked the chief state election official in every state and the District of Columbia to respond to data requests for information about every registered voter in America.  Among other things, it requested information on party affiliation, voting history, criminal records, and personal identifying information.  The Commission, in other words, has asked state election officials to feed it information that would generate an unprecedented national voter database.

3.      The Commission is subject to the PRA's requirements, yet it has failed to comply with those strictures.  In issuing its sweeping request for voter information, the Commission has acted without transparency and without providing legally required opportunities for the public to comment on the appropriateness of the request.  The Commission has never explained what it plans to do with the data or why assembling a national voter database would advance any legitimate purpose.  It has not revealed how it will ensure compliance with applicable legal requirements, such as the Privacy Act of 1974, 5 U.S.C. § 552a.  It has

provided no information about how it will maintain the data. It has offered vague and shifting accounts of how it expects states to transmit the data and what elements of the data will eventually become public. It has failed to create any process for allowing public comment on these or other questions that arise out of its sweeping data request.

4.     The PRA provides a safeguard against federal entities that flout the statute's requirements: it directs the Office of Management and Budget ("OMB") and OMB's Director to take appropriate remedial action in response to violations. In this instance, however, Defendants OMB and its Director, Defendant Mick Mulvaney, have also failed to comply with the statute's mandates to ensure that the requirements of the PRA were met.

5.     The mission of Plaintiffs, United to Protect Democracy and the Protect Democracy Project (together, "Protect Democracy"), is to prevent our democracy from declining into a more autocratic form of government. Plaintiffs' mission is to prevent the erosion of longstanding democratic norms and institutions and to protect our democracy from descending into a more authoritarian form of government. Consistent with that mission, Protect Democracy seeks to prevent those in power from depriving Americans of a free, fair, and fully-informed opportunity to participate in effective democratic governance. As part of its mission, Plaintiffs regularly seek to influence actions of the Executive Branch by using legally prescribed processes to obtain information relevant to governmental decision-making and by submitting analyses to federal agencies to ensure that their decision-making is consistent with fundamental democratic norms and traditions.

6.     Under the PRA, Protect Democracy has a right to receive information about the Commission's sweeping data request and to comment on the Commission's proposed plans before they go into effect. Any report ultimately issued by the Commission, including any

analysis based on the data it seeks, may impact election systems across the country. Indeed, news reports indicate that the mere fact of the requests is already harming democratic participation by inducing some voters to withdraw their registration so that they can opt out of having sensitive information transmitted to the Commission. Accordingly, Plaintiffs seek the opportunity, guaranteed by federal law, to pursue their organizational missions in this important context.

**PARTIES**

7.     Plaintiff United to Protect Democracy is a 501(c)(4) non-profit organization focusing on advocacy efforts to confront threats to our democracy. United to Protect Democracy is incorporated under the laws of the District of Columbia and located at 2020 Pennsylvania Avenue, NW, #163, Washington, D.C. 20006.

8.     Plaintiff Protect Democracy Project, Inc., is a 501(c)(3) non-profit organization that focuses on research and public education to confront threats to our democracy, as well as litigation. The Protect Democracy Project is incorporated under the laws of the District of Columbia and located at 2020 Pennsylvania Avenue, NW, #163, Washington, D.C. 20006.

9.     Defendant Presidential Advisory Commission on Election Integrity is an establishment in the Executive Office of the President that was established by Executive Order 13,799. The Commission is chaired by Vice President Mike Pence and co-chaired by Kansas Secretary of State Kris Kobach.

10.     Defendant Office of Management and Budget is a component of the Executive Office of the President.

11.     Defendant Mick Mulvaney is the Director of the Office of Management and Budget. He is sued in his official capacity.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because the claims in this action arise under federal law, specifically the Paperwork Reduction Act, 44 U.S.C. §§ 3506-3507, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.  It also has original subject matter jurisdiction over the claims against the Commission pursuant to 28 U.S.C. § 1361.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants are based in the District of Columbia, and a substantial portion of the events giving rise to this litigation took place there.

## LEGAL FRAMEWORK

14.     The PRA sets out the legal framework that governs federal agencies when they collect information from individuals or other non-federal actors, including state governments. *See* 44 U.S.C. § 3501 *et seq.*  Specifically, it applies to agencies when they initiate a "collection of information."

15.     A "collection of information" includes, among other things, "obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency, regardless of form or format, calling for either [] answers to identical questions posed to . . . ten or more persons, other than agencies, instrumentalities, or employees of the United States."  *Id.* § 3502(3).

