UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED TO PROTECT DEMOCRACY et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil No. 17-02016 (RC) |
| | ) | |
| | ) | |
| PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY et al. | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MOTION FOR A PRELIMINARY INJUNCTION

Pursuant to Federal Rule of Civil Procedure 65 and Local Civil Rule 65.1, Plaintiffs,

United to Protect Democracy and the Protect Democracy Project, Inc., respectfully move for

preliminary injunctive relief requiring that (1) the Presidential Advisory Commission on Election

Integrity (the "Commission") cease its collection of data and delete and/or sequester any

information collected unless and until it satisfies the procedures prescribed by the Paperwork

Reduction Act, 44 U.S.C. §§ 3501 *et seq.*, before seeking to collect such information; and (2) the

Director of the Office of Management and Budget, Defendant Mick Mulvaney, review the

Commission's violation of the Paperwork Reduction Act and take appropriate remedial action to

cure that violation.

This motion is supported by the attached Memorandum of Law in Support of Plaintiffs'

Motion for a Preliminary Injunction and related declarations and exhibits.

Respectfully submitted,

Date: October 11, 2017

Laurence M. Schwartztol
  (*Pro hac vice* pending)
Justin Florence (D.C. Bar #988953)
THE PROTECT DEMOCRACY PROJECT
10 Ware Street
Cambridge, MA 02138
(202) 856-9191

Danielle Conley (D.C. Bar #503345)
Lynn Eisenberg (D.C. Bar #1017511)
Jason Hirsch (*Pro hac vice* forthcoming)
Michael Posada (*Pro hac vice* pending)
WILMER CULTER PICKERING
  HALE & DORR LLP
1875 Pennsylvania Avenue NW
Washington, D.C. 20006
(202) 663-6000

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED TO PROTECT DEMOCRACY et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | Civil No. 17-02016 (RC) |
| | ) | |
| | ) | |
| **PRESIDENTIAL ADVISORY COMMISSION** | ) | |
| **ON ELECTION INTEGRITY et al.** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Laurence M. Schwartztol
  (*Pro hac vice* pending)
Justin Florence (D.C. Bar #988953)
THE PROTECT DEMOCRACY PROJECT
10 Ware Street
Cambridge, MA 02138
(202) 856-9191

Danielle Conley (D.C. Bar #503345)
Lynn Eisenberg (D.C. Bar #1017511)
Jason Hirsch (*Pro hac vice* forthcoming)
Michael Posada (*Pro hac vice* pending)
WILMER CUTLER PICKERING
  HALE & DORR LLP
1875 Pennsylvania Avenue NW
Washington, D.C. 20006
(202) 663-6000

**TABLE OF CONTENTS**

Page

Introduction ................................................................................................................. 1

Factual Background ...................................................................................................... 3

   I.   The Paperwork Reduction Act ............................................................................ 3

   II.  The Commission's Request for Information from State Election Officials ...................... 6

      A.  The President's Establishment of the Commission Within the Executive Branch ........ 6

      B.  The Commission's Data Requests .............................................................. 7

   III. United to Protect Democracy's Request to Defendants Mulvaney and OMB to Review the Commission's Information Collection and Take Appropriate Remedial Action ..................................................................................... 14

Argument .................................................................................................................. 14

   IV. Plaintiffs Have Standing to Challenge the Commission's and OMB's Failures To Comply with the PRA ....................................................................... 16

      A.  Plaintiffs Have Informational Standing .......................................................... 16

   V.  Plaintiffs are Likely to Succeed on the Merits of Their Claims ........................... 20

      A.  The Commission's Collection of Information is in Clear Violation of the PRA ......... 21

      B.  Plaintiffs are Likely to Succeed on the Merits in Obtaining Mandamus Requiring the Commission to Comply with the Requirements of the PRA ..................... 25

      C.  Plaintiffs are Likely to Succeed on the Merits of their APA Claim that Defendants OMB and Mulvaney Unlawfully Withheld or Unreasonably Delayed the Agency Action Mandated by § 3517(b) ............................................. 29

   VI. Plaintiffs Will Suffer Irreparable Harm if A Preliminary Injunction is Not Granted ........ 34

   VII. The Balance of Equities Favors a Preliminary Injunction ............................... 35

   VIII. The Public Interest Will be Served by a Preliminary Injunction ...................... 36

Conclusion ............................................................................................................... 38

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aamer v. Obama,*
    742 F.3d 1023 (D.C. Cir. 2014).................................................................15

*Alabama v. Bozeman,*
    533 U.S. 146 (2001)...................................................................................24

\*American Hospital Association v Burwell,*
    812 F.3d 183 (D.D.C. 2016)..........................................................24, 25, 30

*Anderson v. Yungkau,*
    329 U.S. 482 (1947)...................................................................................24

*Anglers Conservation Network v. Pritzker,*
    809 F.3d 664 (D.C. Cir. 2016)...................................................................24

*Blue Water Navy Vietnam Veterans Association, Inc. v. McDonald,*
    830 F.3d 570 (D.C. Cir. 2016)...................................................................27

*Central Bank of Denver v. First Interstate Bank,*
    511 U.S. 164 (1994)...................................................................................24

*CityFed Finance Corp. v. Office of Thrift Supervision,*
    58 F.3d 738 (D.C. Cir. 1995)......................................................................15

*Citizens for Responsibility & Ethics in Washington v. Executive Office of President,*
    587 F. Supp. 2d 48 (D.D.C. 2008)........................................................27, 28

*Cresote Council v. Johnson,*
    555 F. Supp. 2d 36 (D.D.C. 2008)..............................................................37

*Dole v. United Steelworkers of America,*
    494 U.S. 26 (1990).....................................................................................14

\*Electronic Privacy Information Center v. Presidential Advisory Commission on Election Integrity,*
    No. 1:17-cv-01320, 2017 WL 3141907 (D.D.C. July 24, 2017), *appeal docketed,*
    No. 17-5171 (D.C. Cir. July 27, 2017) .............................................*passim*

*Environmental Defense Fund v. U.S. Nuclear Regulatory Commission,*
    902 F.2d 785 (10th Cir. 1990) ...................................................................33

*Federal Election Commission v. Akins,*
    524 U.S. 11 (1998)........................................................................16, 17, 19

*Freedom Watch, Inc. v. Obama,*
    807 F. Supp. 2d 28 (D.D.C. 2011).................................................................27

*Friends of Animals v. Jewell,*
    824 F.3d 1033 (D.C. Cir. 2016), *cert. denied*, 137 S. Ct. 388 (2016) ....................16

*Friends of Animals v. Jewell,*
    828 F.3d 989 (D.C. Cir. 2016)......................................................................16

*Gates v. Schlesinger,*
    366 F. Supp. 797 (D.D.C. 1973)...................................................................37

*Illinois Board of Elections v. Socialist Workers Party,*
    440 U.S. 173 (1979)......................................................................................1

*In re American Rivers & Idaho Rivers United,*
    372 F.3d 413 (D.C. Cir. 2004).......................................................................33

*In re Core Communications, Inc.,*
    531 F.3d 849 (D.C. Cir. 2008).......................................................................31

*In re Medicare Reimbursement Litigation,*
    414 F.3d 7 (D.C. Cir. 2005)..........................................................................28

*In re United Mine Workers of America International Union,*
    190 F.3d 545 (D.C. Cir. 1999).......................................................................32

*Jasperson v. Federal Bureau of Prisons,*
    460 F. Supp. 2d 76 (D.D.C. 2006)..................................................................15

*Judicial Watch, Inc. v. National Energy Policy Development Group,*
    219 F. Supp. 2d 20 (D.D.C. 2002)..................................................................28

*Judicial Watch, Inc. v. U.S. Department of Commerce,*
    736 F. Supp. 2d 24 (D.D.C. 2010)..................................................................25

*Kucana v. Holder,*
    558 U.S. 233 (2010)....................................................................................23

*Lawyers' Committee for Civil Rights Under Law v. Presidential Advisory*
    *Commission of Election Integrity,*
    No. 17-cv-1354, 2017 WL 3028832 (D.D.C. July 18, 2017)..................................34

*League of Women Voters of United States v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016)......................................................................36, 38

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach,*
    523 U.S. 26 (1998).....................................................................................24

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)............................................................................16

*Main Street Legal Services, Inc. v. National Security Council,*
    811 F.3d 542 (2d Cir. 2016) ..........................................................23

*McCutcheon v. Federal Election Commission,*
    134 S. Ct. 1434 (2014).......................................................................1

*New Jersey, Department of Environmental Protection v. U.S. EPA,*
    626 F.2d 1038 (D.C. Cir. 1980).....................................................37

*Northern Mariana Islands v. United States,*
    686 F. Supp. 2d 7 (D.D.C. 2009)....................................................37

*People's Mojahedin Organization of Iran,*
    680 F.3d 832 (D.C. Cir. 2012)........................................................32

*Public Citizen v. Federal Trade Commission,*
    869 F.2d 1541 (1989) .....................................................................20

*Public Citizen v. U.S. Department of Justice,*
    491 U.S. 440 (1989)........................................................................16

*R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Administration,*
    823 F. Supp. 2d 36 (D.D.C. 2011).................................................36

*Soucie v. David,*
    448 F.2d 1067 (D.C. Cir. 1971)......................................................23

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016)....................................................................17

*Telecommunications Research & Action Center v. Federal Communications Commission,*
    750 F.2d 70 (D.C. Cir. 1984)..........................................................31

*United Government Security Officers of America, Local 52 v. Chertoff,*
    587 F. Supp. 2d 209 (D.D.C. 2008)................................................26

*Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,*
    559 F.2d 841 (D.C. Cir. 1977)........................................................35

*Western Rangeland Conservation Ass'n v. Zinke,*
    No. 2:14-cv-00327, 2017 WL 2963433 (D. Utah July 11, 2017)............33

**Docketed Cases**

*ACLU v. Trump*, No. 1:17-cv-01351 (D.D.C.) ..............................................7

*Common Cause v. Presidential Advisory Commission on Election Integrity*, No. 1:17-cv-1398 (D.D.C.)......................................................................................11

*\*Electronic Privacy Information Center v. Presidential Advisory Commission on Election Integrity*, No. 1:17-cv-01320 (D.D.C.)..............................................*passim*

*Joyner v. Presidential Advisory Commission on Election Integrity*, No. 1:17-cv-22568 (S.D. Fla.) ...............................................................................................11

*\*Lawyers' Committee For Civil Rights Under Law v. Presidential Advisory Commission on Election Integrity*, No. 1:17-cv-03154 (D.D.C.).............................................7

