## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————

UNITED TO PROTECT DEMOCRACY et al.

        Plaintiffs,

    v.                                Civil No. 17-02016 (RC)

PRESIDENTIAL ADVISORY COMMISSION
ON ELECTION INTEGRITY et al.

        Defendants.

———————————————————————

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND REPLY MEMORANDUM IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Laurence M. Schwartztol
  (D.C. Bar #MA0007)
Justin Florence (D.C. Bar #988953)
THE PROTECT DEMOCRACY PROJECT
10 Ware Street
Cambridge, MA 02138
(202) 856-9191

Danielle Conley (D.C. Bar #503345)
Lynn Eisenberg (D.C. Bar #1017511)
Jason Hirsch (*Pro hac vice* forthcoming)
Michael Posada (*Pro hac vice* pending)
WILMER CUTLER PICKERING
  HALE & DORR LLP
1875 Pennsylvania Avenue NW
Washington, D.C. 20006
(202) 663-6000

# TABLE OF CONTENTS

**Page**

Introduction.................................................................................................................................1

Standards of Review ....................................................................................................................2

Argument .....................................................................................................................................3

I.   Plaintiffs Have Established Informational Standing....................................................................3

    A.   Plaintiffs have been deprived of information the PRA requires the Commission to disclose.................................................................................................................................4

    B.   Plaintiffs have demonstrated that they have suffered the harm Congress sought to prevent by requiring disclosure.................................................................................12

    C.   Plaintiffs have standing to seek injunctive relief ........................................................17

II.   The Commission Is An Agency Under the PRA ....................................................................18

III.   Plaintiffs Are Entitled To Mandamus Because The Commission Has A Clear Duty To Act Under the PRA ........................................................................................................25

IV.   Plaintiffs Suffer A Current and Ongoing Irreparable Harm ....................................................27

V.   Plaintiffs Are Likely to Succeed on the Merits of Their Claims Against OMB......................31

Conclusion ................................................................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AARP v. United States Equal Employment Opportunity Commission*,
226 F. Supp. 3d 7 (D.D.C. 2016) ........................................................................... 30

*Alexander v. FBI*,
691 F. Supp. 2d 182 (D.D.C. 2010) ....................................................................... 23

*Anselmo v. King*,
902 F. Supp. 273 (D.D.C. 1995) ............................................................................ 26

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................. 3

*Atlantic Cleaners & Dyers v. United States*,
286 U.S. 427 (1932) ............................................................................................... 22

*Barr v. Clinton*,
370 F.3d 1196 (D.C. Cir. 2004) ............................................................................... 3

*Bensman v. U.S. Forest Service*,
408 F.3d 945 (7th Cir. 2005) ................................................................................. 17

*Brewer v. D.C.*,
891 F. Supp. 2d 126 (D.D.C. 2012) ......................................................................... 2

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ............................................................................................... 17

*Electronic Privacy Infomation Center v. Department of Justice*,
416 F. Supp. 2d 30 (D.D.C. 2006) ......................................................................... 28

*Electronic Privacy Infomation Center v. Presidential Advisory Commission on
Election Integrity*,
No. 1:17-cv-01320, 2017 WL 3141907 (D.D.C. July 24, 2017), *appeal
docketed*, No. 17-5171 (D.C. Cir. July 27, 2017) ................................................. 25

*Federal Election Commission v. Akins*,
524 U.S. 11 (1998) ..................................................................................... 10, 11, 16

*Fogerty v. Fantasy, Inc.*,
510 U.S. 517 (1994) ............................................................................................... 23

*Freedom Watch, Inc. v. Obama*,
807 F. Supp. 2d 28 (D.D.C. 2011) ......................................................................... 26

*Friends of Animals v. Jewell,*
  828 F.3d 989 (D.C. Cir. 2016) ..................................................................... *passim*

Gordon v. Holder,
  632 F.3d 722 (D.C. Cir. 2011) ............................................................................30

In re American Rivers & Idaho Rivers United,
  372 F.3d 413 (D.C. Cir. 2004) ............................................................................33

Kissinger v. Reporters Committee for Freedom of the Press,
  445 U.S. 136 (1980)...........................................................................................21

National Wildlife Federation v. United States,
  626 F.2d 917 (D.C. Cir. 1980)............................................................................26

National Organization for Women, Inc. v. Scheidler,
  510 U.S. 249 (1994)...........................................................................................24

Open Top Sightseeing USA v. Mr. Sightseeing, LLC,
  48 F. Supp. 3d 87 (D.D.C. 2014) .......................................................................30

Protect Democracy Project, Inc. v. U.S. Department of Defense,
  No. 17-CV-00842 (CRC), 2017 WL 2992076 (D.D.C. July 13, 2017)................28

*Public Citizen v. U.S. Department of Justice,*
  491 U.S. 440 (1989).................................................................................. *passim*

Sandoz, Inc. v. Leavitt,
  427 F. Supp. 2d 29 (D.D.C. 2006) ......................................................................33

Shaffer v. Defense Intelligence Agency,
  901 F. Supp. 2d 113 (D.D.C. 2012) .....................................................................3

Singh v. D.C.,
  881 F. Supp. 2d 76 (D.D.C. 2012) .......................................................................3

Smith v. City of Jackson,
  544 U.S. 228 (2005)...........................................................................................22

Soucie v. David,
  448 F.2d 1067 (D.C. Cir. 1971) ....................................................................20, 21

Spokeo, Inc. v. Robins,
  136 S. Ct. 1540 (2016).................................................................................11, 12

Summers v. Earth Island Institute,
  555 U.S. 488 (2009).....................................................................................10, 11

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996) ........................................................................26

*Texas Children's Hospital v. Burwell,*
    76 F. Supp. 3d 224 (D.D.C. 2014) ..................................................................31

*United Savings Association of Texas v. Timbers of Inwood Forest Assocs., Ltd.,*
    484 U.S. 365 (1988)....................................................................................9, 22

*United States v. Ron Pair Enterprises, Inc.,*
    489 U.S. 235 (1989)........................................................................................10

*United States v. Turkette,*
    452 U.S. 576 (1981)........................................................................................24

*Washington Post v. Department of Homeland Security,*
    459 F. Supp. 2d 61 (D.D.C. 2006) ..................................................................28

*Wilderness Society, Inc. v. Rey,*
    622 F.3d 1251 (9th Cir. 2010) ........................................................................12

**Docketed Cases**

*Common Cause v. Presidential Advisory Commssion on Election Integrity*, No. 1:17-cv-1398
    (D.D.C.) ..........................................................................................................21

*Dunlap v. Presidential Advisory Commission on Election Integrity*, No. 1:17-cv-02361
    (D.D.C.) ..........................................................................................................30

*EPIC v. Presidential Advisory Commission on Election Integrity*, No. 17-5181 (D.C. Cir.)........21

*Lawyers' Committee for Civil Rights Under Law v. Presidential Advisory*
    *Commission on Election Integrity*, No. 1:17-cv-01354 (D.D.C.) ............................30

**Codes, Statutes & Regulations**

5 C.F.R.
    § 1320.3.............................................................................................................24
    § 1320.3(c) ........................................................................................................32
    § 1320.14(a) ........................................................................................................8
    § 1320.14(b) ........................................................................................................8

5 U.S.C.
  § 551(1) ........................................................................................................... *passim*
  § 552(f) ............................................................................................................ *passim*
  § 552a ..................................................................................................................... 23
  § 704 ....................................................................................................................... 29
  § 706(1) ............................................................................................................... 32, 33

44 U.S.C.
  § 3501 ..................................................................................................................... 16
  § 3501(2) ................................................................................................................ 24
  § 3501(4) ............................................................................................................. 6, 12
  § 3501(11) ...................................................................................................... 6, 12, 16
  § 3502(1) ................................................................................................................ 18
  § 3504 ..................................................................................................................... 29
  § 3506 ................................................................................................................. 9, 17
  § 3506(c) ......................................................................................................... *passim*
  § 3506(c)(3) ............................................................................................................. 5
  § 3507 ................................................................................................................. 9, 14
  § 3507(a) ........................................................................................................ *passim*
  § 3517(b) ...................................................................................................... 28, 29, 32, 33

Pub. L. 89-489, 80 Stat. 250 (1966) ............................................................................ 19

**Other Authorities**

Brennan Center for Justice Justice, "Responses to the 'Voter Fraud'
    Commission's Voter File Data Request," (updated Oct. 5, 2017),
    https://www.brennancenter.org/latest-updates-fraud-commission .......................... 13

H.R. Conf. Rep. No. 93-1380 (1974) ............................................................................ 20

Michael Wines & Rachel Shorey, "Even Some Republicans Balk at Trump's
    Voter Data Request. Why the Uproar?," *N.Y. Times* (July 7, 2017) ........................ 13

Office of Information and Regulatory Affairs, *Information Collection Review Data on
    Reginfo.gov* (last visited Nov. 19, 2017),
    https://www.reginfo.gov/public/jsp/PRA/ICR_info.jsp ............................................ 8

S. Rep. No. 96-930 (1980) ........................................................................................... 23

S. Rep. No. 104-8 (1995) .......................................................................................... 7, 24

**INTRODUCTION**

The Presidential Advisory Commission on Election Integrity (the "Commission") has engaged in a secretive, mismanaged, and erratic collection of vast amounts of personal information from American voters, depriving the public of their right to understand how this information will be used and how it might affect future elections and citizens' ability to vote. The Commission has failed to disclose the manner or methods that it intends to use to store and secure the data, and it has otherwise disregarded vital requirements imposed on such collections by Congress through the Paperwork Reduction Act ("PRA").