16.     As OMB has recognized, "collection of information" should be understood quite broadly.  *See* 5 C.F.R. § 1320.3(c)(1).  Significantly, "[t]he requirements of the PRA apply to voluntary collections as well as to mandatory collections."  Cass R. Sunstein, Administrator of the Office of Information and Regulatory Affairs, Memorandum for the Heads of

5

Executive Departments and Agencies and Independent Regulatory Agencies, regarding

Information Collection Under the Paperwork Reduction Act, at 3(Apr. 7, 2010) (citing 44

U.S.C. § 3502(3); 5 C.F.R. § 1320.3(c)),

https://obamawhitehouse.archives.gov/sites/default/files/omb/assets/inforeg/PRAPrimer_040

72010.pdf.

17. Under the statute, an agency "shall not conduct or sponsor the collection of

information" unless it complies with detailed procedural requirements. *Id*. § 3507(a). Those

requirements include, among other things, analyzing the need for the collection, the burdens

it will impose, and the systems in place for conducting the collection consistently with the

overall mandate of the statute; providing a 60-day notice in the Federal Register seeking

public comment on the contemplated collection of information; certifying to the Director of

OMB that the proposed collection comports with the requirements of the statute; and

publishing a second notice in the Federal Register describing the proposed collection and

informing the public how it may submit comments to OMB. *See id*. (citing 44 U.S.C. §

3506(c)(1)-(3)).

18. After satisfying those requirements, an agency may only proceed if the Director

of OMB has approved the proposed collection and issued a control number to be displayed

on the collection of information. *Id.* Under some circumstances, the Director's approval

may be inferred rather than express. *Id.* § 3507(c)(3).

19. Congress imposed these requirements to advance important values. Among other

things, the purposes of the PRA are to avoid undue burdens on the public, including state

governments, and to "ensure that the creation, collection, maintenance, use, dissemination,

and disposition of information by or for the Federal Government is consistent with applicable laws," including the protections ensured by the Privacy Act.  *Id.* § 3501(1), (8).

20.     "The PRA was designed, among other things, to 'ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government' and to 'improve the quality and use of Federal information to strengthen decisionmaking, accountability, and openness in Government and society.'"  Sunstein, *supra*, at 1 (citing 44 U.S.C. § 3501).

## FACTUAL ALLEGATIONS

### *The Presidential Advisory Commission on Election Integrity*

21.     The Presidential Advisory Commission on Election Integrity was established by President Donald Trump on May 11, 2017.  *See* Exec. Order No. 13,799, 82 Fed. Reg. 22,389 (May 11, 2017).

22.     The Executive Order establishing the Commission stated that the Vice President shall serve as chair and that the Commission shall be composed of not more than 15 additional members, to be appointed by the President.  It also authorized the Vice President to select a Vice Chair from among the members appointed by the President.  *Id.*

23.     The Executive Order provided that "[t]he Commission shall, consistent with applicable law, study the registration and voting processes used in Federal elections."  It further provided that the Commission will submit a report to the President on several topics relating to voting processes, including "those vulnerabilities in voting systems and practices used for Federal elections that could lead to improper voter registration and improper voting, including fraudulent voter registration and fraudulent voting."  *Id.*

24.     President Trump has stated that the establishment of the Commission was prompted by supposed voting patterns in the 2016 election.  Following his victory in the Electoral College vote and loss of the national popular vote, President Trump stated on multiple occasions that the true popular vote total had been obscured by millions of ineligible persons casting illegal votes.  It was in the context of advancing that claim that President Trump first proposed the idea of an election integrity commission.  *See, e.g.*, Michael D. Shear & Peter Baker, *After His Claim of Voter Fraud, Trump Vows "Major Investigation,"* NEW YORK TIMES (Jan. 25, 2017), https://nyti.ms/2kt8YIP.   No credible evidence supports the proposition that millions of ineligible voters participated in the 2016 election.

25.      The Commission has been charged with delivering a report that may influence the administration of election systems around the country.  Its methods for analyzing those systems are therefore of overriding public interest, and it is essential that the Commission functions consistently with all legally applicable transparency and public engagement requirements.

26.     The importance of ensuring compliance with all legally prescribed transparency and public-engagement requirements is further underscored by the composition of the Commission's membership.  Several members of the Commission have extensive records of espousing non-credible theories of widespread voter fraud and championing policies that would disenfranchise eligible voters.  Multiple pending lawsuits argue that the President's failure to appoint commissioners reflecting a balanced spectrum of viewpoints or contributing relevant substantive expertise renders its composition unlawful.  *See NAACP Legal Def. & Educ. Fund v. Trump*, 1:17-cv-5427 (S.D.N.Y. filed July 17, 2017); *ACLU v. Trump*, 1:17-cv-01351 (D.D.C. filed July 10, 2017).