*NAACP Legal Defense & Educucational Fund v. Trump*, No. 1:17-cv-5427 (S.D.N.Y.) .............7

*Public Citizen, Inc. v. U.S. Department of the Army*, No. 1:17-cv-01355 (D.D.C.) ....................11

**Codes, Statutes & Regulations**

5 C.F.R.
    § 1320.3(c)............................................................................................................4
    § 1320.3(c)(1).................................................................................................4, 23
    § 1320.10(a).........................................................................................................17
    § 1320.10(g)...................................................................................................30, 33

5 U.S.C.
    Appendix................................................................................................................13
    § 551 .....................................................................................................................23
    § 551(1).................................................................................................................22
    § 706.................................................................................................................15, 29
    § 706(1)............................................................................................................29, 33

28 U.S.C. § 1361..................................................................................................................25

38 U.S.C. § 511(a)...............................................................................................................27

44 U.S.C.

§ 3052(1)(A) ..............................................................................21, 24
§ 3052(1)(B) ..............................................................................21, 24
§ 3052(1)(C) ..............................................................................21, 24
§ 3052(1)(D) ..............................................................................21, 24
§ 3501 *et seq.* ..............................................................................1, 3
§ 3501(1) ..............................................................................5, 37
§ 3501(2) ..............................................................................2, 23, 37
§ 3501(3) ..............................................................................5
§ 3501(4) ..............................................................................5
§ 3501(5) ..............................................................................5
§ 3501(6) ..............................................................................5
§ 3501(8) ..............................................................................5
§ 3501(10) ..............................................................................6
§ 3502(1) ..............................................................................4, 21, 22
§ 3502(3) ..............................................................................4
§ 3504 ..............................................................................2
§ 3506(a) ..............................................................................3, 20
§ 3506(c) ..............................................................................34
§ 3506(c)(1) ..............................................................................1, 4, 17
§ 3506(c)(2) ..............................................................................1, 19
§ 3506(c)(3) ..............................................................................4
§ 3507(a) ..............................................................................*passim*
§ 3507(c) ..............................................................................18, 27
§ 3507(c)(3) ..............................................................................5
§ 3507(d) ..............................................................................18
§ 3507(d)(5) ..............................................................................27
§ 3507(d)(6) ..............................................................................27
§ 3512(b) ..............................................................................35
§ 3517 ..............................................................................*passim*
§ 3517(b) ..............................................................................2, 14

Federal Reports Act, Pub. L. 77-831, 56 Stat. 1078 (1942) ........................22

**Other Authorities**

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts (2012).....25

Executive Order No. 13,799, 82 Fed. Reg. 22,389 (May 11, 2017)..........................6

GAO-05-424 Paperwork Reduction Act (May 2005) ............................................21

S. Rep. No. 96-930 (1980)..............................................................................22

S. Rep. No. 104-8 (1995)..............................................................................22

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

### INTRODUCTION

"There is no right more basic in our democracy than the right to participate in electing our political leaders." *McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434, 1440-41 (2014) (plurality opinion).   Because "voting is of the most fundamental significance under our constitutional structure," *Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979), when the federal government takes action in this area, it must do so carefully and should take extra care to ensure that it is acting in strict compliance with applicable law.   But the Presidential Advisory Commission on Election Integrity (the "Commission"), established in May of this year, has done just the opposite.   Within weeks of its inception, the Commission embarked on an effort to procure information about every registered voter in each state and the District of Columbia, including voters' party affiliation, voting history, criminal records, and personally identifying information.   Yet in doing so, it made no attempt to comply with the requirements of the Paperwork Reduction Act (the "PRA" or the "Act"), 44 U.S.C. §§ 3501 *et seq.*, which imposes a mandatory framework that federal agencies *must* adhere to before collecting information from the public, including from the states.

The PRA requires, among other things, that the government analyze the benefits and burdens of any prospective collection of information and disclose why and how the government seeks to collect information from the public and the burdens that doing so will impose on those from whom the information is sought.   44 U.S.C. § 3506(c)(1).   In addition to those disclosures, the Act requires the government to provide a 60-day notice in the Federal Register seeking public comment on the contemplated collection of information.   *Id.* § 3506(c)(2).   Congress determined that requiring these steps will "ensure the greatest *possible public benefit from* and maximize the

utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government." *Id.* § 3501(2) (emphasis added).

Unsurprisingly, the consequences flowing from the Commission's decision to violate the PRA have been and will continue to be significant.   Collecting sensitive data regarding millions of people without sufficient protection and privacy safeguards may put the data of millions of Americans at risk and may increase the vulnerability of voter registration systems to hackers.   Indeed, the mere specter of the Commission's data-collection has caused thousands of citizens to de-register from their state's voter rolls—an immediate blow to the proper functioning of our democracy.

By not complying with the PRA, the Commission has deprived Plaintiffs, United to Protect Democracy and the Protect Democracy Project, Inc., of information guaranteed by statute about the Commission's plans for the data, and it has prevented Plaintiffs from participating in notice and comment before the information collection begins.   As a result, the Commission has impaired Plaintiffs' ability to engage in public education and advocacy about the Commission's activities or to mobilize members of the public to participate in the statutorily prescribed process *before any such collection occurs.*

Plaintiffs have used the mechanism built into the PRA to demand the Commission's compliance, but to no avail.   The Act directs the Office of Management and Budget ("OMB") to oversee the government's compliance with the PRA, *see* 44 U.S.C. § 3504, and provides that "[a]ny person may request the Director to review any collection of information" for noncompliance, *id.* § 3517(b).   OMB must "respond to the request within 60 days after receiving" it and "take appropriate remedial action, if necessary." *Id.* § 3517(b).   Plaintiffs followed these

procedures, but sixty days passed without any response from OMB and without any remedial action having been taken.

The equitable power of this Court represents Plaintiffs last chance for relief. As such, Plaintiffs respectfully move this Court to enter a preliminary injunction to prevent the Commission from collecting or using information from the public in violation of the PRA until Plaintiffs' claims have been resolved. The relief Plaintiffs seek here is narrow and straightforward: the Commission ought not to be allowed to move forward with its massive data collection effort unless and until it complies with the PRA's mandatory provisions. Whether one supports or opposes the Commission's work, there is no question that its activities are of substantial public interest and concern, especially for organizations like Plaintiffs dedicated to democratic values. Impairing Plaintiffs' ability to participate in public debate on such a central topic by ignoring federal law is, therefore, a serious injury. And that injury can only be remedied if Plaintiffs are provided the information to which they are entitled *before* the Commission's work proceeds any further. Otherwise, Plaintiffs will be prevented from effectively engaging with citizens about the propriety of the Commission's work in time to effectively utilize the democratic process to respond to it. This Court, however, by granting the preliminary injunction, can ensure that the important questions raised in this case are properly adjudicated before it is too late to bring the Commission into compliance with the PRA and Plaintiffs suffer irreparable harm.

## FACTUAL BACKGROUND

### I.    THE PAPERWORK REDUCTION ACT

The PRA establishes the legal framework that governs the executive branch of the federal government when it collects information from individuals or other non-federal actors, including state governments. *See* 44 U.S.C. §§ 3501 *et seq.* Specifically, it applies to agencies when they initiate a "collection of information." *Id.* § 3506(a). A "collection of information" includes,

among other things, "obtaining, causing to be obtained, soliciting, or requiring the disclosure to

third parties or the public, of facts or opinions by or for an agency, regardless of form or format,

calling for either [] answers to identical questions posed to . . . ten or more persons, other than

agencies, instrumentalities, or employees of the United States." *Id.* § 3502(3). A "collection of

information" may be "mandatory, voluntary, or required to obtain or retain a benefit." 5 C.F.R. §

1320.3(c)(1).[1] An "agency" is defined broadly under the PRA to include "any executive

department, military department, Government corporation, Government controlled corporation, or

other establishment in the executive branch of the Government (including the Executive Office of

the President), or any independent regulatory agency," with certain enumerated exceptions not

relevant here. *Id.* § 3502(1).

 The PRA is organized around a set of procedural requirements that agencies must follow

when they seek collections of information from the public. An agency "shall not conduct or

sponsor the collection of information" unless it complies with detailed procedural requirements.

*Id.* § 3507(a). Those requirements are extensive. They include analyzing the need for the

collection, the burdens it will impose, and the systems in place for conducting the collection

consistently with the overall mandate of the statute; providing a 60-day notice in the Federal

Register for public comment on the contemplated collection of information; certifying to the

Director of OMB that the proposed collection comports with the requirements of the statute; and

publishing a second notice in the Federal Register describing the proposed collection and

informing the public how it may submit comments to OMB. *Id.* (citing 44 U.S.C. §

3506(c)(1)-(3)). Even after satisfying those requirements, an agency may only proceed if the

---

[1] *See generally* Cass R. Sunstein, Administrator, Office of Information and Regulatory Affairs, "Memorandum for the Heads of Executive Departments and Agencies, and Independent Regulatory Agencies regarding Information Collection Under the Paperwork Reduction Act" (Apr. 7, 2010) ("The requirements of the PRA apply to voluntary collections as well as mandatory collections.") (citing 44 U.S.C. § 3502(3); 5 C.F.R. § 1320.3(c)), https://obamawhitehouse.archives.gov/sites/default/files/omb/assets/inforeg/PRAPrimer_04072010.pdf.

Director of OMB has approved the proposed collection and issued a control number to be displayed on the collection of information. *Id.*[2]

Congress imposed these requirements to advance a range of important interests that arise when the federal government seeks to collect information from the public, including states. First, Congress sought to "minimize the paperwork burden for individuals, small businesses, educational and nonprofit institutions, Federal contractors, State, local and tribal governments, and other persons resulting from the collection of information by or for the Federal Government." 44 U.S.C. § 3501(1). Second, Congress wanted to "improve the quality and use of Federal information to strengthen decisionmaking, accountability, and openness in Government and society" while also "minimiz[ing] the cost to the Federal Government of the creation, collection, maintenance, use, dissemination, and disposition of information." *Id.* § 3501(4), (5); *see also id.* § 3501(3) (describing the PRA "as a means to improve the productivity, efficiency, and effectiveness of Government programs, including the reduction of information collection burdens on the public and the improvement of service delivery to the public"). Third, the PRA promotes federalism interests, and it is intended to "strengthen the partnership between the Federal Government and State, local, and tribal governments by minimizing the burden and maximizing the utility of information created, collected, maintained, used, disseminated, and retained by or for the Federal Government." *Id.* § 3501(6)). Fourth, Congress enacted the PRA to ensure that the federal government addressed critical privacy, security, and technology concerns inherent in the collection, maintenance, and dissemination of information. *See id.* § 3501(8) ("ensure that the creation, collection, maintenance, use, dissemination, and disposition of information by or for the Federal Government is consistent with applicable laws, including laws relating to … privacy and

---

[2] The Director's approval is inferred and a control number assigned if the Director has not notified the agency of denial or approval within 60 days. 44 U.S.C. § 3507(c)(3).

confidentiality … security of information … [and] access to information. …"); *id.* § 3501(10)

("ensure that information technology is acquired, used, and managed to improve performance of

agency missions, including the reduction of information collection burdens on the public.").    In

enacting the PRA, Congress determined that the procedural requirements contained

therein—including seeking and considering advice from the public before engaging in a collection

of information—would advance these important goals.