As a result, Plaintiffs, United to Protect Democracy and the Protect Democracy Project, Inc., have acted to force the Commission to comply with the PRA and to disclose information about its collection.   Plaintiffs have asked this Court to grant preliminary relief because the Commission's unlawful actions threaten to irreparably harm Plaintiffs by impairing their ability to educate members of the public and government decisionmakers on how the Commission's collection and use of Americans' voter registration information may undermine the democratic process.   This kind of public education and advocacy about governmental collection and management of sensitive information is precisely what the PRA contemplates.   In their opposition, Defendants ask this Court to ignore the robust disclosure requirements imposed by the PRA—a statute expressly designed to inform the public about how the federal government collects, stores, and uses its information and to solicit the public's views on those subjects.   In light of the sweeping and unlawful actions taken by the Commission, a writ of mandamus is necessary to halt the improper collection.   Similarly, the failure of the Office of Management and Budget ("OMB") to respond to a statutorily prescribed petition procedure and ensure the Commission's compliance with the PRA also warrants court intervention.   For these reasons, Plaintiffs are entitled to a preliminary injunction.

Defendants combine their opposition to the motion for preliminary injunction with a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).   That motion to dismiss hinges mainly on an attack on Plaintiffs' standing to litigate this case, and an extended argument that, because the Commission is allegedly not an "agency" under the Freedom of Information Act or the Administrative Procedure Act, Plaintiffs cannot state a claim that the Commission violated the PRA.   Defendants' standing argument reflects an attempt to render nil the PRA's robust disclosure requirements; their merits arguments ask this Court to impose an inapposite doctrinal framework developed for different statutes whose texts, histories, and purposes diverge sharply from the PRA's.   Because the issues involved in the preliminary injunction are intertwined with the issues raised in Defendants' motion to dismiss, Plaintiffs submit this memorandum of law in opposition to the motion to dismiss and in reply to Defendants' arguments regarding the preliminary injunction.

## STANDARDS OF REVIEW

As Plaintiffs have previously noted, on reviewing the Motion for Preliminary Injunction, this Court assesses four factors: Plaintiffs' likelihood of success on the merits, the likelihood of irreparable harm, the balance of equities, and the public interest.   Pls. Mot. at 15.   It bears noting that Defendants' combined opposition and motion to dismiss appears to merge the arguments regarding likelihood of success on the merits with the putative grounds for a motion to dismiss.   Accordingly, should this Court deny the motion to dismiss, that determination will be tantamount to a determination that Plaintiffs have satisfied the first preliminary injunction factor.

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) … does not test a plaintiff's ultimate likelihood of success on the merits, but rather, whether a plaintiff has properly stated a claim."   *Brewer v. D.C.*, 891 F. Supp. 2d 126, 130 (D.D.C. 2012).   To survive

a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).   "It is not necessary for the plaintiff to plead all elements of his prima facie case in the complaint, or to plead law or match facts to every element of a legal theory."   *Singh v. D.C.*, 881 F. Supp. 2d 76, 81 (D.D.C. 2012) (internal citations omitted).   Rather, the court assumes the truth of the factual allegations and "construes them liberally in the plaintiff's favor." *Id.*

In the case of a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, "a court must review the complaint liberally, granting the plaintiff the benefit of all inferences that can be derived from the facts alleged."   *Shaffer v. Def. Intelligence Agency*, 901 F. Supp. 2d 113, 116 (D.D.C. 2012) (citing *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004)).

**ARGUMENT**

## I.     PLAINTIFFS HAVE ESTABLISHED INFORMATIONAL STANDING

Defendants do not disagree that a plaintiff has informational standing when "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure."   *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016).   In resisting the application of that framework here, Defendants ask the Court to interpret out of existence core elements of the PRA and ignore Plaintiffs' showings of the harm caused to their organizational missions by Defendants' unlawful actions.

**A.      Plaintiffs have been deprived of information the PRA requires the Commission to disclose**

Defendants contend that Plaintiffs failed to satisfy the first prong of the informational standing test because Plaintiffs did not specify any information that the PRA mandates be produced to them and that they were deprived of here.   Defs. Opp. at 12-14.   That is not so, as both the Complaint and Plaintiffs' Motion for Preliminary Injunction demonstrate.

The PRA mandates robust disclosures from agencies sponsoring collections of information.   As Plaintiffs explained in their opening brief, under the PRA, "an agency '*shall not*' sponsor an information collection without, among other things, complying with the procedures listed in § 3506(c)," which outline the statute's principal disclosure requirements. Pls. Mot. at 17.   Those procedures make plain that public disclosures are mandatory in order to comply with the PRA.   First, § 3506(c)(1) requires agencies to prepare a series of analyses and other information setting forth, among other things, "a functional description of the information to be collected," "an evaluation of the need for the collection," "a plan for the collection," "a specific … estimate of [the] burden" of the collection, and an explanation of how the chosen approach ensures "the efficient and effective management and use of the information to be collected," evaluating the "need," "burden," and "use" attendant to any proposed information collection and to outline a collection "plan" and an approach to ensuring "the efficient and effective management" of the information obtained.   *Id.* § 3506(c)(1)(A)(i)-(vi).

Next, § 3506(c)(2) requires the agency to "provide 60-day notice in the Federal Register, and *otherwise consult with members of the public* and affected agencies concerning each proposed collection of information" and to "solicit comment" on four questions that follow directly from the information that must be generated in accordance with § 3506(c)(1): (1) "whether the proposed collection of information is necessary for the proper performance of the

4

functions of the agency, including whether the information shall have practical utility"; (2)

whether the "estimate of the burden of the proposed collection of information" is accurate; (3)

how the "quality, utility, and clarity of the information" can be enhanced; and (4) how to

"minimize the burden of the collection of information on those who are to respond." *Id.* §

3506(c)(2)(A)(i)-(iv) (emphasis added).   Finally, § 3506(c)(3) requires the agency to "certify

(and provide a record supporting such certification, including public comments received by the

agency) that each collection of information submitted to the Director for review under section

3507" achieves the objectives on which the agency is required to solicit comment.   *Id.* §

3506(c)(3).

      Those provisions, taken together, establish a baseline amount of information that the

Commission must disclose to the public in order to comply with § 3506(c).   Section 3506(c)(2)

requires the Commission, at a minimum, to publicly disclose the information necessary for

"members of the public" to provide comment on the four objectives listed in that section.   And

not coincidentally, § 3506(c)(1) indicates what materials an agency must create as part of the

assessment of those same questions.   Thus, the statute is naturally read to require the agency to

publicly disclose the materials it must create and produce pursuant to § 3506(c)(1), or derivatives

of those materials, in order to facilitate the public comment process mandated by § 3506(c)(2).

Absent the production of those materials, there would be no possible way for members of the

public—especially members of the public like Plaintiffs whose mission depends on educating the

public about governmental action—to fulfill the role Congress set forth for them in that

provision.   After all, no one could realistically provide insights on "whether the proposed

collection of information is necessary for the proper performance of the functions of the agency,

including whether the information shall have practical utility," § 3506(c)(2), without being

informed of, at a minimum, what is being collected, why it is being collected, and the use to which the collection will be put.   Likewise, in order to meaningfully comment on whether the "estimate of the burden of the proposed collection of information" is accurate, *id.*, one would need to have information about the agency's estimated burden.   Information regarding each of those subjects—what is being collected, why, how will it be used, and what will the burden be— are unsurprisingly part of what the agency must prepare pursuant to § 3506(c)(1).