### *The Commission's Request to Voting Officials in Every State*
### *Seeking Voter Data and Other Information*

27.     On June 28, 2017, the Commission held an "Organizational Conference Call."
The call was neither preannounced nor open to the public.  A subsequently published agenda
reveals that "information requests" was a topic discussed on that call.

28.     On the same day, the Commission sent substantially identical letters (the "June 28
Letters") to Secretaries of State or other election officials in all 50 states and the District of
Columbia.  The June 28 Letters were signed by Commission Vice Chair Kris Kobach and
appeared on the Commission's letterhead.

29.     The June 28 Letters "invited" recipients to provide information and opinions on
several complex policy questions relating to election administration.  They sought, for
example, opinions on potential changes to federal election law related to election integrity,
"evidence or information" relating to voter fraud, information on "convictions for election-
related crimes" since the November 2000 election, and recommendations relating to
preventing voter intimidation or disenfranchisement.

30.      In addition to these requests for narrative answers, the June 28 Letters
"request[ed]" that recipients "provide to the Commission the publicly-available voter roll
data for your state, including, if publicly available under the laws of your state, the full first
and last names of all registrants, middle names or initials if available, addresses, dates of
birth, political party (if recorded in your state), last four digits of social security number if
available, voter history (elections voted in) from 2006 onward, active/inactive status,
cancelled status, information regarding any felony convictions, information regarding voter
registration in another state, information regarding military status, and overseas citizen
information."

31.     The June 28 Letters advised recipients that they "may submit [their] responses electronically to ElectionIntegrityStaff@ovp.eop.gov or by utilizing the Safe Access File Exchange ('SAFE'), which is a secure FTP site the federal government sues for transferring large data files."  It asked for responses by July 14, 2017.

32.     The June 28 Letters stated that "any documents that are submitted to the full Commission will also be made available to the public."

33.     Almost immediately, the requests contained in the June 28 Letters sparked alarm among state election officials throughout the country.  Many of those officials expressed deep concern about the privacy and data security implications of providing responses to such sweeping requests for voter data.  According to the Brennan Center for Justice, as of September 27, 2017, eight states had declined to provide any data; 11 states imposed conditions prior to the release of data; and 17 states said they will provide data that they claim is not shielded under state law.  14 states and the District of Columbia have not publicly issued a decision.  *See* https://www.brennancenter.org/latest-updates-fraud-commission.

34.     President Trump has repeatedly asserted that declining the Commission's "invitation" to submit data somehow reveals derogatory information about a state.  For example, on July 1, 2017, he posted the following statement on Twitter: "Numerous states are refusing to give information to the very distinguished VOTER FRAUD PANEL.  What are they trying to hide?"  Similarly, the President delivered remarks at the Commission's first public meeting on July 19, 2017.  In his remarks, the President stated: "If any state does not want to share this information, one has to wonder what they're worried about.  And I asked

the Vice President, I asked the commission:  What are they worried about?  There's

something.  There always is."

35.     Commissioners have also sought to denigrate states that indicated they would

withhold responses.  For example, in an interview with Fox News, Commissioner Ken

Blackwell dismissed states' refusal to submit data to the commission as "hyper-political

activity and blatant partisanship *Voter Fraud Commission Member Speaks Out*, Fox News

(July 9, 2017), https://www.youtube.com/watch?v=wxIv4P9t8Xs, despite the fact that

significant criticism has been voiced by members of both parties, *see, e.g.*, Brooke Seipel,

*Mississippi Official:  Fraud Commission Can "Go Jump in Gulf of Mexico,"* The Hill (June

30, 2017), http://thehill.com/blogs/blog-briefing-room/news/340307-miss-official-on-trump-

voter-fraud-request-they-can-go-jump-in.

36.     In addition to concerns raised by state election officials, experts in several fields

also quickly criticized the Commission's efforts to create what would in effect be a

nationwide database of voter information.

37.     Voting rights experts have articulated a broad set of concerns about how the

requests would fuel the Commission's efforts at voter suppression.  *See, e.g.*, Vanita Gupta,

*The Voter Purges are Coming*, NEW YORK TIMES (July 19, 2017), https://nyti.ms/2vAYrgk;

Christopher Ingraham, *How Trump's Nationwide Voter Data Request Could Lead to Voter*

*Suppression*, WASHINGTON POST (June 30, 2017), http://wapo.st/2urNvB2.