## II.    THE COMMISSION'S REQUEST FOR INFORMATION FROM STATE ELECTION OFFICIALS

### A.    The President's Establishment of the Commission Within the Executive Branch

The Commission was established by President Donald Trump on May 11, 2017.  *See*

Exec. Order No. 13,799, 82 Fed. Reg. 22,389 (May 11, 2017).    The Executive Order establishing

the Commission states that the Vice President shall serve as chair and that the Commission shall be

composed of not more than 15 additional members, to be appointed by the President.  *Id.*   It

further provides that "[t]he Commission shall, consistent with applicable law, study the

registration and voting processes used in Federal elections" and that the Commission will submit a

report to the President on several topics relating to voting processes, including "those

vulnerabilities in voting systems … that could lead to improper voter registration and improper

voting, including fraudulent voter registration and fraudulent voting."   *Id.*   The Commission, in

other words, has been charged with delivering a report that may influence the administration of

election systems around the country.

The Commission has generated significant concerns about its ability to exercise its

authority in a credible way.   Several members of the Commission have extensive records of

espousing non-credible theories of widespread voter fraud and championing policies that would

disenfranchise eligible voters.  *See* Dartunorro Clark, "Trump Vote Fraud Commission Could

Not Be More Divided," *NBC News* (July 21,

2017), https://www.nbcnews.com/politics/white-house/trump-vote-fraud-commission-hopelessly

-divided-n785461 (explaining that multiple members of the Commission have attempted to

increase restrictions on voter registration and have made the unsubstantiated claim that millions

voted illegally in the 2016 presidential election); Vann R. Newark II, "Trump's Voter-Fraud

Commission Has Its First Meeting," *The Atlantic* (July 19,

2017), https://www.theatlantic.com/politics/archive/2017/07/trumps-voter-fraud-commission-ru

ns-into-a-roadblock/534084/ (describing how Commission Vice Chair Kris Kobach and other

members of the Commission have engaged in voter suppression).    For example, the

Commission's Vice Chair, Kris Kobach, has not shied away from raising unsubstantiated claims of

voter fraud in connection with his work on the Commission; while in New Hampshire for a

Commission hearing, Vice Chair Kobach stated—without providing support—that he now has

proof that out-of-state, ineligible voters swung New Hampshire's election 2016.    *See* Michelle Ye

Hee Lee, "Kris Kobach's Claim That There is Now 'Proof' of Voter Fraud in New Hampshire,"

*The Washington Post* (Sept. 25, 2017),

https://www.washingtonpost.com/news/fact-checker/wp/2017/09/25/kris-kobachs-claim-that-ther

e-is-now-proof-of-voter-fraud-in-new-hampshire/?utm_term=.4e04cbec72e7.[3]

## B.    The Commission's Data Requests

On June 28, 2017, the Commission sent substantially identical letters (the "June 28

Letters") to the Secretaries of State or other chief election officials in all 50 states and the District

of Columbia.    *See* Eisenberg Decl., Ex. A (providing one example of a letter sent to all states and

---

[3] Multiple pending lawsuits argue that the President's failure to appoint commissioners reflecting a balanced spectrum of viewpoints or relevant substantive expertise renders its composition unlawful.    *See NAACP Legal Def. & Educ. Fund v. Trump*, No. 1:17-cv-5427 (S.D.N.Y. filed July 18, 2017); *ACLU v. Trump*, No. 1:17-cv-01351 (D.D.C. filed July 10, 2017); *Lawyers' Comm. For Civil Rights Under Law v. Presidential Advisory Comm'n on Election Integrity*, No. 1:17-cv-03154 (D.D.C. filed July 10, 2017).

District of Columbia).[4]   The June 28 Letters were signed by the Commission's Vice Chair, Kris

Kobach, and appeared on the Commission's letterhead.   *Id.*   These letters "invited" recipients to

provide information and opinions on several complex policy questions relating to election

administration.   *Id.*   They sought, for example, opinions on potential changes to federal election

law related to election integrity, "evidence or information" relating to voter fraud, information on

"convictions for election-related crimes" since the November 2000 election, and

recommendations for preventing voter intimidation or disenfranchisement.   *Id.*

      In addition to these requests for narrative answers, the June 28 Letters asked state officials

to provide the Commission with extensive information about every registered voter in their states.

Specifically, the letters "request[ed]" that each recipient "provide to the Commission the

publicly-available voter roll data for [your state], including, if publicly available under the laws of

your state, the full first and last names of all registrants, middle names or initials if available,

addresses, dates of birth, political party (if recorded in your state), last four digits of social security

numbers if available, voter history (elections voted in) from 2006 onward, active/inactive status,

cancelled status, information regarding any felony convictions, information regarding voter

registration in another state, information regarding military status, and overseas citizen

information."   *Id.*   The June 28 Letters advised recipients that they "may submit [their] responses

electronically to ElectionIntegrityStaff@ovp.eop.gov or by utilizing the Safe Access File

Exchange ('SAFE'), which is a secure FTP site the federal government uses for transferring large

data files."   *Id.*   The Letters asked for responses by July 14, 2017, and stated that "any documents

that are submitted to the full Commission will also be made available to the public."   *Id.*

---

[4] The Commission has posted all of the letters on its website, at
https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/information-requests-to-states-06282017.pdf.

Almost immediately, the data requests contained in the June 28 Letters sparked alarm among state election officials throughout the country.[5]   Many of those officials expressed deep concern about the privacy and data security implications of providing responses to such sweeping requests for voter data.   In addition to concerns raised by state election officials, experts in several fields also quickly criticized the Commission's efforts to create a new nationwide database of voter information.   Voting rights experts have articulated a broad set of concerns about how the requests could fuel the Commission's efforts at voter suppression.   *See, e.g.*, Christopher Ingraham, "How Trump's nationwide voter data request could lead to voter suppression," *Washington Post* (June 30),

https://www.washingtonpost.com/news/wonk/wp/2017/06/30/how-trumps-nationwide-voter-data -request-could-lead-to-voter-suppression/?utm_term=.aaa1e15b851b.   Experts in cybersecurity pointed to risks inherent in consolidating such sensitive data without a clear plan for managing it securely.   For example, shortly after the Commission issued its data requests, former Secretary of Homeland Security Michael Chertoff published an op-ed in the *Washington Post* in which he stated, among other things:

> [W]hatever the political, legal and constitutional issues raised by this data request, one issue has barely been part of the public discussion: national security...   We know that a database of personal information from all voting Americans would be attractive not only to adversaries seeking to affect voting but to criminals who could use the identifying information as a wedge into identity theft.   We also know that foreign intelligence agencies seek large databases on Americans for intelligence and counterintelligence purposes.

---

[5] *See, e.g.,* Daniel Desrochers, "Grimes stiffing Trump committee's request for 'sensitive personal data' of voters," *Lexington Herald Leader* (June 30, 2017), http://www.kentucky.com/news/politics-government/article159011489.html; California Secretary of State, "Secretary of State Alex Padilla Responds to Presidential Election Commission Request for Personal Data of California Voters," (June 29, 2017), http://www.sos.ca.gov/administration/news-releases-and-advisories/2017-news-releases-and-advisories/secretary-sta te-alex-padilla-responds-presidential-election-commission-request-personal-data-california-voters/; Dennis Domrzalski, "Pushback: NM SOS Won't Give Voter Info to Trump Commission," *ABQ Free Press Weekly* (June 30 2017), http://www.freeabq.com/2017/06/30/toulouse-oliver-wint-give-trump-voter-info/.

Michael Chertoff, "Trump Voter Data Request Poses an Unnoticed Danger," *Washington Post*

(July 5, 2017),

https://www.washingtonpost.com/opinions/trumps-voter-data-request-poses-an-unnoticed-danger

--to-national-security/2017/07/05/470efce0-60c9-11e7-8adc-fea80e32bf47_story.html?utm_term

=.693b26dd96a2.   Chertoff highlighted, in particular, the critical importance of establishing a

plan for maintaining such data securely and emphasized that, in constructing such a plan, the

details matter.  *Id.*

  According to news reports, the Commission's data requests had an immediate, negative

burden on democratic participation.   Several state election officials told media outlets that

thousands of voters have apparently withdrawn their registration to avoid having their personal

information transmitted to the Commission's national database of voter information.[6]   Indeed, the

Director of Elections for Denver, Colorado, published a column on July 10, 2017, stating that

"[t]he effect of the request to states for voter data from the [the Commission] is concerning

because it is causing voters to disengage" and that in the week following the June 28 Letters,

Denver experienced a "2,150 percent increase in voter registration withdrawals."   Amber F.

McReynolds, "Trump's voter commission is frightening away Denver voters," *The Denver Post*

(July 10, 2017),

---

[6] *See, e.g.*, Blair Miller, "5,300+ Colorado Voters Withdraw Registration as State Prepares to Send Info. to Trump Commission," *TheDenverChannel.com* (July 31, 2017),
http://www.thedenverchannel.com/news/politics/5300-colorado-voters-withdraw-registration-as-state-prepares-to-send-info-to-trump-commission; Lauren Pearle et al., "What to know about Trump's election commission as it faces pushback, legal challenges," *ABC News* (July 19, 2017),
http://abcnews.go.com/Politics/trumps-election-commission-holds-1st-meeting-amid-pushback/story?id=48713462 (reporting officials in several states stating that voters were de-registering in response to Commission's data request); Lynn Bonner, "NC elections office swamped with calls about voter data going to fraud commission," *The News & Observer* (July 7, 2017),
http://www.newsobserver.com/news/politics-government/politics-columns-blogs/under-the-dome/article160188674.html (stating that Executive Director for the Bipartisan State Board of Elections & Ethics Enforcement reported some voters asking to cancel their registration); Joseph Flaherty, "Maricopa County Recorder: Arizona Flip-Flopped on Sending Voter Data to Kobach Panel," *Phoenix New Times* (July 5, 2017),
http://www.phoenixnewtimes.com/news/arizona-reverses-course-on-sending-voter-data-to-trump-commission-9472162 (reporting that Maricopa County Recorder stated that his office received dozens of phone calls, emails, and messages from voters requesting to cancel their registration, and that other county recorders received similar messages).

http://www.denverpost.com/2017/07/10/trumps-voter-commission-is-frightening-away-denver-v
oters.