The detailed procedures of § 3506(c) are not the PRA's only public disclosure requirements.   After concluding the process outlined in § 3506(c), the agency must then make a second public disclosure in the Federal Register, under 44 U.S.C. § 3507(a)(1)(D), which requires the relevant agency to explain, among other things, what is being collected, why the collection is necessary, how the collected information will be used, and the estimated burdens of the proposed collection.   *Id.* § 3507(a)(1)(D)(ii)(I-VI).   The plain text of § 3507(a)(1)(D) is therefore also most naturally understood to require, at a minimum, that the agency include in its public submission the materials it created pursuant to § 3506(c)(1).

The legislative purposes and history of the PRA buttress the proposition that § 3506(c)(2) and § 3507(a)(1)(D) require government entities to publicly provide the information and analyses called for by § 3506(c)(1).   The PRA lists a series of statutory purposes.   Those goals include "improv[ing] the quality and use of Federal information to strengthen decisionmaking, accountability, and *openness* in Government and society," *id.* § 3501(4), and "improv[ing] the responsibility and accountability of the [OMB] and all other Federal agencies to Congress *and to the public* for implementing the information collection review process, information resources management, and related policies and guidelines established under this subchapter," *id.* § 3501(11) (emphases added).

6

Moreover, the Senate Report accompanying the 1995 amendment of the PRA, when § 3506(c) was added, further demonstrates Congress's commitment to "meaningful public participation in the development and implementation of [government collections] policy."  S. Rep. No. 104-8, at 5 (1995).   The report reaffirms that one of Congress's central purposes in passing the PRA was to "[e]nhance opportunities for public participation in government decisions regarding paperwork burdens," *id*. at 2, and notes that the "key to success" for the PRA remains "encouraging more effective public participation," *id*. at 5.   The Report's retrospective look at the 1986 amendments to the PRA is particularly telling, as it explains that those amendments were specifically designed to "[r]equir[e] agencies *to provide the public with more information about paperwork proposals*," and to "[m]andat[e] steps to make government information more accessible to the public."   *Id*. at 11 (emphasis added).   The report went further:

> [T]he Act's provisions for public participation are doubly important.   The Committee continues to believe that: A key to successful information resources management is public participation and comment on the development and implementation of information policy.   *Effective public comment at the front end of decision processes is particularly beneficial.*   Public participation in itself is a resource which should be tapped by agency official planning and designing collection of information.

*Id*. at 14 (emphasis added).   The "meaningful" and "effective" public comments that Congress sought "at the front end" of the collection process on the questions set forth in § 3506(c)(2) would only be possible if Congress likewise intended for the public to gain access to the information generated pursuant to § 3506(c)(1).

What is more, government practice in complying with the PRA is consistent with Plaintiffs' reading of the statute.   Myriad entities within the Executive Branch engage in the PRA's notice-and-comment process before undertaking any data collections.   In doing so,

Executive Branch entities regularly provide documentation detailing, explaining, and justifying

proposed document collections for OMB to assess whether to approve an information collection

and for members of the public to consider while engaging in the comment process.[1]   OMB

routinely makes this information public per its own regulations, which explain that it does so

"[i]n order to enable the public to participate in and provide comments during the clearance

process."   5 C.F.R. § 1320.14(a) (noting that "OMB will ordinarily make its paperwork docket

files available for public inspection"); *id.* § 1320.14(b) ("Agencies shall provide copies of the

material submitted to OMB for review promptly upon request by any person."); *see also* Office

of Information and Regulatory Affairs, *Information Collection Review Data on Reginfo.gov*,

Reginfo.gov (last visited Nov. 19, 2017), https://www.reginfo.gov/public/jsp/PRA/ICR_info.jsp

(explaining that OIRA, a component of OMB, puts PRA requests on this website to "give[] the

public the ability to view and search information collection reviews").

　　Importantly, to establish informational standing at this early stage, Plaintiffs need not

unequivocally demonstrate that the PRA requires the public disclosure of the types of

---

[1]  *See, e.g.*, ICR (Information Collection Review) Documents for Election Assistance Comm'n, Evaluation of EAC Educational Products, Reginfo.gov (last visited Nov. 20, 2017), https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=200911-3265-001; ICR Documents for Dep't of Energy/Energy Information Admin., Oil and Gas Reserves System Surveys, Reginfo.gov (last visited Nov. 20, 2017), https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201603-1905-001; ICR Documents for Food and Drug Admin., Experimental Studies of Nutrition Symbols on Food Packages, Reginfo.gov (last visited Nov. 20, 2017), https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=200912-0910-003; ICR Documents for U.S. Fish and Wildlife Serv., North American Woodcock Singing Ground Survey, Reginfo.gov (last visited Nov. 20, 2017), https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201201-1018-001; ICR Documents for Veterans Admin., VOV (Voice of Veteran) Surveys, Reginfo.gov (last visited Nov. 20, 2017), https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=201603-2900-007.

information created consistent with § 3506(c)(1).   Rather, it requires only that "*on [plaintiff's]*

*interpretation*, a statute requires the government . . . to disclose" the relevant information.

*Friends of Animals*, 828 F.3d at 992 (emphasis added).   There can be no question that Plaintiffs

have offered an interpretation of the PRA that amply meets that threshold.

       Defendants' arguments to the contrary are unavailing.   As an initial matter, their textual

arguments must fail.   First, Defendants' breezy rebuttal to the substantial support for Plaintiffs'

position tellingly omits any discussion of, or even reference to, § 3506(c)(2), which is perhaps

the provision most critical to the PRA's scheme for required public disclosures.   Further,

Defendants support their position by improperly assessing cherrypicked provisions of the PRA

only in isolation.   *See* Defs. Opp. at 12-13 (arguing that neither § 3506(c)(1) nor § 3507 alone

create a disclosure mandate).   But, consistent with standard interpretive practice, Plaintiffs'

construction of the PRA is "holistic," and the basis for the required disclosures can be

understood only in the context of the overall "statutory scheme," especially § 3506 and § 3507.

*See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest* Assocs*., Ltd.*, 484 U.S. 365, 371

(1988).

       Additionally, Defendants' argument cannot hold the weight that the Commission's

actions (or inactions) have placed on it.   The Commission jettisoned the PRA's notice-and-

comment requirements in their entirety and failed to provide any of the information discussed in

§ 3506(c) and § 3507(a)(1)(D).   While this Court need not determine the precise scope of the

disclosure requirements under § 3506 and § 3507 for purposes of finding standing, crediting

Defendants' argument that there has been no deprivation of required information would require a

finding that the PRA does not mandate the public disclosure of *any* information.   And

Defendants offer no theory of how a member of the public could satisfy Congress's wishes under

Defendants' view that the PRA entitles public commenters to no information about the subject on which they are asked to comment.   Interpreting the PRA to be soliciting educated public views on the questions laid out in § 3506(c)(2) without commensurate access to the information on which the views would be predicated creates the type of illogical result courts have long sought to avoid in construing statutes.   *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989).

In addition, Defendants contend that Plaintiffs' reliance on the PRA's notice-and-comment requirements is "only a potential basis for a procedural injury, not a basis for informational injury."   Defs. Opp. at 13.   First, Plaintiffs' injury, which flows directly from its deprivation of the PRA's mandated disclosures, is rooted in its ability to carry out its core missions of educating the public and engaging in advocacy—not a bare procedural right to participate in a statutory process.   *See* Bassin Decl. ¶¶ 3, 9.   Moreover, the doctrine does not impose any categorical, necessary separation between procedural and informational injury. Indeed, the Supreme Court has recognized on multiple occasions that a procedural violation related to an information disclosure provision can give rise to an informational injury.   *See Federal Election Comm'n v. Akins*, 524 U.S. 11 (1998) (holding that the plaintiffs had suffered an "informational injury" where statute's "disclosure requirements" were not followed); *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989) (finding standing where an agency failed to comply with a statute's "charter and notice" procedures and thereby deprived plaintiff of the information subject to disclosure).   That is precisely what Plaintiffs allege here.

Defendants next appear to rely on *Summers v. Earth Island Institute*, 555 U.S. 488 (2009), to suggest that the violation of a statutorily mandated notice-and-comment procedure can never give rise to Article III standing.   Defs. Opp. at 13.   That is incorrect for several reasons.