38.     Experts in cybersecurity pointed to risks inherent in consolidating such sensitive

data without a clear plan for managing it securely.  For example, on July 5, 2017, former

Secretary of Homeland Security Michael Chertoff published an op-ed in the *Washington Post*

in which he stated, among other things: "[W]hatever the political, legal and constitutional

issues raised by this data request, one issue has barely been part of the public discussion: national security. . . .  We know that a database of personal information from all voting Americans would be attractive not only to adversaries seeking to affect voting but to criminals who could use the identifying information as a wedge into identity theft.  We also know that foreign intelligence agencies seek large databases on Americans for intelligence and counterintelligence purposes."  A nationwide voter database maintained without sufficient safeguards would be vulnerable not only to sophisticated hacking, but also to more routine mistakes in data maintenance that undermine the security of the kind of huge data cache the Commission seeks to create.  *See, e.g.*, Selena Larson, *Data of Almost 200 Million Voters Leaked Online by GOP Analytics Firm*, CNN.com (June 19, 2017), http://money.cnn.com/2017/06/19/technology/voter-data-leaked-online-gop/index.html.

39.     The data requests also had an immediately adverse effect on democratic participation:  thousands of voters have reportedly withdrawn their registration to avoid having their personal information transmitted to the Commission's national database of voter information.  *See, e.g.*, Blair Miller, *5,300+ Colorado Voters Withdraw Registration as State Prepares to Send Info. to Trump Commission*, THEDENVERCHANNEL.COM (July 31, 2017), http://www.thedenverchannel.com/news/politics/5300-colorado-voters-withdraw-registration-as-state-prepares-to-send-info-to-trump-commission; Benjamin Hart, *Thousands of People Have Canceled Their Voter Registration Because of Kris Kobach*, NEW YORK MAGAZINE (July 14, 2017), http://nymag.com/daily/intelligencer/2017/07/trumps-voter-intimidation-scheme-is-already-working.html.

40.     The requests for data reflected in the June 28 Letters also spawned numerous legal challenges.  *See, e.g.*, *Electronic Privacy Info. Ctr. v. Presidential Advisory Comm'n on*

*Election Integrity*, No. 1:17-cv-01320 (D.D.C. filed July 3, 2017); *Public Citizen, Inc. v. U.S. Dep't of the Army*, No. 1:17-cv-01355 (D.D.C. filed July 10, 2017); *Joyner v. Presidential Advisory Comm'n on Election Integrity*, No. 1:17-cv-22568 (S.D. Fla. filed July 10, 2017); *Common Cause v. Presidential Advisory Comm'n on Election Integrity*, No. 1:17-cv-1398 (D.D.C. filed July 14, 2017).

41.     Those lawsuits unearthed additional information about the June 28 Letters and caused the Commission to temporarily suspend its efforts to collect information from voting officials around the country.

42.     For example, the plaintiffs in *Electronic Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, No. 1:17-cv-01320 (D.D.C. filed July 3, 2017) ("*EPIC*"), moved for a temporary restraining order to prevent the Commission from collecting the information outlined in the June 28 Letters.

43.     In the context of that motion, Commission Vice Chair Kobach submitted a declaration on July 5, 2017.  In that declaration, Vice Chair Kobach stated, among other things, that when the June 28 Letters were sent, "[he] intended that narrative responses, not containing voter roll data, be sent via email to the address provided in the letter.  The email is a White House email address (in the Office of the Vice President) and subject to the security protecting all White House communications and networks.  For voter roll data, [he] intended that states use the Safe Access File Exchange ('SAFE'), which is a secure method of transferring large files up to two gigabytes (GB) in size."

44.     There was no indication of either "intention" in the June 28 Letters, nor did Vice Chair Kobach or the Commission ever publicize a plan for managing the transfer of information or seek public comment on how to do so appropriately.

45.     In the same declaration, Vice Chair Kobach further stated: "My letters state that 'documents' submitted to the Commission will be made available to the public.  That refers only to the narrative responses.  With respect to voter roll data, the Commission intends to de-identify any such data prior to any public release of documents."

46.     The Commission's plans for publication or de-identification of information were not contained in the June 28 Letters.  Nor did Vice Chair Kobach or the Commission ever publicize a plan for publication and de-identification of data or seek public comment on how to do so appropriately.  The Commission has not provided any analysis of whether its plans for determining which data will become public, and what will be withheld or redacted, comports with the requirements of the Federal Advisory Committee Act's disclosure requirements.

47.     In his July 5, 2017 declaration, Vice Chair Kobach also stated: "To my knowledge, as of July 5, 2017, no Secretary of State had yet provided to the Commission any of the information requested in my letter."