Reflecting the array of concerns inherent in the government's attempt to collect the
information sought by the June 28 Letters, the requests for data spawned numerous legal
challenges. *See, e.g.*, *Common Cause v. Presidential Advisory Comm'n on Election Integrity*,
No. 1:17-cv-1398 (D.D.C. filed July 14, 2017); *Public Citizen, Inc. v. U.S. Dep't of the Army*, No.
1:17-cv-01355 (D.D.C. filed July 10, 2017); *Joyner v. Presidential Advisory Comm'n on Election
Integrity*, No. 1:17-cv-22568 (S.D. Fla. filed July 10, 2017); *Electronic Privacy Info. Ctr. v.
Presidential Advisory Comm'n on Election Integrity* ("*EPIC*"), No. 1:17-cv-01320 (D.D.C. filed
July 3, 2017).

Those lawsuits unearthed additional information about the June 28 Letters and caused the
Commission to temporarily suspend its efforts to collect information from voting officials around
the country.  For example, the plaintiffs in *EPIC* moved for a temporary restraining order to
prevent the Commission from collecting the information outlined in the June 28 Letters.  In
responding to that motion, Commission Vice Chair Kobach submitted a declaration on July 5,
2017, stating, among other things, that when the June 28 Letters were sent: "[he] intended that
narrative responses, not containing voter roll data, be sent via email to the address provided in the
letter.  The email is a White House email address (in the Office of the Vice President) and subject
to the security protecting all White House communications and networks.  For voter roll data, [he]
intended that states use the Safe Access File Exchange ('SAFE'), which is a secure method for
transferring large files up to two gigabytes (GB) in size."  Eisenberg Decl., Ex. C,
¶ 5.  There was no indication of either "intention" in the June 28 Letters, nor did Vice Chair
Kobach or the Commission ever publicize a plan for managing the transfer of information or seek

11

public comment on how to do so appropriately.  In the same declaration, Vice Chair Kobach

further stated: "My letters state that 'documents' submitted to the Commission will be made

available to the public.  That refers only to narrative responses.  With respect to voter roll data,

the Commission intends to de-identify any such data prior to the public release of documents."

*Id.*

      On July 10, 2017, Vice Chair Kobach submitted a subsequent declaration in the *EPIC*

matter.  *See* Eisenberg Decl., Ex. E.   There, he stated that "[t]he Commission no longer intends to

use the DOD SAFE system to receive information from the states," and as an alternative, "the

Director of White House Information Technology is repurposing an existing system that regularly

accepts personally identifiable information through a secure, encrypted computer application

within the White House Information Technology enterprise."  *Id.*   Vice Chair Kobach further

noted that the Commission had sent a communication to state election officials that day requesting

that they "hold" on submitting information in response to the June 28 Letters until the judge in the

*EPIC* matter issued her ruling.  *Id.*

      On July 24, 2017, the court in *EPIC* denied without prejudice the plaintiff's motion for a

temporary restraining order.  Two days later, the Commission sent substantially identical letters

(the "July 26 Letters") to state election officials in all 50 states and the District of Columbia.  *See*

Eisenberg Decl., Ex. B.[7]  The July 26 Letters "renew[ed] the June 28 request" and explained that

"the Commission will not publicly release any personally identifiable information regarding any

individual voter or any group of voters from the voter registration records you submit," *id.*, though

they did not offer details on the de-identification process or address whether the plans for

publication and de-identification of data would comply with the mandatory disclosure provisions

---

[7] The versions of that letter to each state and the District of Columbia are at
https://www.whitehouse.gov/sites/whitehouse.gov/files/docs/letter-vice-chair-kris-kobach-07262017.pdf.

of the Federal Advisory Committee Act, *see* 5 U.S.C. App.   The July 26 Letters further stated that

"the Commission is offering a new tool for you to transmit data directly to the White House

computer system" and directed recipients to contact a member of the Commission's staff who

would then "reach out to [you or] your point of contact to provide detailed instructions for

submitting the data securely."   Eisenberg Decl., Ex. B.   They did not provide any information on

the Commission's plans for managing the transmission and maintenance of data.   *Id.*

      Although the Commission has never explained to the public why it needs or how it plans to

use the data—as required by the PRA—its members have on several occasions indicated an

interest in cross-referencing the newly collected data to other databases maintained by the federal

government.   Vice Chair Kobach has publicly suggested that he would like to see voter

registration data cross-referenced against federal databases that contain information about

immigrants, including those who have naturalized as citizens.[8]   In addition, disclosures that the

Commission was recently compelled to provide in related litigation reveal a steady traffic of

communications between the Commission and the Department of Homeland Security ("DHS"),

which would be consistent with an intention to cross-reference voter data obtained from state

election officials against DHS's databases.   *See* Eisenberg Decl., Ex. F (Rows 364, 383, 384, 445,

472, 475, 681, 682, 693, 701, 703, 705, 706, 711, 735, 744, 749, 750).   The Commission has

never explained how it would execute such analyses across multiple federal databases, what

purpose doing so would serve, how data would be maintained and secured in the course of doing

so, or how it would ensure compliance with applicable federal laws, including the Privacy Act.

---

[8] *See* Amy Sherman, "Trump's Commission Vice Chair Kris Kobach Says Immigration Data not Bounced Against
Voter Rolls," *Politifact: Florida* (May 23, 2017),
http://www.politifact.com/florida/statements/2017/may/23/kris-kobach/trumps-election-commission-chair-kris-koba
ch-says-/; Dave Boyer, "Voter fraud and suppression commission to meet in July," *Washington Times* (June 27, 2017),
http://www.washingtontimes.com/news/2017/jun/27/voter-fraud-and-suppression-commission-to-meet-in-/?utm_sou
rce=RSS_Feedutm_medium=RSS.

Nor has the Commission ever provided an opportunity for members of the public to submit comments on such prospective uses of the data obtained by the Commission.

III.   **UNITED TO PROTECT DEMOCRACY'S REQUEST TO DEFENDANTS MULVANEY AND OMB TO REVIEW THE COMMISSION'S INFORMATION COLLECTION AND TAKE APPROPRIATE REMEDIAL ACTION**

The PRA charges OMB with the responsibility to ensure compliance with the statute's requirements.  *Dole v. United Steelworkers of America*, 494 U.S. 26, 32 (1990) ("Congress designated OMB the overseer of other agencies with respect to paperwork and set forth a comprehensive scheme designed to reduce the paperwork burden.").   It directs OMB to take action when agencies fail do to so.   Specifically, the statute provides that "[a]ny person may request the Director [of OMB] to review any collection of information conducted by or for an agency to determine if ... a person shall maintain, provide, or disclose the information to or for the agency."  44 U.S.C. § 3517(b).   The statute further directs OMB within 60 days to respond to the request and to "take appropriate remedial action, if necessary."  *Id.*

On July 3, 2017, Plaintiff United to Protect Democracy, along with the Brennan Center for Justice, submitted a letter to Defendant Mulvaney invoking § 3517(b).   Bassin Decl., ¶ 9; *id.*, Ex. D.   That letter described in detail the grounds for concluding that the June 28 Letters violated the procedural requirements of the PRA.  *Id.*   It further requested that that Director Mulvaney "review the collections of information" embodied in the June 28 Letters "and take necessary remedial action as soon as possible."  *Id.*   To date, Director Mulvaney has neither responded to that request nor taken remedial action in response to the Commission's clear violations of the PRA.

### ARGUMENT

The Commission's ongoing solicitation of sensitive, personal data from state election officials violates the mandatory obligations of the PRA.   Similarly, OMB has failed to comply

with its legal obligation to review the Commission's requests for this data and take necessary remedial steps. Because the actions of the Commission and inaction of OMB do not comport with the duties imposed upon them by federal law, Plaintiffs seek a preliminary injunction to enjoin the Commission from further data collection, either by (1) directly ordering the Commission to cease its attempts to collect or use data in violation of the PRA, or (2) requiring OMB to take appropriate remedial steps as required by the PRA.

"A plaintiff seeking a preliminary injunction must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tip in his favor, and (4) that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). In addition, "[t]hese factors should be balanced against one another and '[i]f the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak.'" *Jasperson v. Fed. Bureau of Prisons*, 460 F. Supp. 2d 76, 88 (D.D.C. 2006) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)).

Because the Commission is currently engaged in an unlawful collection of information, Plaintiffs seek to immediately halt the Commission's activities. Plaintiffs are likely to succeed in demonstrating that the Commission violated the PRA, that they will suffer irreparable harm as the Commission continues to collect this information, that the equities are in their favor, and that preliminary relief is in the public interest. In addition, because OMB is primarily charged with administering the PRA, Plaintiffs have requested, pursuant to 5 U.S.C. § 706, that this Court compel OMB to respond to its letter request submitted under § 3517 of the PRA and to take the appropriate remedial action here, *i.e.*, to immediately stay and then review the Commission's planned collection of information.

15

IV.    **PLAINTIFFS HAVE STANDING TO CHALLENGE THE COMMISSION'S AND OMB'S FAILURES TO COMPLY WITH THE PRA**

As a threshold matter, Plaintiffs meet the requirements for standing under Article III of the Constitution. The Commission's and OMB's violations of the PRA have harmed Plaintiffs in a particular manner, and this Court can redress that harm through this lawsuit. To meet the minimum requirements for constitutional standing, courts require that a plaintiff demonstrate (1) that the plaintiff has suffered an "injury in fact," meaning the invasion of a legally protected interest that is "concrete and particularized" and "actual or imminent"; (2) a causal connection between the injury and the challenged conduct such that the injury is fairly connected to the challenged conduct; and (3) that it is "likely" rather than "speculative" that the injury will be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

### A.    **Plaintiffs Have Informational Standing**

Under the doctrine of informational standing, a plaintiff may suffer an "injury in fact" when it "fails to obtain information which must be publicly disclosed pursuant to a statute." *Friends of Animals v. Jewell*, 824 F.3d 1033, 1040 (D.C. Cir. 2016), *cert. denied*, 137 S. Ct. 388 (2016) (citing *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998)). A plaintiff has informational standing to sue when "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *EPIC*, No. 1:17-cv-1320, 2017 WL 3141907, at \*6 (D.D.C. July 24, 2017) (citing *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016)) (finding informational standing in a suit against the Commission), *appeal docketed*, No. 17-5171 (D.C. Cir. July 27, 2017); *see also Public Citizen v. U.S. Dep't of Justice,* 491 U.S. 440, 449 (1989) (holding that two advocacy organizations' failure to obtain information subject to disclosure under the Federal

16

Advisory Committee Act "constitutes a sufficiently distinct injury to provide standing to sue"). Where the injury giving rise to litigation flows from a failure to disclose information as required by statute, "a plaintiff in such a case need not allege any *additional* harm beyond the one Congress has identified." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016).