First, *Summers* is inapposite here.   The plaintiffs in *Summers* did not assert informational standing and did not allege deprivation of any information "a statute requires the government or a third party to disclose."   *Friends of Animals*, 828 F.3d at 992.   Rather, they alleged an interest in "the ability to file comments on . . . Forest Service actions."   *Summers*, 555 U.S. at 496.   The Court held that the plaintiffs could not challenge the agency's failure to follow the comment process "*in vacuo*," but needed to allege an interest in the comment processes in which they sought to participate.   *Id.*

Second, the Supreme Court clarified the limits of the *Summers* holding two terms ago in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016).   *Spokeo* confirmed that a "bare procedural violation, divorced from any concrete harm" cannot give rise to standing.   *Id.* at 1549 (citing *Summers*, 555 U.S. at 496).   But, contrary to Defendants' position, the Court also indicated that a "violation of a procedural right granted by statute *can be* sufficient . . . to constitute injury in fact" and absolve the plaintiff of the need to "allege any additional harm beyond the one Congress has identified" in certain circumstances.   *Id.* at 136 S. Ct. at 1549-50 (emphasis added).   And the Court cited as examples of such circumstances the two informational standing cases on which *Friends of Animals*' test is based and on which Plaintiffs relied in their motion. *See id.* (citing *Federal Election Comm'n v. Akins*, 524 U.S. 11 (1998) and *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989)).   *Spokeo* thus exempts procedures that mandate information disclosure from *Summers*'s holding that a plaintiff must allege "additional harm"

beyond deprivation of the information that must be statutorily disclosed.[2]   *Summers* therefore

erects no barrier where, as here, Plaintiffs have demonstrated that a statute mandates information

disclosure.

> **B.      Plaintiffs have demonstrated that they have suffered the harm Congress
> sought to prevent by requiring disclosure**

Defendants contend that Plaintiffs have not demonstrated that they have suffered "the

type of harm Congress sought to prevent by requiring disclosure," *Friends of Animals*, 828 F.3d

at 992, because in Defendants' view, the PRA is "designed to improve the government's

information collection processes, rather than to create an informational interest in the general

public."   Defs. Opp. at 14.   That view misunderstands the PRA's purpose and misstates the

legal requirements for informational harm.

First, Defendants' reading of the PRA's purpose is artificially thin.   Improving the

government's information collection processes is among the PRA's purposes, but as noted

above, the PRA also strives to promote public accountability in information collection by

"improv[ing] the . . . accountability of . . . Federal agencies to Congress and to the public for

implementing the information collection review process . . . ," 44 U.S.C. § 3501(11), and by

"improv[ing] the quality and use of Federal information to strengthen decisionmaking,

accountability, and openness in Government and society," *id.* § 3501(4).

---

[2] Defendants' reliance on the Ninth Circuit's decision in *Wilderness Society, Inc. v. Rey*, 622 F.3d 1251 (9th Cir. 2010), is equally unavailing because the Supreme Court later rejected the very premise of that decision on which the Defendants rely.   *Wilderness Society* rested on the idea that "the deprivation of procedural rights, alone, cannot confer Article III standing," *id.* at 1258, but *Spokeo* stated the exact opposite: "[T]he violation of a procedural right granted by statute *can* be sufficient in some circumstances to constitute injury in fact," 136 U.S. at 1549 (emphasis added), and cited procedural violations of statutory disclosure provisions of the type *Public Citizen* also alleges.   *Id.*

Plaintiffs would have used the information that § 3506(c) and § 3507(a)(1)(D) require the Commission to disclose to promote the PRA's accountability purposes and, through them, its broader information-collection goals.   As Plaintiffs have alleged, it is part of their mission to educate the public and pursue advocacy to help ensure that governmental "decision-making is consistent with fundamental democratic norms and traditions."   Compl. ¶ 5.   That mission has particular importance in the context of this data request.   The request has sparked significant controversy about whether it comports with the democratic norms at the heart of Plaintiffs' mission.   *See e.g.,* Michael Wines & Rachel Shorey, "Even Some Republicans Balk at Trump's Voter Data Request. Why the Uproar?," *N.Y. Times* (July 7, 2017).   Moreover, there is significant need for the kind of advocacy on those issues that Plaintiffs pursue because, in the midst of that controversy, state election officials were faced with a decision over whether to comply with the requests in their entirety, in part, or not at all.   *See generally* Brennan Center for Justice, "Responses to the 'Voter Fraud' Commission's Voter File Data Request," (updated Oct. 5, 2017), https://www.brennancenter.org/latest-updates-fraud-commission.

The information that the Commission unlawfully withheld would play a critical role in efforts by Plaintiffs (and others) to educate and persuade state election officials about, *inter alia*, "whether, and to what extent, to disclose the information sought" in the June 28 Letters and "the state and federal legal implications of the [] Commission's request."   *See* Bassin Decl. ¶ 9, Ex. E.   The information supplied by compliance with the PRA would have significantly bolstered Plaintiffs' efforts to make similar arguments to broad audiences within and beyond the legal community.   *See* Bassin Decl. ¶ 9, Exs. F & G.   Had the Commission complied with the statute, it would have needed to describe the proposed uses of the data and articulate a justification for the data collection, which would have been published in the Federal Register.   *See* 44 U.S.C. §

3507.   These mandatory disclosures would have enabled Plaintiffs to scrutinize and (as appropriate) critique that justification well in advance of any state official deciding whether to produce information.   *See*, *e.g*., Compl. ¶ 73 ("Had Plaintiffs received the information to which they were entitled, they would have sought to educate the public on the implications of that information, and would have organized their own advocacy strategies to respond appropriately to those disclosures."); Bassin Decl. ¶ 10 ("In the future, if the Commission engages in the process required by the statute, Protect Democracy will carefully review and analyze any information the Commission discloses through that process.   We would also anticipate publicizing the information disclosed by the Commission, publishing our analysis of that information in an effort to educate the public, submitting comments to the Commission and OMB through the procedures prescribed by statute, and engaging in other advocacy as appropriate to advance Protect Democracy's mission in light of the information provided by the Commission.").   Complying with the PRA would also have meant creating a plan for the maintenance of the data, an undertaking which would have allowed Plaintiffs to educate state officials on those proposed plans relative to best practices for maintaining and using potentially sensitive voter data.   *See* Schneier Decl. ¶¶ 12, 13; Lindback Decl. ¶¶ 9, 12.   In short, Plaintiffs would have used the information that the Commission unlawfully withheld in precisely the way envisioned by the PRA: to use public accountability to improve government decision-making.

Second, to the extent Defendants are suggesting that a statute must "create an informational interest in the general public," Defs. Opp. at 14, in order for a plaintiff to demonstrate that it has suffered the "type of harm Congress sought to prevent by requiring

disclosure," *Friends of Animals*, 828 F.3d at 992, that is also wrong.[3]   Indeed, the two most important cases on informational standing impose no such requirement, but focus instead on whether the plaintiffs alleged that they would use the relevant information to advance the congressionally defined purposes of the statute in question.

In *Public Citizen v. U.S. Department of Justice*, the Supreme Court found that the plaintiffs had established informational standing under the Federal Advisory Committee Act ("FACA").   491 U.S. 440, 449 (1989).   The Court recognized that FACA was intended to "assess the need for the 'numerous [entities] which have been established to advise officers and agencies in the executive branch of the Federal Government'" and to ensure they, among other things, were "established only when essential," "terminated when they have outlived their usefulness," and "subject to uniform standards and procedures."   *Id.* at 445-46.   To accomplish those objectives, FACA required the advisory committees covered by the act to provide notice of their meetings and disclose "committee minutes, records, and reports" to the public.   *Id.* at 446-47.   The plaintiffs were advocacy organizations that sought that information in order "to monitor [the] workings" of one such advisory committee and "participate more effectively" in its interactions with the government.   *Id.* at 449.   The Court held that the plaintiffs had informational standing because they proposed to use the disclosure in just the way the Congress had envisioned: to ensure the advocacy organization continued to serve the purposes FACA set out for it.   *Id.*

---

[3] Defendants' references, *see* Defs. Opp. at 14, to FOIA's general informational interest is irrelevant because the Supreme Court has not adopted a requirement that all statutes mirror FOIA in order to give rise to informational standing.   Nor is Defendants' invocation of FACA relevant here.   The controlling precedent on informational standing in the FACA context is *Public Citizen v. U.S. Department of Justice*, 491 U.S. 440 (1989), and that case establishes no requirement that informational standing stem from a statute creating an "informational interest in the general public."