48.     On July 10, 2017, Vice Chair Kobach submitted a subsequent declaration in the *EPIC* matter.  Among other things, he stated: "In order not to impact the ability of other customers to use the DOD Safe Access File Exchange ('SAFE') site, the Commission has decided to use alternative means for transmitting the requested data.  The Commission no longer intends to use the DOD SAFE system to receive information from the states, and instead intends to use alternative means of receiving the information requested in the [June 28 Letters].  Specifically, the Director of White House Information Technology is repurposing an existing system that regularly accepts personally identifiable information through a secure, encrypted computer application within the White House Information

Technology enterprise.  We anticipate this system will be fully functional by 6:00 p.m. Eastern today."

49.     In the same declaration, Vice Chair Kobach also stated that the Commission had sent a communication to state election officials that day requesting that they "hold" on submitting information in response to the June 28 Letters until the judge in the *EPIC* matter issued her ruling.

50.     On July 24, 2017, the court in *EPIC* denied without prejudice the plaintiff's motion for a temporary restraining order.

51.     On July 26, 2017, Vice Chair Kobach sent substantially identical letters (the "July 26 Letters") to state election officials in all 50 states and the District of Columbia.  The July 26 Letters purported to "renew the June 28 request, as well as to answer questions some States raised about the request's scope and the Commission's intent regarding its use of the registration records."

52.     The July 26 Letters further stated: "I want to assure you that the Commission will not publicly release any personally identifiable information regarding any individual voter or any group of voters from the voter registration records you submit.  Individuals' voter registration records will be kept confidential and secure throughout the duration of the Commission's existence.  Once the Commission's analysis is complete, the Commission will dispose of the data as permitted by federal law.  The only information that will be made public are statistical conclusions drawn from the data, other general observations that may be drawn from the data, and any correspondence that you may send to the Commission in response to the narrative questions enumerated in the [June 28 Letters].  Let me be clear, the

Commission will not release any personally identifiable information from voter registration records to the public."

53.     In the July 26 Letters, Vice Chair Kobach also stated that "the Commission is offering a new tool for you to transmit data directly to the White House computer system." He directed recipients to contact a member of the Commission's staff who would then "reach out to your point of contact to provide detailed instructions for submitting the data securely." It did not provide any information on the Commission's actual plans for managing the transmission and maintenance of data.

54.     The language used in the June 28 Letters—which purports to "invite" responses—suggests the information collection is voluntary, not mandatory.  However, in at least one instance, the Commission has invoked applicable state laws to legally compel disclosure of data.  In response to the June 28 Letters, New York officials announced that they would not submit the requested information.  The Commission subsequently submitted an amended request (removing certain categories of data, including Social Security numbers, criminal history, and other personal information) to New York's Board of Elections pursuant to the state's Freedom of Information Law ("FOIL *See* Statement from Governor Andrew M. Cuomo (Aug. 2, 2017), https://www.governor.ny.gov/news/statement-governor-andrew-m-cuomo-149.  New York's FOIL statute mandates that state officials produce information in response to valid requests.  *See* Freedom of Information Law, N.Y. State Public Officers Law §§ 87 *et seq.*

55.     Although the Commission has never formally explained to the public why it needs the data or how it plans to use it, its members have on several occasions indicated an interest in subjecting such data to complex cross-referencing to other databases maintained by the

federal government.  Vice Chair Kobach has suggested that he would like to see voter

registration data cross-referenced against federal databases that contain information about

immigrants, including those who have naturalized as citizens.  *See* Amy Sherman, *Trump's*

*Commission Vice Chair Kris Kobach Says Immigration Data not Bounced Against Voter*

*Rolls*, POLITIFACT: FLORIDA (May 23, 2017),

http://www.politifact.com/florida/statements/2017/may/23/kris-kobach/trumps-election-

commission-chair-kris-kobach-says-/; Dave Boyer, *Voter fraud and suppression commission*

*to meet in July*, WASHINGTON TIMES (June 27, 2017),

http://www.washingtontimes.com/news/2017/jun/27/voter-fraud-and-suppression-

commission-to-meet-in-/.

56.     The Commission has never explained how it would execute such analyses across

multiple federal databases, what purpose doing so would serve, how data would be

maintained and secured in the course of doing so, or how it would ensure compliance with

applicable federal laws, including the Privacy Act.  Nor has the Commission ever provided

an opportunity for members of the public to submit comments on such prospective uses of

the data obtained by the Commission.