### 1.    Plaintiffs Have Been Deprived of Information that the PRA Required the Commission to Disclose

By circumventing the PRA's disclosure procedures, the Commission deprived Plaintiffs of information that Congress intended be made public, and it imposed precisely the harm on Plaintiffs that Congress sought to prevent.    There is no question that Plaintiffs have been deprived of information that the PRA requires the Commission to disclose.[9]   Under the PRA, an agency "*shall not*" sponsor an information collection without, among other things, complying with the procedures listed in § 3506(c).   *See* 44 U.S.C. § 3507(a).   Pursuant to that mandate, the Commission was required to make numerous disclosures before sponsoring the information collection embodied in the June 28 Letters.   Those requirements included disclosing, among other things, an evaluation of the need for the program; a functional description of the information to be collected; a plan for collecting the information; a specific, objectively supported estimate of burden, and a plan for the efficient and effective management and use of the information to be collected, including necessary resources.   *Id.* § 3506(c)(1)(A); *see also* 5 C.F.R. § 1320.10(a) (requiring sponsoring agency to notify public of right to access "the proposed collection of information and supporting documentation").   If the Commission certified to the Director of OMB that the proposed information collection meets the statute's requirements after receiving an

---

[9] The fact that the statute required disclosure to the general public does not change the analysis.  *See Akins*, 524 U.S. at 24-25 ("We conclude that . . . the informational injury at issue here, directly related to voting, the most basic of political rights, is sufficiently concrete and specific such that the fact that it is widely shared does not deprive Congress of constitutional power to authorize its vindication in the federal courts."); *EPIC*, 2017 WL 3141907, at *8 (noting that "the fact that a substantial percentage of the public is subject to the same harm does not automatically render that harm inactionable").

initial round of comments, Plaintiffs would then have been entitled to further disclosures, via notice in the Federal Register, including a statement of the "proposed use of the information" the Commission sought to collect.  *Id.* § 3507(a), (c), (d).  Instead, the Commission did not disclose the required statement or the other information about the collection of information as required by the statute.  Because the Commission flouted the PRA's requirements, Plaintiffs were unable to obtain the information they were entitled to under the statute.

<b>2.    This Deprivation Has Harmed Plaintiffs in the Way Congress Meant to Prevent</b>

This deprivation constitutes a judicially cognizable harm because Plaintiffs "suffer[], by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure."  *EPIC*, 2017 WL 3141907, at *6.  Protect Democracy's mission is to engage in advocacy and public education to defend core democratic norms and institutions.  Bassin Decl. ¶ 4.  It does so by seeking information through government transparency statutes, analyzing and publishing information received through those channels, and, where appropriate, incorporating this information into broader advocacy campaigns meant to advance democratic norms.  *Id.* ¶ 5.  Protect Democracy in particular has sought to utilize these tools broadly with respect to the current work of the Commission.  *Id.* ¶ 7.  Protect Democracy has submitted a series of Freedom of Information Act requests about the Commission's founding and operations, and it is now engaged in litigation in federal district court to enforce some of those requests.  *Id.* ¶ 8.  Protect Democracy has also engaged in public education and advocacy related to the Commission's efforts to collect nationwide voter information.  *Id.* ¶ 9.  In addition to sending a letter to Defendant Mulvaney seeking OMB review of the June 28 Letters, Protect Democracy has sent letters to Attorneys General and Secretaries of State around the country alerting them to the legal deficiencies in the June 28 Letters, published analysis on a prominent legal blog urging state

18

officials to consider the Commission's violations of the PRA in determining whether to submit responsive data, and addressed the issue on its website and Twitter feed.  *Id.* ¶ 9.

The disclosures mandated by the PRA would have enabled Protect Democracy to evaluate whether the proposed collection of information is "necessary for the proper performance" of the Commission's functions.  *Id.* § 3506(c)(2).   Once it formed a view on that question (in reliance on the PRA's required disclosures), Protect Democracy could have participated in the public process provided by the statute, sought to convince other actors to participate in that process, and educated state and federal officials and the general public on the implications of the Commission's proposed request.  *See Akins*, 524 U.S. at 21 (holding that the plaintiffs had standing to seek disclosure about political expenditures by an advocacy group because the disclosures "would help them (and others to whom they would communicate [the information]) to evaluate candidates for public office" in light of the advocacy group's support).   By short-circuiting their statutory obligations, the Commission and OMB have deprived Plaintiff of the ability to pursue its mission in the manner anticipated by the PRA.

This injury to Plaintiffs has been heightened by attacks lodged by President Trump and members of the Commission against states who declined to produce the relevant information.  When several states voiced concern about the request and a disinclination to turn over potentially sensitive voter data, the President and others questioned their motives.[10]   Protect Democracy will be better equipped to evaluate and counter these arguments, and to persuade state election officials to withhold data (if appropriate), if it can analyze and comment on the Commission's evaluation of

---

[10] *See, e.g.*, Christopher Ingraham & Philip Bump, "Trump Says States Are 'Trying to Hide' Things From His Voter Fraud Commission.  Here's what they actually say," *Washington Post* (July 1, 2017), https://www.washingtonpost.com/news/wonk/wp/2017/07/01/trump-says-states-are-trying-to-hide-things-from-his-v oter-fraud-commission-heres-what-they-actually-say/?utm_term=.a4cd29296966; "Voter Fraud Commission Member Speaks Out," *Fox News* (July 9, 2017), https://www.youtube.com/watch?v=wxIv4P9t8Xs.

the need for the data, the Commission's functional description of how the data would be used, and the Commission's plan for maintaining and managing the data.  *See* 44 U.S.C. § 3506(a).

The PRA contemplates public participation as the primary mechanism for preventing improper collections of information—hence the requirement of two rounds of solicited public comments and the accompanying disclosure requirements.  *See Public Citizen v. Fed. Trade Comm'n*, 869 F.2d 1541, 1549 (1989) (holding that "[f]or standing purposes," the "congressional determination" to create a comprehensive disclosure scheme was entitled to "great weight"); *see also* Sunstein, *supra* note 1, at 1.  Disregarding the solicitation of public comments, which necessarily eliminates public participation, strikes at the very heart of what Congress sought to prevent through the PRA.

## V.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS

Plaintiffs' complaint in this action sets forth the clear-cut, ongoing violation of the PRA effected by the Commission's requests to state election officials for data on hundreds of millions of registered voters.  The violation is clear: the statute contains mandatory directives with which Defendants have made no effort to comply, and the legal claims against all Defendants flow from those violations.

Because Plaintiffs' likely success on the merits of their claims against all Defendants are premised on the Commission's basic violations of the PRA, this section proceeds by explaining why the statute applies to Defendants, describing Defendants' violations of its mandatory provisions, and presenting why the requested avenue of relief sought against each Defendant is appropriate.

A.     **The Commission's Collection of Information is in Clear Violation of the PRA**

1.     **The Commission is an "Agency" Under the PRA**

The PRA's requirements apply to "agencies," which are broadly defined in the Act as "any

executive department, military department, Government corporation, Government controlled

corporation, or other establishment in the executive branch of the Government (including the

Executive Office of the President), or any independent regulatory agency," with certain

enumerated exclusions.[11]   44 U.S.C. § 3502(1).   Under a plain reading of this definition, the

Commission qualifies as an "establishment of the executive branch."   After all, its authorizing

Executive Order designates the Vice President as its chair; charges it with producing a report to the

President; and orders the General Services Administration to provide the Commission with

administrative services, funds, facilities, staff, equipment, and other supports services as may be

necessary to carry out its mission on a reimbursable basis.   Moreover, much of the Commission's

operations and communications have been run out of the Office of the Vice President.

This plain reading of the text is consistent with Congress' broad purpose in passing the

PRA.   In particular, Congress believed that the PRA's predecessor statute, the Federal Reports

Act, had been ineffectual in curbing the expansion of government document collection efforts, in

part because it had exempted a significant amount of government collection from the clearance

process.   *See, e.g.*, GAO-05-424 Paperwork Reduction Act, at 9 (May 2005),

http://www.gao.gov/assets/250/246399.pdf (noting that the PRA "supplanted the Federal Reports

Act, made virtually all federal agency information collection activities subject to OMB review,

and established broad objectives for OMB oversight of the management of federal information

---

[11] The only limitation placed on the definition of "agency" in the PRA, which is not relevant here, is the explicit exclusion of: "(A) the Government Accountability Office; (B) Federal Election Commission; (C) the governments of the District of Columbia and of the territories and possessions of the United States, and their various subdivisions; [and] (D) Government-owned contractor-operated facilities, including laboratories engaged in national defense research and production activities."   44 U.S.C. § 3052(1)(A)-(D).

resources"). When it enacted the PRA in 1980, Congress removed many of those exceptions. Indeed, Congress "rewr[ote] the original Federal Reports Act of 1942 and eliminate[d] all agency exemptions to the Act except the Federal Election Commission." S. Rep. No. 96-930 at 2 (1980). Whereas the Federal Reports Act applied to "any executive department, commission, independent establishment, corporation owned or controlled by the United States, board, bureau, division, service, office, authority, or administration in the executive branch of the Government," with enumerated exclusions, Pub. L. 77-831, 56 Stat. 1078, 1079-80, § 7(a) (1942), with the PRA, Congress expanded the definition of "agency" to include Executive departments, government corporations, government controlled corporations, and all "other establishment[s] in the executive branch of the Government," 44 U.S.C. § 3502(1).

Since the passage of the original Act, Congress has repeatedly reaffirmed its intent to apply the PRA broadly. Indeed, when Congress amended the PRA in 1995 without making any changes to the definition of "agency," Congress made clear that the Act was meant to "[r]eaffirm the fundamental purpose" of the PRA: "to minimize Federal paperwork burdens imposed on the public by [the] Government." S. Rep. No. 104-8 at 1 (1995).