Similarly, in *Federal Election Commission v. Akins*, the Supreme Court found informational standing under the Federal Election Campaign Act ("FECA").   *See* 524 U.S. 11 (1998).   FECA seeks to "remedy any actual or perceived corruption of the political process," including corruption enabled by so-called "political committees."   *Akins*, 524 U.S. at 14.   To advance that objective, it "imposes extensive recordkeeping and disclosure requirements" on those committees.   *Id.*   The plaintiffs, a group of voters, had informational standing to require those disclosures because they alleged that the information "would help them (and others to whom they would communicate it) to evaluate candidates for public office" and "evaluate the role that [a disclosing organization's] financial assistance might play in a specific election."   *Id.* at 14, 21.[4]   As in *Public Citizen*, the plaintiffs in *Akins* had standing because they sought disclosures to advance the very purposes of the statute.

Here, likewise, the PRA is intended to improve information collection by the government by minimizing its "burden," while ensuring its "quality," "public benefit," and lawfulness, *see* 44 U.S.C. § 3501, and to ensure "accountability of . . . Federal agencies to Congress and to the public for implementing the information collection review process . . . ." *id.* § 3501(11). Plaintiffs have alleged that they plan to use the information unlawfully withheld by the Commission to "educate[] state and federal officials and the general public on the implications of the Commission's proposed request," Pls. Mot. at 19, and to thereby ensure the Commission's accountability to the other information collection practices outlined in § 3501 of the PRA.

---

[4] Defendants notably fail to even mention either of these precedents, though they agree that *Friends of Animals* articulates the appropriate test for informational standing, and that case relies on both of them in formulating that test.   *See Friends of Animals*, 828 F.3d at 992; *see also* Pls. Mot. at 16.

Those allegations are directly parallel to the kinds of allegations the Court in *Public Citizen* and

*Akins* found to be sufficient to demonstrate harm of the type Congress sought to prevent.[5]

### C.   Plaintiffs have standing to seek injunctive relief

Finally, Defendants allege that even if Plaintiffs can establish informational standing, that

standing theory cannot support "an injunction requiring the Commission to cease collecting

information and to destroy information already collected."   Defs. Opp. at 15.   That

misunderstands the structure of Plaintiffs' claim.   The principal form of relief sought by

Plaintiffs is an injunction in the form of mandamus directing the Commission to comply with all

of "the PRA's mandatory provisions," Pls. Mot. at 3, including the information disclosure

provisions in 44 U.S.C. §§ 3506-07.   *See* Compl. ¶¶ 60-76.

But courts have broad equitable power to grant "complete relief" to plaintiffs.   *Califano

v. Yamasaki*, 442 U.S. 682, 702 (1979).   The harms Plaintiffs suffer stem from their inability to

scrutinize and hold the Commission to account in its design and pursuit of its current information

collection.   Pls. Mot. at 8-9.   Plaintiffs therefore cannot be accorded complete relief unless the

injunction is accompanied by an attendant directive ordering the Commission to cease this

unlawful collection until it has followed the PRA's required process and destroy the information

it has obtained unlawfully so that it may recollect that information in compliance with the PRA.

---

5 Rather than engage with *Public Citizen* and *Akins*, Defendants rely on the Seventh Circuit's
decision in *Bensman v. U.S. Forest Service*, 408 F.3d 945 (7th Cir. 2005), to advance the
incorrect notion that the second prong of the *Friends of Animals* test can only be satisfied when a
statute "create[s] an informational interest in the general public."   Defs. Opp. at 14.   But
*Bensman* stands for much less—the uncontroversial proposition that if a statute does not require
an information disclosure, it cannot confer informational standing.   The statute at issue there, the
Appeals Reforms Act ("ARA"), could not satisfy the *Friends of Animals* test because it did not
actually require the disclosure of information, and thus there was no information to which the
plaintiff could claim an entitlement.   *See Bensman*, 408 F.3d at 957 ("[T]here is no
information to which Mr. Bensman may claim an entitlement"); *id.* at 958 ("[T]here is nothing in
the ARA's history to indicate that Congress intended it as a vehicle for transmitting information
to the public.").

But that relief is merely in service of ensuring that Plaintiffs' principal relief is not mooted before this action can be fully litigated.   Indeed, the PRA recognizes that public scrutiny and accountability is necessary *prior to* an agency's pursuit of information by requiring that an agency "shall not conduct or sponsor the collection of information," unless it complies with the statute's procedural requirements, including those mandating the disclosures Plaintiffs seek.   44 U.S.C. § 3507(a).

Thus, Plaintiffs ask this Court to require the Commission to make information disclosures consistent with § 3506(c) and § 3507(a)(1)(D) and to order the Commission to cease its unlawful information collection until it has done so.

## II.   THE COMMISSION IS AN AGENCY UNDER THE PRA

Defendants contend that the Commission is not an agency subject to the PRA and that Plaintiffs' claims should be dismissed as a result.   But this argument is contrary to the plain language of the PRA, which defines an "agency" as "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency," with certain enumerated exclusions.   44 U.S.C. § 3502(1). That capacious definition encompasses "*any* executive department" as well as all "*other* establishment[s] in the executive branch."   *Id.* (emphasis added); *see also* Pls. Mot. at 21. Defendants do not contest that the plain text of § 3502(1) encompasses the Commission.   *See* Defs. Opp. at 16-25.   They instead resist the notion that satisfying the plain text of the PRA's definition is sufficient, and seek to import an additional, atextual requirement into that definition based on purported similarities to the Freedom of Information Act and Administrative Procedure Act.   The definition of "agency" in those statutes has been interpreted to exclude "staff or units in the Executive Office whose sole function is to advise or assist the President."   *See id.* at 17.

18

Defendants attempt to recast the PRA's definition of "agency" contrary to its plain text in order to add an additional, atextual hurdle for Plaintiffs and exempt units that "advise or assist" the President.   But Defendants fail to grapple with or even acknowledge the critical textual and contextual dissimilarities between the PRA and the other statutory regimes upon which their arguments rely.

Defendants' effort to read an implied exemption for units that "advise or assist" the President into the PRA is premised on their assertion that the PRA's definition of "agency" is "materially indistinguishable from the definition that appears in the [Freedom of Information Act ("FOIA")], 5 U.S.C. § 552(f)(1)."   Defs. Opp. at 17.   That claim simply ignores several *material* differences between the PRA and FOIA definitions.   It is true that FOIA and the PRA share *some* similar language.   But FOIA's definition extends well beyond the language it shares with the PRA, and it is the language that the FOIA definition does *not* share with the PRA, rather than the shared language, that gives rise to the "advise or assist" exemption Defendants now seek to apply to the PRA.

The definition of "agency" in FOIA has two component parts.   FOIA was enacted in 1966 as an amendment to the Administrative Procedure Act ("APA").   *See* Pub. L. 89-489, 80 Stat. 250 (1966).   At the time, FOIA did not specify its own definition of "agency," but instead used the APA's definition codified at 5 U.S.C. § 551(1), which defines "agency" as "*each authority of the Government of the United States*, whether or not it is within or subject to review by another agency."   *Id*. (emphasis added).   In 1974, Congress amended FOIA to add to that definition.   That amendment provided that for purposes of FOIA, "'agency' as defined in section 551(1)" of the APA would also "include[] any executive department, military department, Government corporation, Government controlled corporation, or other establishment

19

in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency." *See* 5 U.S.C. § 552(f); *see also* H.R. Conf. Rep. No. 93-1380, at 14 (1974) (noting that the "conferees . . . intend to include within the definition of 'agency' those entities encompassed by 5 U.S.C. 551" and the additional entities contained in the amendment).   Thus, § 551(1) is the first discrete component of FOIA's definition of "agency," and § 552(f) is the second.