### *United to Protect Democracy's Request to OMB to Review the Commission's Information Collection and Take Appropriate Remedial Action*

57.     The PRA charges OMB with the responsibility to ensure that federal agencies

comply with the statute's requirements.  It directs OMB to take action when agencies fail do

to so.  Specifically, the statute provides that "[a]ny person may request the Director [of

OMB] to review any collection of information conducted by or for an agency to determine,

if, . . . a person shall maintain, provide, or disclose the information to or for the agency."

44 U.S.C. § 3517(b).  The statute further directs OMB to respond to the request within 60 days and to "take appropriate remedial action, if necessary."  *Id.*

58.      On July 3, 2017, Plaintiff United to Protect Democracy, along with the Brennan Center for Justice, submitted a letter to Defendant Mulvaney invoking § 3517(b).  That letter described in detail the grounds for concluding that the June 28 Letters violated the procedural requirements of the PRA.  It further requested that that Director Mulvaney "review the collections of information" embodied in the June 28 Letters "and take necessary remedial action as soon as possible."

59.      To date, Director Mulvaney has not provided any response to that request.  On information and belief, he has also taken no remedial action in response to the Commission's clear violations of the PRA.

## CLAIMS FOR RELIEF

### Count One

**(For Relief in the Nature of Mandamus, as provided by 28 U.S.C. § 1361, Compelling Defendant Presidential Advisory Commission on Election Integrity to Comply with its Non-Discretionary Duties Under the PRA, 44 U.S.C. §§ 3506-3507)**

60.      Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

61.      The Commission is subject to the PRA's requirements.  The PRA applies to "agencies," which it defines as "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency," with certain enumerated exclusions not applicable here. 44 U.S.C. § 3502(1).

62.     The Commission is an "agency" under the PRA because it is an establishment in the Executive Branch of the Government.  Executive Order 13,799 provides that the Vice President serves as chair of the Commission, charges the Commission with producing a report for the President, and orders the General Services Administration to provide the Commission with administrative services, funds, facilities, staff, equipment, and other supports services as may be necessary to carry out its mission on a reimbursable basis.

63.     The Commission's Vice Chair has requested that data be transmitted to systems operated and maintained by the White House, within the Executive Office of the President ("EOP").  Email correspondence on behalf of the Commission is conducted through an account associated with the Office of the Vice President, within the EOP.

64.     The June 28 Letters constituted a "collection of information" under the PRA.  The June 28 Letters posed identical questions to election officials in all 50 states and the District of Columbia and requested both narrative information and aggregate statistical information, which it solicited and sought to obtain for use by an agency, the Commission.  *See id*. § 3502(3).

65.     On information and belief, the Commission did not conduct the review established and required under § 3506(c)(1) of the PRA.  Under that provision, the Commission was required to (1) review the June 28 Letters and provide an evaluation of the need for the collection of information, a functional description of the information to be collected, a plan for the collection of the information, a specific, objectively supported estimate of burden, a test of the collection of information through a pilot program (if appropriate), and a plan for the efficient and effective management of the use of information to be collected, including necessary resources; (2) ensure that the information collection is

inventoried and displays a control number, indicates that the collection is in accordance with

the clearance requirements of § 3507, informs the person receiving the collection of the

reasons the information is being collected, the way such information is to be used, an

estimate, to the extent practicable, of the burden of collection, whether the responses to the

collection of information are voluntary, required to obtain a benefit, or mandatory, and the

fact that an agency may not conduct or sponsor, and a person is not required to respond to, a

collection of information unless it displays a valid control number; and (3) assess the

information collection burden of proposed legislation affecting the agency.  *See id.* §

3507(a)(1)(A) (citing 42 U.S.C. § 3506(c)(1)).

66.     Furthermore, the Commission did not provide a 60-day notice in the Federal

Register or otherwise consult with members of the public and affected agencies concerning

the June 28 Letters, and it did not solicit comment to (1) evaluate whether the proposed

collection of information is necessary for the proper performance of the function of the

agency, including whether the information shall have practical utility; (2) evaluate the

accuracy of the agency's estimate of the burden of the proposed collection of information; (3)

enhance the quality, utility, and clarity of the information to be collected; and (4) minimize

the burden of the collection of information on those who are to respond, including through

the use of automated collection techniques or other forms of information technology.  *See id*.

§ 3507(a)(1)(B) (citing 42 U.S.C. § 3506(c)(2)).

67.     On information and belief, the Commission did not certify with supporting

records to the Director of OMB that the information requested in the June 28 Letters is

necessary to the proper performance of the functions of the Commission, that the information

has practical utility, that it is not unnecessarily duplicative of information otherwise

reasonably accessible to the agency, and that it reduces to the extent practical and appropriate the burden on persons who shall provide information to or for the agency, through the use of such technique as, *inter alia*, having been developed by an office that has planned and allocated resources for the efficient and effective management and use of the information to be collected, including the processing of the information in a manner which shall enhance, where appropriate, the utility of the information to agencies and the public. *See id.* § 3507(a)(1)(C) (citing 42 U.S.C. § 3506(c)(3)).