While the statute's text and purpose make plain that the PRA applies to the Commission, that conclusion is further supported by what Congress chose to omit from the statute. Significantly, unlike other statutes, including the Administrative Procedure Act ("APA"), the PRA does not ground its definition of "agency" in the "authority" an agency wields. *See* 5 U.S.C. § 551(1) (defining "agency" for purposes of the APA as "each *authority* of the Government of the United States, whether or not it is within or subject to review by another agency," with certain enumerated exclusions) (emphasis added). For years, courts have relied on Congress's focus on "authority" under the APA to limit application of that statute to only those executive branch

entities that exercise authority. *See, e.g., Main St. Legal Servs., Inc. v. Nat'l Sec. Council*, 811 F.3d 542, 547 (2d Cir. 2016) ("*Soucie* construed the [APA's] definition of 'agency,' referencing government 'authority,' to reach executive branch units that have 'substantial independent authority in the exercise of specific functions,' but not to reach units whose 'sole function [is] to advise and assist the President." (citing *Soucie v. David*, 448 F.2d 1067, 1073 (D.C. Cir. 1971)).[12] Had Congress wanted to limit application of the PRA to executive branch units that exercise independent authority, "Congress could easily have said so." *Kucana v. Holder*, 558 U.S. 233, 248 (2010). But in full view of the APA's definition of "agency," Congress chose not to do so, and that purposeful decision indicates that the PRA applies throughout the executive branch.

This makes sense. After all, from the perspective of a person receiving a potentially burdensome data request from the federal government, it will not make much difference whether the entity seeking the information has a broad portfolio of authorities or not.[13] The statutory purposes—among other things, to "ensure the greatest possible public benefit from and maximize the utility of information created, collected, maintained, used, shared and disseminated by or for the Federal Government," 44 U.S.C. § 3501(2)—will be imperiled by an improper information request, regardless of the breadth of the authority of the sponsoring agency. Furthermore, the numerous references to "Federal Government" in Congress's stated purposes for the PRA demonstrate that Congress intended this statute to have a broad reach.

---

[12] Plaintiffs note that the parties in related lawsuits dispute whether the Commission qualifies as an "agency" for purposes of the Administrative Procedure Act, and that the courts in those cases have not definitively settled that question. *See, e.g.,* Memoranda Opinion at 27, *EPIC*, No. 1:17-cv-01320 (D.D.C. July 24, 2017), ECF No. 40 (finding that that evidence is "presently … insufficient to demonstrate that the Commission is an 'agency'" under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551). Plaintiffs take no position on that dispute, but note that the question presented in that context is not present here because the PRA does not predicate its application on the "authority" an agency wields.
[13] The fact that the PRA's protections apply to voluntary collections of information underscores the proposition that the statute's broad purposes require application to *all* governmental collections of information, not just those emanating from offices that wield broader authority. *See* 5 C.F.R. § 1320.3(c)(1) (providing that a "collection of information" may be "mandatory, voluntary, or required to obtain or retain a benefit").

23

Moreover, Congress could have referenced or adopted the APA definition when it drafted the 1980 statute, but it decided not to; and when it amended the statute in 1995, it left the PRA's broader definition of "agency" unchanged.   By providing for only limited explicit exceptions, *see* 44 U.S.C. § 3052(1)(A)-(D), but otherwise maintaining a definition of "agency" that was distinct from other statutes, Congress made clear that the PRA was meant to cover an especially broad range of federal information collection activities.   *See Central Bank of Denver v. First Interstate Bank*, 511 U.S. 164, 176-77 (1994) (finding that "Congress knew how to impose aiding and abetting liability when it chose to do so," such that where a statute did not use the words "aid" or "abet" it did not impose aiding and abetting liability).   To interpret the PRA's definition of "agency" narrowly would undermine the purpose of the statute and allow the federal government to structure its collection of information in such a way as to avoid the PRA in contravention of how Congress intended.

### 2.    The PRA's Procedures are Mandatory

Compliance with the PRA is not optional.   Because the Commission is an "agency" for purposes of the PRA, it must comply with the statute's detailed procedural framework.   Section 3507(a) employs distinctively mandatory language in providing that an agency "shall not" sponsor a collection of information unless it adheres to the statute's exacting procedural requirements. The Supreme Court has repeatedly recognized that the word "shall" indicates a command or mandatory duty, not a grant of discretion.   *E.g., Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) (observing that "shall" is "mandatory" and "normally creates an obligation impervious to judicial discretion"); *Alabama v. Bozeman*, 533 U.S. 146, 153 (2001) ("The word 'shall' is ordinarily 'the language of command.'" (quoting *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947))); *see also, e.g., Am. Hosp. Ass'n v Burwell*, 812 F.3d 183, 191 (D.D.C. 2016); *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 671 (D.C. Cir. 2016) ("'The

traditional, commonly repeated rule is that shall is mandatory and may is permissive.'" (citing

Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 112 (2012))).

### 3.    The Commission Has Violated Its Clear Duty to Act Under the PRA

Despite the clear command of the PRA, the Commission has nonetheless sponsored a

collection of information without complying with the process set forth in the statute.   *See supra*

Section I (describing statutory procedures).   As a result, the Commission has violated its duty to

abide by the PRA in undertaking its recent collection of information, and it remains in violation of

this clear duty as long as the information collection persists and as long as the Commission

maintains possession of any information collected.

### B.    Plaintiffs are Likely to Succeed on the Merits in Obtaining Mandamus Requiring the Commission to Comply with the Requirements of the PRA

Plaintiffs are likely to succeed on the merits of their claim for a writ of mandamus to

compel the Commission to immediately cease its collection of information and to comply with the

PRA.   "The Mandamus Act authorizes district courts to issue mandamus orders compelling

federal officials to perform ministerial or non-discretionary duties."   *Judicial Watch, Inc. v. U.S.*

*Dep't of Commerce*, 736 F. Supp. 2d 24, 31 (D.D.C. 2010) (citing 28 U.S.C. § 1361)).

"[D]iscrete, non-discretionary duties qualify as relief in the nature of mandamus."   *Id.*   A

plaintiff seeking mandamus relief must demonstrate "(1) a clear and indisputable right to relief, (2)

that the government agency or official is violating a clear duty to act, and (3) that no adequate

alternative remedy exists."   *Am. Hosp. Ass'n*, 812 F.3d at 189.   If a plaintiff satisfies these legal

requirements, a court must then determine that there are compelling equitable grounds to grant

mandamus relief.   *Id.*   Those requirements are satisfied here.

25

1.    **The Commission is Violating the PRA, and Plaintiffs Have a Clear and Indisputable Right to Relief**

As demonstrated above, *see supra* Section V.A, the Commission is subject to the requirements of the PRA, and it has acted and continues to act in clear violation of its duties under the law in seeking information from the public absent compliance with the PRA's requirements. The PRA uses mandatory language that requires agencies to comply with its framework; because compliance is not discretionary, the Commission has a clear duty to follow the procedures of the PRA. *Cf. United Gov't Sec. Officers of Am., Local 52 v. Chertoff*, 587 F. Supp. 2d 209, 218-19 (D.D.C. 2008) (holding that an agency had a clear duty to act based in part on regulations that used words such as "must" and "shall," which "le[ft] no discretion on the part of the agency").

In addition, Plaintiffs have a clear and indisputable right to relief from the Commission's violations.   As set forth in detail above, *supra* Section I, the PRA was designed to protect the rights of parties such as Plaintiffs.   The numerous procedures outlined in the PRA are designed to protect the public from unnecessary and burdensome information collection, which has already begun to occur.   The Commission's failure to abide by the PRA's requirements, including by failing to allow Plaintiffs to participate in the PRA's notice-and-comment and disclosure processes, has harmed Plaintiffs, and they are entitled to relief because they have been deprived of information and the ability to participate in a decision-making process with that information, as Congress intended in enacting the PRA.

### 2.    There is No Adequate Alternative Remedy to Prevent Further Violations of the PRA by the Commission

While the PRA does not limit the judicial relief available under mandamus or otherwise,[14]

it does not affirmatively provide a private right of action that could serve as an alternative to

mandamus relief against the Commission.    Nor does the PRA create a process for an

administrative appeal to the Commission that could or must be exhausted.    In cases like this one,

"the mandamus statute may provide an avenue to remedy violations of statutory duties even when

the statute that creates the duty does not contain a private cause of action."    *Freedom Watch, Inc.*

*v. Obama*, 807 F. Supp. 2d 28, 34 (D.D.C. 2011) (citation and quotation marks omitted).

Mandamus is appropriate when there is no administrative means to challenge an agency's failure

to comply with a statute that imposes clear duties.    *See Citizens for Responsibility & Ethics in*

*Washington v. Exec. Office of President*, 587 F. Supp. 2d 48, 62 (D.D.C. 2008).    The APA does

not provide an adequate alternative remedy against the Commission where, as here, the

government has strenuously insisted that the Commission is not an agency susceptible to claims

under the APA.    *See, e.g.*, Gov't Mot. to Dismiss, at 25, *EPIC*, No. 1:17-cv-01320 (D.D.C. Sept.

5, 2017), ECF No. 49 (arguing that under the definitions of "agency" in the APA and the

E-Government Act, "the Commission and the various Executive Office of the President ('EOP')

components named as defendants in [the *EPIC*] suit are not 'agencies'").    While Plaintiffs do not

endorse that position, the fact that the government has vigorously argued that the APA is

unavailable should be sufficient to resolve the question, at this stage of the case, of whether

Plaintiffs have an adequate alternative.    The government cannot have it both ways: if it is going to

---

[14] The PRA does not have language that appears in other statutes that bars judicial review "by an action in the nature of mandamus or otherwise."    *See, e.g.*, 38 U.S.C. § 511(a); *Blue Water Navy Vietnam Veterans Ass'n, Inc. v. McDonald*, 830 F.3d 570, 576 (D.C. Cir. 2016).    The PRA does limit judicial review for a separate set of information-collections related to agency rulemaking, but not for the violations at issue here.    *Compare* 44 U.S.C. § 3507(c) (provisions applying to non-rulemaking collections of information), *with id.* § 3507(d)(6) ("The decision by the [OMB] Director to approve or not act upon a collection of information *contained in an agency rule* shall not be subject to judicial review.") (emphasis added), *and id.* § 3507(d)(5) ("This subsection *shall apply only when an agency published a notice of proposed rulemaking and requests public comment*.") (emphasis added).

insist that the APA is not available as a pathway to relief against the Commission, it cannot simultaneously argue that the availability of the APA constitutes an alternative that renders mandamus off limits.[15]   Moreover, the mere fact that Plaintiffs are able to petition OMB to review the collection under § 3517 does not, by itself, provide an adequate administrative means; Plaintiffs have availed themselves of this procedure, yet OMB has still failed to take action or grant any of the relief that Plaintiffs seek.   Thus, the availability of procedures outlined in § 3517 do not negate the possibility of or need for mandamus relief.[16]

### 3.    There are Compelling Equitable Grounds to Grant Mandamus

In addition to demonstrating that they meet the legal requirements for the issuance of a writ of mandamus, Plaintiffs are also entitled to the writ based on compelling equitable grounds.   *See In re Medicare Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005).   Plaintiffs suffer concrete and ongoing harm from the Commission's failure to comply with any of the procedures of the PRA and its failure to disclose the purpose and plans for the collection of information.   *See supra* Section IV.   In contrast, the Commission would not suffer any harm in being required to follow the law as it was initially required to do.   Granting mandamus would simply require the Commission to comply with the well-established, mandatory process laid out by Congress and to provide necessary information to the public about its information collection.   Given the minimal (if any) harm to the Commission and the ongoing and irreparable harm to Plaintiffs, *see* Section VI

---

[15] The question of whether the Commission is an "agency" for purposes of the APA is presently under consideration before the D.C. Circuit.   *See EPIC*, 2017 WL 3141907, at *11 ("The record presently before the Court is insufficient to demonstrate that the Commission is an 'agency' for purposes of the APA."), *appeal docketed*, No. 17-5171 (D.C. Cir. July 27, 2017).   Should the D.C. Circuit hold that the Commission is an agency under the APA, Plaintiffs will determine at that time whether it is appropriate to amend their claims and seek redress for the Commission's PRA violations under that statute.