The PRA's definition of "agency" shares language with only the *second component* of that definition, outlined in § 552(f).   But the FOIA and APA exemption for units in the Executive Office that "advise and assist" the President derives solely from the *first component* of the FOIA definition codified at § 551(1), which the PRA does not adopt and with which it shares no language.   As Defendants recognize, *see* Defs. Opp. at 17, the exemption in § 551(1) originates in a 1971 D.C. Circuit case, *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971).   In *Soucie*, the D.C. Circuit noted that the word "agency" *in § 551(1)* is defined as "any '*authority* of the Government'" and therefore requires, at a minimum, that qualifying entities possess "substantial independent authority in the exercise of specific functions."   *Soucie*, 448 F.2d at 1073 (emphasis added).   Applying that logic, the court held that an entity whose "sole function" is to "advise and assist the President" does not exercise sufficient independent authority and cannot qualify as an "agency" under FOIA.   *Id.* at 1075.   But *Soucie* was only construing § 551(1), not § 552(f).   Indeed, *Soucie* predates the addition of the language in § 552(f) to FOIA.   Therefore, Defendants' claimed textual connection between that exemption and the

language the PRA shares with FOIA and the APA does not exist, and applying such an

exemption here because of any purported similarities would be improper.[6]

Nor can Defendants find support for their theory in the Supreme Court's decision in

*Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136 (1980).   *See* Defs.

Opp. at 17.   In that case, the Supreme Court addressed whether Congress' addition of § 552(f) to

FOIA's definition of "agency" in the 1974 FOIA amendments overrode or otherwise impacted

the exemption previously identified in *Soucie* for units that "advise or assist" the President.

Noting legislative history of the 1974 amendments explicitly indicating that Congress intended

*Soucie*'s exemption to remain, the Court held that the amendments did not alter it.   *Id.* at 156

("The legislative history is unambiguous …. The Conference Report for the 1974 FOIA

Amendments indicates that "the President's immediate personal staff or units in the Executive

Office whose sole function is to advise and assist the President" are not included within the term

"agency" under the FOIA.").   That holding has no relevance here because the PRA does not

incorporate any of the language of § 551(1) from which that requirement is derived.   It would,

moreover, be unnecessary and superfluous to understand the language of § 552(f) to incorporate

---

[6] Plaintiffs explicitly did not raise the argument that the Commission is an "agency" under FOIA or the APA, *see* Pls. Mot. at 23 n.12 ("Plaintiffs note that the parties in related lawsuits dispute whether the Commission qualified as an 'agency' for purposes of the Administrative Procedure Act….   Plaintiffs take no position on that dispute, but note that the question presented in that context is not present here because the PRA does not predicate its application on the 'authority' an agency wields.").   While FOIA's definition of "agency"—predicated on the "authority" the government entity wields—is inapplicable in the context of the PRA, should the Court find the FOIA standard applicable here, Plaintiffs would request leave to file an amended complaint pleading why, even under that higher standard, the Commission is an "agency."   That very question is pending in parallel litigation in this Circuit, and the plaintiffs in those cases have offered detailed factual showings to support the proposition that, rather than merely advise the President, the Commission has launched a freestanding investigative effort.   *See* Brief for Appellant, *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'm on Election Integrity*, No. 17-5181 (D.C. Cir. filed Aug. 18, 2017); *Common Cause v. Presidential Advisory Comm'n on Election Integrity*, No. 1:17-cv-1398 (D.D.C. filed July 14, 2017).

21

the "advise and assist" limitation, when that limitation was already present and operative for FOIA in § 551(1) at the time Congress passed § 552(f).

Even if Defendants could demonstrate that the language in § 552(f) that the PRA and FOIA share somehow also embodies the *Soucie* exception, there can be no justification for importing that meaning into the PRA's definition of "agency." Although courts sometimes interpret similar language in different statutory contexts "*pari passu*" or side-by-side, "this is not a rigid or absolute rule, and it readily yields to other indicia of congressional intent." *Smith v. City of Jackson*, 544 U.S. 228, 260 (2005) (Scalia, J., concurring). And indicia that Congress intended FOIA and the PRA to have different meanings are amply available.

First, when interpreting FOIA's definition of "agency," courts must reconcile and coherently integrate the meanings of both § 551(1) and § 552(f). *See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 374 (1988) (provisions must be interpreted to avoid inconsistency). To the extent the language of § 552(f) could be understood to be limited to "author[ities]" of the government that exercise independent power rather than those that "advise and assist" alone, that limitation stems from a need to make § 552(f) consistent with § 551(1). There is no similar need in the PRA's definition of "agency" because that statute contains no reference to any conception of an "agency" as an "authority." To the contrary, Congress' omission of any such references is a telling indication that it did not intend the PRA to be so constrained. *See Atl. Cleaners & Dyers v. United States*, 286 U.S. 427, 433 (1932) (rejecting "*pari passu*" presumption where "the circumstances under which the language was employed" are different). To demonstrate otherwise, Defendants would have to show that in borrowing language from § 552(f) alone, Congress intended to *sub silentio* incorporate the meaning-laden text of § 551(1) as well. Such an inference would ignore the differences in

context between the two statutes and work a drastic alteration to the PRA's plain text absent any

support that Congress intended for such an alteration.

Second, Congress knew how to indicate that a subsequent statute should follow both parts

of FOIA's definition, but did not include an indication of that sort here.   The Privacy Act

incorporates FOIA's definition of "agency" by cross-reference, *see* 5 U.S.C. § 552a, thereby

adopting both § 551(1) and § 552(f).   Defendants' claim that the Privacy Act is "interpreted

coextensively with the term as used in FOIA," Defs. Opp. at 22 (citing *Alexander v. FBI*, 691 F.

Supp. 2d 182, 189 (D.D.C. 2010)), is thus both unremarkable and irrelevant here.   The Privacy

Act's definition of "agency" does not merely contain or mirror language from FOIA's

definition—*it is the FOIA definition*.   Congress could have similarly cross-referenced the entire

FOIA definition in the PRA and indicated its intention that they be interpreted together, as

Defendants seek now, but it did not.   It chose to include only a small part of FOIA's definition

and that choice should be afforded appropriate weight in construing the PRA.

Third, the goals of the PRA and FOIA are significantly different, indicating that

Congress' decision not to define "agency" the same in both statutes had purpose.   *See, e.g.*,

*Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 523 (1994) (rejecting the presumption that similar

language should be interpreted similarly where the legislative histories and goals of two statues

did not support reading them the same way).   Congress initially passed the PRA to expand the

reach of its predecessor statute.   *See* S. Rep. No. 96-930, at 2 (1980) (noting that, with the PRA,

Congress "rewr[ote] the original Federal Reports Act of 1942 and eliminate[d] all agency

exemptions to the Act except the Federal Election Commission").   When Congress amended the

PRA in 1995, Congress made clear that it meant to "[r]eaffirm the fundamental purpose" of the

PRA: "to minimize the Federal paperwork burdens imposed on the public by [the] Government."

S. Rep. No. 104-8, at 1 (1995).   It did not indicate in any way that it intended to minimize

burdens imposed on the public only by those segments of the federal government that wield

substantial independent authority from the President; "Congress could easily have narrowed the

sweep of the term," *National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 260

(1994), but chose not to do so.   *See also United States v. Turkette*, 452 U.S. 576, 581 (1981)

("Had Congress not intended to reach criminal associations, it could easily have narrowed the

sweep of the definition by inserting a single word, 'legitimate.'").   To hold otherwise would

undermine the purpose of the PRA, to "ensure the greatest possible public benefit from and

maximize the utility of information created, collected, maintained, used, shared and disseminated

by or for the Federal Government."   44 U.S.C. § 3501(2).

Finally, adopting Defendants' position would lead to anomalous practical results.   Quite

simply, from the perspective of an individual, business, or state government entity receiving an

information collection from the government, it is entirely irrelevant whether the agency

sponsoring that collection meets the "substantial authority" test crafted in the FOIA and APA

context.   It is, indeed, unlikely that the recipients of such requests would be able to perceive

whether the sponsoring agency satisfied this test or not.   Yet, Defendants ask this Court to

interpret the statute in a way that would impose the PRA's exacting procedural requirements on

some of these requests while lifting them altogether for others.   Beyond the practical absurdity

of such an outcome, it would be inconsistent with OMB's own longstanding construction of the

PRA as applying to voluntary collections of information.   *See* 5 C.F.R. § 1320.3.   Defendants'

position would lead to a further absurd outcome: it would allow the government to establish

freestanding "advisory" bodies to collect information outside the ambit of the PRA and then

funnel that information to other agencies to which the statute unquestionably applies.   This is

not fanciful—it appears to be precisely what *this Commission* is doing, as reflected in its

extensive interaction with agencies that maintain databases that the members of the Commission

have suggested they would like to cross-reference against voter data.   *See* Pls. Mot. at 13 (citing

news reports of Commissioners' statements and disclosures in parallel litigation of contacts with

DHS).