68.     The Commission did not publish a notice in the Federal Register stating that it had submitted a certification to the Director of OMB as required by 42 U.S.C. § 3507(a)(1) and setting forth a title for the collection of information, a summary of the collection of information, a brief description of the need for the information and the proposed use of the information, a description of the likely respondents and proposed frequency of the response to the collection of information, an estimate of the burden that shall result from the collection of information, and notice that comments may be submitted to the Commission and the Director of OMB.   *See id.* § 3507(a)(1)(D).

69.     On information and belief, the Director of OMB did not notify the Commission concerning whether he approved or denied the June 28 Letters.

70.     The June 28 Letters did not contain an OMB-issued control number.

71.     The Commission's duties under the PRA are mandatory.  *See id.* § 3507 (mandating that "[a]n agency *shall not* conduct or sponsor the collection of information unless in advance of the adoption or revision of the collection of information" it complies with the statute's detailed procedural requirements).

72.     Plaintiff has a clear right to the information that the Commission is required to disclose under the PRA, including the reasons for the collection of information embodied in the June 28 Letters, how the information will be managed and used, and any efforts the Commission made to ensure that the collection, maintenance, use, dissemination, and disposition of the information is consistent with applicable laws, including, *inter alia*, relevant provisions of the Privacy Act.

73.     Plaintiffs are injured and suffer an ongoing harm by virtue of being deprived of the information that the Commission was required to disclose under the mandatory provisions of the PRA.  Plaintiffs devote substantial resources to ensuring that the democratic process does not suffer due to inappropriate or unlawful obstacles to participation in elections.  They seek to educate the public and engage in advocacy to advance that objective. They have already devoted substantial resources to pursuing that mission with respect to the work of the Commission.  In addition to the advocacy directed to Defendant Mulvaney in response to the June 28 Letters, Plaintiffs have sought to educate the public and state officials on the legal deficiencies surrounding the June 28 Letters.  More broadly, the Protect Democracy Project has filed multiple rounds of FOIA requests with several federal agencies regarding the founding and operation of the Commission, and it has initiated litigation in federal district court to enforce some of those requests.  The information that the PRA required the Commission to disclose would have facilitated Plaintiffs' mission.  Had Plaintiffs received the information to which they were entitled, they would have sought to educate the public on the implications of that information, and would have organized their own advocacy strategies to respond appropriately to those disclosures.

74.     Had the Commission provided the opportunity for public comment prescribed by the statute, Plaintiffs would have availed themselves of that opportunity to submit comments urging the Commission to refrain from any information collection that threatens to undermine democratic participation.  This could include, among other things, comments based on Plaintiffs' expertise and mission relating to:  (1) the absence of any justification for creating a nationwide voter database, (2) the potentially harmful effects on democratic participation of the mere request for such sweeping data, (3) the risks inherent in creating a database without sufficient safeguards geared toward data maintenance and security, or (4) the implications of such an information collection under the Privacy Act or other applicable sources of law.

75.     As a result of the foregoing deficiencies, mandamus relief is appropriate to stop the Commission's ongoing violation of the PRA.

76.     No adequate alternative remedy exists to mandamus relief.

### Count Two

**(Violation of the Administrative Procedure Act, 5 U.S.C. § 706, Against the OMB Defendants for Unlawfully Withholding or Delaying Agency Action as Required by the PRA, 44 U.S.C. § 3517)**

77.     Plaintiffs incorporate by reference the allegations of the preceding paragraphs.

78.     For the reasons described in paragraphs 60-76, the June 28 Letters violated the mandatory procedural requirements of the PRA.

79.     Pursuant to 42 U.S.C. § 3517, "[a]ny person may request the Director [of OMB] to review any collection of information conducted by or for any agency to determine, if, under this subchapter, a person shall maintain, provide, or disclose the information to or for the agency.  Unless the request is frivolous, the Director shall, in coordination with the

agency responsible for the collection of the information – (1) respond to the request within 60 days after receiving the request, unless such period is extended by the Director to a specified date and the person making the request is given notice of such extension; and (2) take appropriate remedial action, if necessary."

80.     On July 3, 2017, Plaintiff United to Protect Democracy transmitted by facsimile and email a letter to the Director of OMB outlining the reasons that the June 28 Letters violate the PRA's procedural requirements.  Invoking § 3517, the letter to the Director of OMB "request[ed] that [the Director of OMB] review the collections of information described in this letter and take necessary remedial action as soon as possible."