[16] Plaintiffs acknowledge that, to the extent that this Court compels OMB and Director Mulvaney to take the necessary remedial measures pursuant to § 3517 to cease the illegal collection and use of information, then that relief may serve as an adequate alternative remedy.   Plaintiffs submit, however, that the proper stage for determining whether the APA claim against OMB represents an adequate alternative remedy is when the court reaches a final adjudication and fashions appropriate relief.   *Cf. Citizens for Responsibility & Ethics in Washington*, 587 F. Supp. 2d at 63 ("As for defendants' contention that the claims for mandamus must be dismissed as duplicative to plaintiffs' APA, the court disagrees.   At this time, the court cannot rule as a matter of law that plaintiffs will not be entitled to mandamus relief." (citing *Judicial Watch, Inc. v. Nat'l Energy Policy Dev. Grp.*, 219 F. Supp. 20, 44 (D.D.C. 2002)).

*infra*, the balance of equities weighs in favor of a writ of mandamus directing the Commission to comply with the PRA.

> ### C. Plaintiffs are Likely to Succeed on the Merits of their APA Claim that Defendants OMB and Mulvaney Unlawfully Withheld or Unreasonably Delayed the Agency Action Mandated by § 3517(b)

Plaintiffs are also likely to succeed in their APA claim against OMB for failing to take the remedial action that the PRA requires.   In a challenge to agency action or inaction under 5 U.S.C. § 706, a "reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."   If a court determines that an agency action has been "unlawfully withheld or reasonably delayed," then it "shall … compel agency action." *Id.* § 706(1).   Here, OMB has not provided the response or taken the appropriate remedial action required by the PRA within the time set forth by the statute.

> ### 1. OMB Is Required by PRA § 3517 To Respond to Plaintiffs' Letter and to Take Appropriate Remedial Action by Halting the Unlawful Collection

In addition to imposing requirements on agencies seeking to collect information, the PRA provides for OMB's review of an agency's planned collection of information.   Under 44 U.S.C. § 3517, "[a]ny person may request the Director [of OMB] to review any collection of information conducted by or for an agency to determine, if, under this subchapter, a person shall maintain, provide, or disclose the information to or for the agency."   Section 3517 also mandates that "[u]nless the request is frivolous, the Director shall, in coordination with the agency responsible for the collection of information[,] … respond to the request within 60 days after receiving the request" and "take appropriate remedial action, if necessary."

Pursuant to § 3517, on July 3, 2017, Plaintiff United to Protect Democracy along with the Brennan Center for Justice, submitted a letter to Defendant Mulvaney and OMB that explained

how the June 28 Letters violated the procedural requirements of the PRA and requested that

Director Mulvaney "review the collections of information" embodied in the June 28 Letters "and

take necessary remedial action as soon as possible."    Bassin Decl., Ex. D.    As of the date of this

filing, Director Mulvaney and OMB have failed to respond to Plaintiff's letter or take any remedial

actions.    But as explained above with regard to the Commission, compliance with the PRA is not

voluntary.    "Federal agencies must obey the law, and congressionally imposed mandates and

prohibitions trump discretionary decisions."  *Am. Hosp. Ass'n*, 812 F.3d at 193.    In this case, the

PRA requires that "the Director *shall* … take appropriate remedial action, if necessary" when

alerted to a violation of the PRA.    44 U.S.C. § 3517 (emphasis added).    Here, there is no

substantial question as to whether the Commission complied with the PRA before sponsoring its

information request—it made no pretense of compliance—and thus OMB should exercise its

authority to halt the Commission's improper, ongoing data request, as it is empowered to do and

has recently done in other contexts.    5 C.F.R. § 1320.10(g); *see also* Memo. from Neomi Rao,

Administrator, Office of Information and Regulatory Affairs to Victoria Lipnic, Acting Chair,

Equal Employment Opportunity Commission regarding "EEO-1 Form; Review and Stay" (Aug.

29, 2017) (imposing an "immediate stay" on a collection of information where "continued

collection of this information is contrary to the standards of the PRA"),

https://www.reginfo.gov/public/jsp/Utilities/Review_and_Stay_Memo_for_EEOC.pdf.    In this

case, because the Commission has clearly violated the PRA and is engaged in an ongoing and

large-scale information collection effort that has failed to comply with any of the standards of the

PRA, OMB should be directed to implement an immediate stay and review of the Commission's

collection of information.

### 2.    OMB's Delay in Taking the Statutorily Required Action Is Unreasonable

Courts evaluate the reasonableness of agency delay using the factors outlined in

*Telecommunications Research & Action Center v. Federal Communications Commission*

("*TRAC*"):

> (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2)
> where Congress has provided a timetable or other indication of the speed with which it
> expects the agency to proceed in the enabling statute, that statutory scheme may supply
> content for this rule of reason; (3) delays that might be reasonable in the sphere of
> economic regulation are less tolerable when human health and welfare are at stake; (4) …
> the effect of expediting delayed action on agency activities of a higher or competing
> priority; (5) … the nature and extent of the interests prejudiced by delay; and (6) the court
> need not "find any impropriety lurking behind agency lassitude in order to hold that agency
> action is "unreasonably delayed."

750 F.2d 70, 80 (D.C. Cir. 1984) (citations omitted).    These "factors are not 'ironclad,' but rather

are intended to provide 'useful guidance in assessing claims of agency delay.'    *In re Core*

*Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (citing *TRAC*, 750 F.2d at 80).    "The first and

most important factor is that 'the time agencies take to make decisions must be governed by a 'rule

of reason.'"    *Id.*

Defendants OMB and Mulvaney are significantly outside the statutory deadline to take

action; their failure to act is especially harmful here, where the collection of information has

immediate consequences for democratic participation and poses immediate risks for the data

security of millions of Americans.    *See, e.g.*, Schneier Decl. ¶ 9 (noting that the "magnitude and

probability of any harm flowing from the collection of [the] data would depend in significant part

on front-end decisions regarding the transmission, storage, and maintenance of [the] data");

Lindback Decl. ¶ 7 (noting that policies and procedures must be established regarding safe

transmission of voter data).    Their failure to comply with the mandatory, time-limited

requirements of § 3517(b) thus constitutes unreasonable agency delay or failure to act, warranting
action by this Court.

   All of the *TRAC* factors in this case weigh in favor of Plaintiffs.  With respect to the first
and second factors, the "rule of reason" is measured by an applicable enabling statute, and
§ 3517 mandates that the OMB Director respond within 60 days to a request for review of an
information collection.   Plaintiffs submitted their letter on July 3, 2017, and the response from the
Director was due on September 1, 2017.   OMB has yet to respond, and its failure to respond
within the applicable time frame is a clear violation of § 3517.   As the D.C. Circuit noted in *In re
People's Mojahedin Organization of Iran*, "Congress's timetable may supply content for the rule
of reason—the 'first and most important' of the *TRAC* factors."   680 F.3d 832, 837 (D.C. Cir.
2012) (citations omitted).   Notably, the D.C. Circuit held that the 180-day deadline provided in
the enabling statute at issue "manifest[ed] 'Congress's intent that the Secretary act promptly.'"
*Id.* (citation omitted).   Similarly, in *In re United Mine Workers of America International Union*,
the D.C. Circuit concluded "that Congress meant what it said" when it established a 90-day
deadline for a determination regarding a proposed rule under the Mine Act, and because the
Secretary of Labor had exceeded this deadline, there was a "clear violation" of the statute.   190
F.3d 545, 551 (D.C. Cir. 1999).   Accordingly, the first two—and most important—*TRAC* factors
indicate that OMB's delay is unreasonable.

   Third, the consequences of the delay in this case are far more serious than in a case
concerning economic regulation.   "In general, the more drastic the consequences resulting from a
given delay, the less likely that such a delay will be found to be justifiable," and "[t]he court must
also estimate the extent to which the delay undermines the statutory scheme, either by frustrating
the statutory goal or creating a situation in which the agency is 'losing its ability to effectively

regulate at all.'" *W. Rangeland Conservation Ass'n v. Zinke*, No. 2:14-cv-00327, 2017 WL

2963433, at *15 (D. Utah July 11, 2017) (quoting *Envtl. Def. Fund v. U.S. Nuclear Regulatory*

*Comm'n*, 902 F.2d 785, 789 (10th Cir. 1990)). Here, the public's privacy, security, and trust in

our voting system is at stake, *see* Schneier Decl. ¶¶ 9-14; Lindback Decl. ¶¶ 7-12, and the failure

by Defendants OMB and Director Mulvaney to remedy an obvious violation, one that already has

drastic consequences, frustrates the purpose of the statute.

Fourth, the imposition on the agency's priorities by the relief sought here is minimal.