### III.   PLAINTIFFS ARE ENTITLED TO MANDAMUS BECAUSE THE COMMISSION HAS A CLEAR DUTY TO ACT UNDER THE PRA

Defendants argue that Plaintiffs have no clear right and Defendants have no clear duty

that would entitle Plaintiffs to mandamus because the "weight of the case law" indicates that the

Commission is not an "agency" subject to the PRA.   Defs. Opp. at 26-27.   At the outset, it bears

noting what is not contested: that the PRA imposes a set of non-discretionary procedural

requirements on agencies sponsoring collections of information, and the data requests at issue

here clearly constitute a collection of information as defined in the statute.   Defendants dispute

the statute's application to the Commission—and for the reasons described extensively, *see*

*supra*, they are wrong—but there is no question that the statute's requirements represent the kind

of clear statutory mandates appropriately enforced through mandamus.[7]

Defendants "weight of the case law" argument is unavailing.   As Plaintiffs noted in their

opening brief, the district court in *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on*

*Election Integrity* only considered whether the Commission is an agency under the APA, and it

did not definitively settle that question.   No. 1:17-cv-01320, 2017 WL 3141907, at *11 (D.D.C.

July 24, 2017) ("The record presently before the Court is insufficient to demonstrate that the

Commission is an 'agency' for purposes of the APA."), *appeal docketed*, No. 17-5171 (D.C. Cir.

---

[7] Defendants appear to concede that Plaintiffs lack an adequate remedy at law for the claims against the Commission.   *See* Defs. Opp. at 27.

July 27, 2017).   Another court's observations regarding a separate statute is not a "weight of case law" that bears on the PRA's application to the Commission in this case.   Although Defendants nonetheless contend that the "agency" issue is an open question and therefore not clear, "a ministerial duty can exist even 'where the interpretation of the controlling statute is in doubt,' provided that 'the statute, once interpreted, creates a peremptory obligation for the officer to act.'"   *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996) (citation omitted).   As noted at length above, *see supra* Section II, the PRA employs a broader definition of "agency" than the other statutes relied on by Defendants, and it imposes a clear set of nondiscretionary responsibilities on agencies engaged in a collection of information.   That Defendants attempt to generate doubt by suggesting a different interpretation of "agency" based on a different statute should not be sufficient to deny relief through mandamus.   *See Anselmo v. King*, 902 F. Supp. 273, 277 (D.D.C. 1995) (noting that "it would 'greatly impair[ ] … the value of the writ [of mandamus]' if '[e]very executive officer whose duty is plainly devolved upon him by statute might refuse to perform it, and when his refusal is brought before the court he might successfully plead that the performance of the duty involved the construction of a statute by him'") (alternations in original).

With regard to the half-hearted claim that this Court should decline to issue mandamus because the Commission is chaired by the Vice President, Defendants all but concede, *see* Defs. Opp. at 26, that executive officials—including the President and Vice President—are subject to mandamus.   *See Nat'l Wildlife Fed'n v. United States*, 626 F.2d 917, 923 (D.C. Cir. 1980); *Freedom Watch, Inc. v. Obama*, 807 F. Supp. 2d 28, 34 (D.D.C. 2011).   Thus, because Plaintiffs have a clear right to relief and Defendants have a clear duty to comply with the PRA, Plaintiffs are entitled to a writ of mandamus to compel the Commission to cease its collection of

information.

IV.   **PLAINTIFFS SUFFER A CURRENT AND ONGOING IRREPARABLE HARM**

Defendants do not make a serious attempt to dispute the nature or significance of the

irreparable harms that Plaintiffs will suffer if the Commission is permitted to continue to collect

and use sensitive information about hundreds of millions of American voters without making the

basic disclosures required by the PRA.   This omission is revealing.   As described *supra*,

Plaintiffs seek to pursue their organizational mission by persuading state election officials to

withhold the requested data unless they are satisfied that the requests are lawful and the data will

be handled responsibly.   The disclosures mandated by the PRA are vital to Plaintiffs' ability to

do that effectively.   If the Commission completes its collection of the data, subjects it to

whatever undisclosed maintenance protocols it has in mind, and uses it according to whatever

still-secret method it has crafted, Plaintiffs will be irreparably harmed in their efforts to sway

state election officials, other government actors, and members of the public.   This is especially

critical because the mere fact of the Commission's data request—which was launched in an

opaque and rushed manner that only reinforced the public's anxiety about those requests—has

already negatively impacted democratic participation.   *See* Pls. Mot. at 10 (describing news

reports of surge in voter de-registration in several states following data request).[8]   The denial of

---

[8]  In conjunction with this brief, Plaintiffs have sought leave to file an additional declaration
further underscoring the impact that the Commission's data request has already had on
democratic participation.

access to information that is vital to an ongoing public debate can constitute irreparable harm.[9]

*See, e.g.*, *Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, No. 17-CV-00842 (CRC), 2017

WL 2992076, at *5 (D.D.C. July 13, 2017) ("[T]he potential for irreparable harm under these

circumstances exists 'because ongoing public and congressional debates about issues of vital

national importance cannot be restarted or wound back.'") (citation omitted).

      Rather than address the harms posited by Plaintiffs, Defendants ask this Court to dispose

of the preliminary injunction motion based on the date on which it was filed.   Defs. Opp. at 30-

31.   Defendants' characterization of Plaintiffs' filing date as a three-month-long and unjustified

delay is misleading and overlooks key events in the short and tortured life of the Commission.

This attempt to distract from the ongoing irreparable harm caused by the Commission and

suffered by Plaintiffs is unavailing because the facts do not support it and because the law does

not allow it.

      As an initial matter, Defendants' re-characterization of the purported delay is

disingenuous.   On July 3, 2017, only days after the Commission sent its first round of letters

seeking voter data, Plaintiffs submitted a letter to OMB pursuant to § 3517 requesting that OMB

review this improper and illegal collection of information.   Under the PRA, OMB had 60 days,

or until September 1, 2017, to respond to Plaintiffs' letter.   In light of OMB's significant role in

---

[9] The cases cited by Defendants on the irreparable harm point, *see* Defs. Opp. at 31-32, are directly contradicted by numerous other cases within this Circuit.   *See, e.g.*, *Washington Post v. Dep't of Homeland Sec.*, 459 F. Supp. 2d 61, 75 (D.D.C. 2006) ("Without a preliminary injunction directing the Secret Service to process the plaintiff's FOIA request in an expedited fashion, the plaintiff would lose out on its statutory right to expedited processing and on the time-sensitive public interests which underlay the request."); *Elec. Privacy Info. Ctr. v. Dep't of Justice*, 416 F. Supp. 2d 30, 41 (D.D.C. 2006) ("Beyond losing its right to expedited processing, EPIC will also be precluded, absent a preliminary injunction, from obtaining in a timely fashion information vital to the current and ongoing debate surrounding the legality of the Administration's warrantless surveillance program.").

and responsibility for managing collections of information, *see* 44 U.S.C. § 3504 (defining the authority and function of the OMB Director in implementing the PRA), Plaintiffs' pursuit of this avenue was eminently reasonable.   In addition to providing a potentially meaningful pathway to relief, given the obligations imposed on OMB by § 3517, even a denial of remedial action would have clarified the legal issues in any subsequent litigation and constituted final agency action for purposes of potential APA review.   *See* 5 U.S.C. § 704.   Had Plaintiffs filed their claims against the Commission and OMB prior to September 1, 2017, Defendants would have certainly protested on ripeness grounds.   And had Plaintiffs filed this lawsuit on September 2, 2017, Defendants would likely have contended that such a delay was not sufficiently excessive to warrant court intervention.

With respect to the time between when OMB failed to respond to Plaintiffs' request for review and when Plaintiffs filed their pleadings and motion for a preliminary injunction, Plaintiffs note that the Commission's approach to the collection of information throughout this time has been haphazard and chaotic, making it something of a moving target.   The Commission first asked state election officials to send vast amounts of personal data on June 28, 2017. Compl. ¶ 31.   After an initial group of plaintiffs challenged the action in court, the Commission halted the collection on July 5, 2017.   *Id.* ¶ 43.   Before and during that time, Plaintiffs sought relief through OMB.   Weeks later, after a temporary restraining order was denied in one litigation, Vice Chair Kris Kobach sent another letter renewing the request for voter information but asking the parties to send sensitive information to a different location.   *Id.* ¶¶ 51, 53. Indeed, information relevant to this litigation was continuing to emerge literally up until the date that Plaintiffs filed their Complaint: on the same day that the Complaint was originally filed, Defendants disclosed for the first time (and subject to compulsory discovery in another lawsuit)

partial information about the number of states that have thus far submitted data.   *See Lawyers'*
*Comm. for Civil Rights Under Law v. Presidential Advisory Comm'n on Election Integrity*, No.
1:17-cv-01354 (D.D.C. filed Sept. 29, 2017), ECF No. 33-3.   To this day, Plaintiffs and the
public remain largely in the dark about the extent of the Commission's collection of information,
where the information is being stored, how much information has been collected, whether more
information will be collected, how it will be used, etc.   *Cf. Dunlap v. Presidential Advisory*
*Comm'n on Election Integrity*, No. 1:17-cv-02361 (D.D.C. filed Nov. 9, 2017) (alleging FACA
violations by member of the Commission who claims to have been denied significant
information about the Commission's activities).