81.     Under § 3517, the Director of OMB was required to respond to that request within 60 days of receipt of the letter.  That response would therefore have been required on September 1, 2017.

82.     To date, Director Mulvaney has not responded to Plaintiff's July 3, 2017 request. He has therefore unlawfully withheld or unreasonably delayed agency action required by 44 U.S.C. § 3517(b), and Plaintiff is entitled to relief under 5 U.S.C. § 706(1).

83.     Director Mulvaney is also required by the statute to take appropriate remedial action.  On information and belief, Director Mulvaney has not taken appropriate remedial action relating to the June 28 Letters.  He has therefore unlawfully withheld or unreasonably delayed agency action required by 44 U.S.C. § 3517(b), and Plaintiff is entitled to relief under 5 U.S.C. § 706(1).

## Count Three

**(For Declaratory Judgment, as provided for by 28 U.S.C. § 2201-2202, that Defendant Presidential Advisory Commission on Election Integrity is in Violation of the PRA, 44 U.S.C. §§ 3506-3507, and Defendant OMB is in Violation of the Administrative Procedure Act, 5 U.S.C. § 706)**

84.     For the reasons provided in paragraphs 60-76, Defendant Presidential Advisory Commission on Election Integrity is in violation of the PRA.

85.     Plaintiffs are entitled to a declaration that Defendant Presidential Advisory Commission on Election Integrity is in violation of the PRA.

86.     For the reasons provided in paragraphs 77-83, Defendants OMB and Mulvaney are unlawfully withholding or delaying agency action in violation of the Administrative Procedure Act.

87.     Plaintiffs are entitled to a declaration that Defendants OMB and Mulvaney are in violation of the Administrative Procedure Act.

**Prayer for Relief**

WHEREFORE, Plaintiffs pray for relief as follows:

1.  That the Court determine that it has jurisdiction over this action.

2.  That the Court declare that Defendant Presidential Advisory Commission on Election Integrity has violated the relevant provisions of the PRA.

3.  That the Court declare that Defendants Mulvaney and OMB have unlawfully withheld or delayed agency action in violation of the Administrative Procedure Act.

4.  That the Court enter judgment against Defendant Presidential Advisory Commission on Election Integrity and in favor of Plaintiff and that the Court issue a writ of mandamus directing the Commission to comply with all mandatory provisions of PRA by (1) immediately ceasing all collection of information pursuant to the June 28 Letters, (2) immediately ceasing analysis or distribution to other government agencies of information already collected pursuant to the June 28 Letters, (3) immediately destroying, returning, or otherwise sequestering any information already collected pursuant to the June 28 Letters, and (4) immediately taking any other actions necessary to comply with the non-discretionary provisions of the PRA.

5.  That the Court enter judgment against Defendants Mulvaney and OMB for injunctive relief directing those Defendants to take all appropriate remedial actions to cure violations of the PRA effected by the June 28 Letters, including, but not limited to, taking action sufficient to ensure that the Commission (1) immediately ceases collecting of information pursuant to the June 28 Letters, (2) immediately ceases analysis or distribution to other government agencies of information already collected pursuant to the June 28 Letters, (3) immediately destroys, returns, or otherwise sequesters any

information already collected pursuant to the June 28 Letters, and (4) immediately takes

any other action necessary to comply with the applicable provisions of the PRA.

6. That the Court award attorneys' fees and litigation costs to Plaintiffs' attorneys.

7. That the Court grant all other and further relief as it may deem necessary and appropriate.


Dated this 29th Day of September, 2017

Respectfully submitted by,


<table>
<tr><td></td><td>      /s/ Danielle Conley      </td></tr>
<tr><td>Laurence M. Schwartztol (<em>Pro hac vice</em> to be filed)</td><td>Danielle Conley (D.C. Bar #503345)</td></tr>
<tr><td>Justin Florence (D.C. Bar. #988953)</td><td>Lynn Eisenberg (D.C. Bar #1017511)</td></tr>
<tr><td>THE PROTECT DEMOCRACY PROJECT</td><td>Michael Posada (<em>Pro hac vice</em> to be filed)</td></tr>
<tr><td>10 Ware Street</td><td>WILMER CUTLER PICKERING HALE & DORR LLP</td></tr>
<tr><td>Cambridge, MA 02138</td><td>1875 Pennsylvania Avenue NW</td></tr>
<tr><td>(202) 856-9191</td><td>Washington, D.C.  20006</td></tr>
<tr><td></td><td>(202) 663-6000</td></tr>
</table>