Plaintiffs do not ask for the kind of agency action that would typically implicate significant

questions of resource allocation—for example, undertaking a major rule-making, expanding the

scope of a regulatory framework, or pursuing enforcement actions. OMB cannot justify the delay

with a "plea of administrative error, administrative convenience, practical difficulty in carrying

out a legislative mandate, or need to prioritize in the face of limited resources." *In re Am. Rivers*

*& Idaho Rivers United*, 372 F.3d 413, 420 (D.C. Cir. 2004). To the contrary, the relief here

would amount to OMB taking action to restore the status quo and exercising its well-established

authority to require an agency to stay a non-compliant collection of information. *See* 5 C.F.R. §

1320.10(g). Fifth, as discussed in more detail *infra*, *see* Section VI, allowing the Commission's

data collection to continue causes Plaintiffs ongoing and irreparable harm. Finally, this Court

need not find any bad faith in the agency's delay to hold it unreasonable. Taken together, these

factors demonstrate that OMB action has been "unlawfully withheld or unreasonably delayed" and

intervention is required in order to "compel agency action," 5 U.S.C. § 706(1), by ordering OMB

to remediate the Commission's violation of the PRA.

## VI.    PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF A PRELIMINARY INJUNCTION IS NOT GRANTED

Plaintiffs will suffer irreparable harm absent preliminary relief.    Plaintiffs rely on access to legally mandated disclosures, like those required by the PRA, to advance their mission of defending democratic norms and institutions.    Already, according to news reports, the Commission's request for nationwide voter data is impacting democratic participation, see *supra* note 6, and the manner in which the Commission collects, maintains, shares, and analyzes the data threatens to expose individuals as well as state and local election systems to serious harm, *see* Schneier Decl. ¶¶ 10-12.    The guiding premise of the PRA is that transparency and public participation, as mandated by the procedures prescribed by statute, provide the appropriate safeguards against information collections that cause significant burdens to the public.    *See* 44 U.S.C. §§ 3506(c), 3507(a).    If the Commission complies with the PRA's procedural requirements, Plaintiffs will carefully review and analyze any information the Commission discloses through that process.    Depending on what facts the Commission discloses, Plaintiffs would expect to publish analyses of that information in an effort to educate the public, submit comments to the Commission and OMB through the procedures prescribed by statute, and engage in other advocacy as appropriate to advance their mission in light of the information provided by the Commission.    Bassin Decl. ¶ 10.    "District courts in this circuit have recognized that, where an obligation to disclose exists, plaintiffs may suffer irreparable harm if they are denied access to information that is highly relevant to an ongoing public debate." *Lawyers' Comm. for Civil Rights Under Law v. Presidential Advisory Comm'n of Election Integrity*, No. 17-cv-1354, 2017 WL 3028832, at *9 (D.D.C. July 18, 2017).

The gravamen of this injury is, by definition, irreparable.    The opportunity to comment *ex post* on the impact of the Commission's data collection can never repair the harm of being

deprived of an *ex ante* opportunity to receive relevant information and participate in and speak on the decision-making process about the information collection.   Critically, Plaintiffs seek relief that does more than bolster their ability to engage in broad public education related to election-related issues (though it does that as well); the relief they seek would enable them to participate in a concrete, knowledgeable way in a *specific decision-making process*—whether and how to collect national voter registration data—that could have sweeping consequences.   But this relief becomes unattainable if the Commission's data collection occurs before this Court resolves Plaintiffs' claims.   The PRA's public comment procedures are premised on providing public commenters with an opportunity to influence how decision-makers formulate a possible information collection or whether to proceed with the collection at all.   This cannot occur if the agency has already collected the data and acted on it—the bell cannot be un-rung.[17]   In this instance, the ability to exercise that opportunity to be heard has especially high stakes because the data collection is so massive and the Commission's actions are so consequential.   *See* Schneier Decl. ¶¶ 9-14; Lindback Decl. ¶¶ 7-12.   By ignoring the PRA, the Commission has vitiated Plaintiffs' right to avail itself of that opportunity to be heard.

## VII.   THE BALANCE OF EQUITIES FAVORS A PRELIMINARY INJUNCTION

The balance of harms heavily favors issuing a preliminary injunction, as a preliminary injunction in this case would merely "maintain the status quo pending a final determination on the merits."   *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977).   This is especially true where the only conceivable harm to the government is delaying a desired action long enough for it to comply with a Congressionally-mandated review

---

[17] The analysis, of course, is different for an entity whose harm flows from the burden imposed by an information-collection, as opposed to the kind of informational injury at issue here.   Where the harm is the burden imposed by an information-collection, the *ex post* relief offered by 44 U.S.C. § 3512(b) may typically provide adequate relief.   But where the injury inheres in the deprivation of an opportunity to receive mandatory disclosures and use those disclosures to engage the agency or the public, the backward-looking remedy of § 3512(b) will offer no solace.

process.  *See R.J. Reynolds Tobacco Co. v. U.S. Food & Drug Admin.*, 823 F. Supp. 2d 36, 51

(D.D.C. 2011); *id.* at 52 ("I can afford little weight to defendants' argument that a delay

specifically contemplated and mandated by Congress could prejudice the public, or even the

Government itself.").   There is no reason to believe that whatever legitimate purpose may be

served by collecting nationwide voter information would be substantially burdened by that delay.

And in any event, given the tenuous justification of the June 28 Letters as a means of effectuating

the Executive Order's mandate, any harm arising from the delay needed to maintain the status quo

while the Court resolves this matter deserves little weight.[18]

Indeed, the nature of the relief sought here counsels in favor of minimizing harm to *all*

*parties* by maintaining the status quo.   In the absence of preliminary relief, if Plaintiffs eventually

obtain a final judgment, the Commission will have to take affirmative—and costly—steps to

restore the *status quo ante* by destroying or returning data it has received and clawing back data

from other agencies before embarking on the procedural steps imposed by the PRA.   Maintaining

the status quo limits the governmental effort and expense that may be required if the Commission

eventually attempts to collect information in a manner that conforms to its legal requirements

under the PRA.

## VIII.   THE PUBLIC INTEREST WILL BE SERVED BY A PRELIMINARY INJUNCTION

The preliminary relief requested here would advance the public interest in several respects.

As a general matter, "there is a substantial public interest in having governmental agencies abide

by the federal laws that govern their existence and operations."  *League of Women Voters of*

*United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).   That is especially so when, as here,

---

[18] The Commission has not voluntarily disclosed the extent to which states have already submitted data.   However, on September 19, 2017, in a disclosure compelled in related litigation, the Commission revealed that at least 20 states have submitted *some data* to the Commission.   See Eisenberg Decl., Ex. F (rows 98-117).   The Commission has not revealed what categories of data those states have produced, whether those states intend to produce further data, how the already produced data has been used, or what other states may still produce data. Accordingly, Plaintiffs' harm is current and ongoing, and will become more pronounced to the extent the Commission continues collecting and using the data sought in the June 28 Letters.

those laws speak to the public's ability to participate in the processes of government.    The

notice-and-comment provisions of the PRA serve a substantial public interest by allowing the

public to be informed and have a meaningful say *before* the federal government collects

information.    And just as in the context of the APA or the Federal Advisory Committee Act, there

is a "general public interest in open and accountable agency decision-making."    *Cresote Council*

*v. Johnson,* 555 F. Supp. 2d 36, 40 (D.D.C. 2008); *see also N. Mariana Islands v. United States*,

686 F. Supp. 2d 7, 21 (D.D.C. 2009) ("The public interest is served when administrative agencies

comply with their obligations under the APA."); *Gates v. Schlesinger*, 366 F. Supp. 797, 801

(D.D.C. 1973) (observing that the "public interest will be best served by requiring strict

compliance with the letter and spirit of the Federal Advisory Committee Act").    As the D.C.

Circuit observed over 30 years ago, "[i]t is now a commonplace

that notice-and-comment rule-making is a primary method of assuring that an agency's decisions

will be informed and responsive."    *N.J., Dep't of Envtl. Prot. v. U.S. EPA,* 626 F.2d 1038, 1045

(D.C. Cir. 1980).

    The PRA promotes a similar public purpose with respect to collections of information by

the executive branch; among its purposes is to "ensure the greatest *possible public benefit from* and

maximize the utility of information created, collected, maintained, used, shared and disseminated

by or for the Federal Government."    44 U.S.C. § 3501(2) (emphasis added).    That is the whole

purpose of the statute: to benefit the public by "minimiz[ing] the paperwork burden for

individuals, small businesses, educational and nonprofit institutions, Federal contractors, State,

local and tribal governments, and other persons resulting from the collection of information by or

for the Federal Government."    *Id.* § 3501(1).    Pausing the Commission's collection until it

adheres to the PRA will further that public benefit.

In addition, there are quite specific public harms arising from the particular information collection undertaken here.    Schneier Decl. ¶¶ 9-14; Lindback Decl. ¶¶ 7-12.    Media reports indicate that Commission's intended collection has already led voters to de-register.    *See supra* note 6.    Given the "most fundamental significance under our constitutional structure" of the right to vote, *League of Women Voters*, 838 F.3d at 12, there is a substantial public cost to an improper information collection that threatens to interfere with that right.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court issue a preliminary injunction requiring that (1) the Commission cease its collection of data and delete and/or sequester any information collected, unless and until it satisfies the procedures prescribed by the PRA before seeking to collect such information; and (2) the Director of the OMB and Director Mulvaney review the Commission's violation of the PRA and take appropriate remedial action to cure that violation.

Respectfully submitted,

Date: October 11, 2017

Laurence M. Schwartztol
   (*Pro hac vice* pending)
Justin Florence (D.C. Bar #988953)
THE PROTECT DEMOCRACY PROJECT
10 Ware Street
Cambridge, MA 02138
(202) 856-9191

Danielle Conley (D.C. Bar #503345)
Lynn Eisenberg (D.C. Bar #1017511)
Jason Hirsch (*Pro hac vice* forthcoming)
Michael Posada (*Pro hac vice* pending)
WILMER CUTLER PICKERING
   HALE & DORR LLP
1875 Pennsylvania Avenue NW
Washington, D.C. 20006
(202) 663-6000

## CERTIFICATE OF SERVICE

I hereby certify that, on this 11th day of October, 2017, a true and correct copy of the foregoing Motion for Preliminary Injunction and accompanying Memorandum of Law, declarations, and exhibits have been served, via FedEx Overnight Mail, on the following parties:

Presidential AdvisoryCommission on Election Integrity
1650 Pennsylvania A venue NW
Eisenhower Executive Office Building
Rm. 268
Washington, D.C.  20504

The Office of Management and Budget
725 17th Street NW
Washington, D.C.  20503

Mick Mulvaney, in his official capacity
The Office of Management and Budget
725 17th Street NW
Washington, D.C.  20503

Danielle Conley (D.C. Bar #503345)
WILMER CUTLER PICKERING
   HALE & DORR LLP
1875 Pennsylvania Avenue NW
Washington, D.C. 20006
(202) 663-6006