      While Defendants cite a handful of district court cases for the proposition that Plaintiffs'
alleged delay "should be fatal to their motion," Defs. Opp. at 30, the D.C. Circuit has
unequivocally held that "a delay in filing is not a proper basis for denial of a preliminary
injunction."   *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011).   And in assessing when
other courts have accounted for a filing delay, the D.C. Circuit noted that "those cases in no way
stand for the proposition that a late filing, on its own, is a permissible basis for denying a
preliminary injunction," and that courts must conduct a thorough analysis of the irreparable harm
in evaluating whether to grant a preliminary injunction.   *Id.* at 724-25.   In the cases cited by
Defendants in which a court faulted a party for a filing delay, the parties clearly failed to
demonstrate diligence in pursuing their claims.   *See, e.g.*, *AARP v. United States Equal Emp't*
*Opportunity Comm'n*, 226 F. Supp. 3d 7, 22 (D.D.C. 2016) (citing the plaintiff's "unexplained"
delay despite the "looming applicability date" of the rules at issue); *Open Top Sightseeing USA*
*v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) (noting that the plaintiffs
undermined their claim of irreparable harm when they sought an extension of their own briefing

schedule).   Yet other courts considering the relevance of a filing delay have afforded latitude to

parties who diligently pursued their claims but initially sought relief through other methods.   *See*

*Tex. Children's Hosp. v. Burwell*, 76 F. Supp. 3d 224, 245 (D.D.C. 2014) (citing the "plaintiffs'

diligent pursuit of a variety of avenues").

Finally, Defendants have not made any serious effort to demonstrate countervailing

governmental or public interests that would be adversely affected by this Court's granting of

preliminary relief.   Indeed, in ostensibly addressing the balance of interests surrounding the

requested preliminary injunction, Defendants merely restate the Commission's purpose, as set

out in the Executive Order establishing it, and then make the conclusory claim that the

Commission's information collection is a "necessary first step" in advancing that purpose.

Defs. Opp. at 32.   It is hardly clear that constructing a database of millions of Americans' voter

registration information, collected inconsistently across the country, is a "necessary first step" to

any good purpose.   Such a claim would be much easier to assess if the Commission had

disclosed precisely the sort of information contemplated by the PRA.   Much more importantly,

Defendants have failed to even suggest any prejudice to that purpose that would follow from this

Court issuing *preliminary* relief until it can reach a final resolution on the merits.   Weighed

against Plaintiffs' very concrete description of the immediate effects the data requests have had

on its mission, Defendants simply fail to mount a serious argument that the balance of interests

tips in their direction.

## V.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS AGAINST OMB

Defendants assert three defenses against Plaintiffs' ability to vindicate their right to relief

against OMB.   All are unpersuasive.

First, they reassert their position that the Commission is not an "agency" and thus not

subject to the PRA, and conclude from that premise that OMB had no statutory obligations under § 3517.   Defs. Opp. at 28.   That premise is unsound, for the reasons described at length above. *See supra* Section II.   Moreover, even if that view supplied a basis for OMB to fail to take appropriate remedial action, it certainly does not excuse OMB's failure to provide the mandatory response to Plaintiff's request for review.   It would certainly be very convenient for OMB—yet plainly absurd as a matter of statutory construction—if it could circumvent its obligation to respond to requests by translating its view of the merits of such requests into a conclusion that the request for review was not a request at all under the statute.   Had OMB timely provided the required response and stated its position that the Commission falls outside the PRA's scope, it would have equipped Plaintiffs to take further legal or administrative action as appropriate.

Second, Defendants suggest that OMB's obligations under § 3517 only apply when a request is mandatory.   Defs. Opp. at 28.   This ignores OMB's own rule providing that voluntary responses are subject to the same treatment under the PRA as mandatory ones.   5 C.F.R. § 1320.3(c) ("Collection of information means … the obtaining, causing to be obtained, soliciting, or requiring the disclosure … whether such collection of information is mandatory, voluntary, or required to obtain a benefit….").   It also elides the statutory structure, which provides a right to seek review to "any person," not merely a person who has received an information request, mandatory or otherwise.   *See* 44 U.S.C. § 3517(b).

Third, Defendants claim that they cannot be compelled under 5 U.S.C. § 706(1) to comply with § 3517(b)(2)'s mandate that OMB "take appropriate remedial action, if necessary" in response to request for review.   Defendants would be on much stronger ground if Plaintiffs were invoking § 706(1) to ask a court to superintend the exercise of discretionary judgment as to what constitutes "appropriate remedial action" in a specific instance.   But that is not the posture

of this case.    OMB simply ignored a request for review in a context where no one disputes that (a) a collection of information, as defined by the statute, was sponsored, and (b) no effort was made to comply with § 3507's mandates.    Whatever space for discretion Congress has granted OMB, it has not authorized it to simply do nothing in light of a statutory provision that it "shall . . . take appropriate remedial action, if necessary" in response to requests for review.    44 U.S.C. § 3517(b).    This is the very definition of "agency action unlawfully withheld or unreasonably delayed."    5 U.S.C. § 706(1).    Courts in this Circuit have made clear that agencies may not simply ignore petitions in their entirety because of a difference in the view of the law.    *See, e.g.*, *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 418-19 (D.C. Cir. 2004) (rejecting a claim by the Federal Energy Regulatory Commission that it was "not obligated to address a petition filed under one of its own regulations allowing requests for discretionary action"). Defendants' position defeats the entire purpose of § 706(1) of the APA, which is designed for "instances in which a litigant is challenging an agency failure to act."    *Sandoz, Inc. v. Leavitt*, 427 F. Supp. 2d 29, 34 (D.D.C. 2006).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court issue a preliminary injunction requiring that (1) the Commission cease its collection of data and delete and/or sequester any information collected, unless and until it satisfies the procedures prescribed by the PRA before seeking to collect such information; and (2) the Director of the OMB and Director Mulvaney review the Commission's violation of the PRA and take appropriate remedial action to cure that violation.    Plaintiffs also request that this Court deny Defendants' motion to dismiss in its entirety.

Respectfully submitted,

Date: November 20, 2017

/s/ Danielle Conley
_____

| | |
|---|---|
| Laurence M. Schwartztol | Danielle Conley (D.C. Bar #503345) |
| (D.C. Bar # MA0007) | Lynn Eisenberg (D.C. Bar #1017511) |
| Justin Florence (D.C. Bar #988953) | Jason Hirsch (*Pro hac vice* forthcoming) |
| THE PROTECT DEMOCRACY PROJECT | Michael Posada (*Pro hac vice* pending) |
| 10 Ware Street | WILMER CUTLER PICKERING |
| Cambridge, MA 02138 | HALE & DORR LLP |
| (202) 856-9191 | 1875 Pennsylvania Avenue NW |
| | Washington, D.C. 20006 |
| | (202) 663-6000 |

## CERTIFICATE OF SERVICE

I hereby certify that, on this 20th day of November, 2017, a true and correct copy of the foregoing Memorandum of Law has been served on the following parties:

Presidential Advisory Commission on Election Integrity
1650 Pennsylvania Avenue NW
Eisenhower Executive Office Building
Rm. 268
Washington, D.C. 20504

The Office of Management and Budget
725 17th Street NW
Washington, D.C. 20503

Mick Mulvaney, in his official capacity
The Office of Management and Budget
725 17th Street NW
Washington, D.C. 20503

/s/ Danielle Conley_____
Danielle Conley (D.C. Bar #503345)
WILMER CUTLER PICKERING
   HALE & DORR LLP
1875 Pennsylvania Avenue NW
Washington, D.C. 20006
(202) 663-6006