# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED TO PROTECT DEMOCRACY and THE PROTECT DEMOCRACY PROJECT, INC., <br><br> Plaintiffs, <br><br> v. <br><br> PRESIDENTIAL ADVISORY COMMISSION ON ELECTION INTEGRITY, *et al.*, <br><br> Defendants. | Civil Action No. 1:17-cv-02016 (RC) |

## NOTICE OF FILING OF EXHIBIT TO DOCKET NO. 29

Attached please find a copy of the decision in *Electronic Privacy Information Center v. Presidential Advisory Commission on Election Integrity*, No. 17-5171 (D.C. Cir. Dec. 26, 2017), which was inadvertently omitted from Docket Entry No. 29.

Dated: December 28, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director

*/s/ Carol Federighi*
CAROL FEDERIGHI
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Phone: (202) 514-1903
Email: carol.federighi@usdoj.gov

*Counsel for Defendants*

# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 21, 2017   Decided December 26, 2017

No. 17–5171

ELECTRONIC PRIVACY INFORMATION CENTER,
APPELLANT

v.

PRESIDENTIAL ADVISORY COMMISSION ON
ELECTION INTEGRITY, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-01320)

*Marc Rotenberg* argued the cause for the appellant. *Alan Butler* was with him on brief.

*Daniel Tenny*, Attorney, United States Department of Justice, argued the cause for the appellees. *Mark B. Stern*, Attorney, was with him on brief. *Elizabeth J. Shapiro*, Attorney, entered an appearance.

*Lawrence J. Joseph* was on brief for the *amicus curiae* Eagle Forum Education & Legal Defense Fund in support of the appellees.

2

Before: HENDERSON, *Circuit Judge*, and WILLIAMS and GINSBURG, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

Opinion concurring in part and concurring in the judgment filed by *Senior Circuit Judge* WILLIAMS.

KAREN LECRAFT HENDERSON, *Circuit Judge*: By executive order issued in May 2017, the President established the Presidential Advisory Commission on Election Integrity (Commission). Exec. Order No. 13799, 82 Fed. Reg. 22389 (May 11, 2017). The Commission is a temporary and "solely advisory" body charged with studying the integrity of federal elections. *Id*. § 3. In keeping with that objective but lacking any authority to demand information, the Commission "requested" that each state and the District of Columbia provide the Commission with certain "publicly-available voter roll data." Joint Appendix (JA) 51.

The Electronic Privacy Information Center (EPIC)—a nonprofit organization whose stated mission is "to focus public attention on emerging privacy and civil liberties issues"—sued the Commission and other entities and officials, claiming violations of the Administrative Procedure Act (APA), 5 U.S.C. § 706. Pl.'s Second Am. Compl. (Compl.), Dkt. No. 33 at 2, 12-13.[1] EPIC sought a preliminary injunction to

---

[1] EPIC's complaint also alleged violations of the Federal Advisory Committee Act, 5 U.S.C. app. 2, and the Fifth Amendment's Due Process Clause. Those claims are not before us because EPIC presents no argument about them. *See N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007) (party forfeits argument by failing to brief it or by mentioning it only "in the most skeletal way" (internal quotation omitted)).

3

prohibit the defendants from collecting voter data unless and until they complete a privacy impact assessment as allegedly required by the E-Government Act of 2002, Pub. L. No. 107-347, § 208(b), 116 Stat. 2899, 2921-22 (Dec. 17, 2002). The district court denied preliminary injunctive relief. *EPIC v. Presidential Advisory Comm'n on Election Integrity*, 2017 WL 3141907 (D.D.C. July 24, 2017). The court concluded (*inter alia*) that EPIC has standing, *id*. at *6-*10, but is unlikely to succeed on the merits because under the APA neither the Commission nor any other defendant constitutes an "agency" that the court can enjoin to produce an assessment, *id*. at *11-*13.

On an interlocutory basis, EPIC appeals the denial of a preliminary injunction. *See* 28 U.S.C. § 1292(a)(1). We agree with the district court that EPIC is unlikely to succeed on its APA claims. But we reach that conclusion for a different reason from the one the district court identified. *See Parsi v. Daioleslam*, 778 F.3d 116, 126 (D.C. Cir. 2015) ("Ordinarily, a court of appeals can affirm a district court judgment on any basis supported by the record, even if different from the grounds the district court cited."). Specifically, we uphold the denial of a preliminary injunction because EPIC has not shown a substantial likelihood of standing. *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) ("A party who fails to show a 'substantial likelihood' of standing is not entitled to a preliminary injunction." (quoting *Obama v. Klayman*, 800 F.3d 559, 568 (D.C. Cir. 2015) (opinion of Williams, J.))).[2]

---

[2] Because EPIC has not met its burden with respect to standing, we do not consider whether any of the defendants constitutes an agency under the E-Government Act or the APA. Nor do we consider the preliminary injunction factors other than EPIC's likelihood of success. A plaintiff unlikely to have standing

4

## I. BACKGROUND

In 2002, the Congress passed the E-Government Act to streamline government use of information technology "in a manner consistent with laws regarding protection of personal privacy, national security, records retention, access for persons with disabilities, and other relevant laws." E-Government Act § 2(b)(11). Section 208 of the Act, entitled "Privacy Provisions," states that "[t]he purpose of this section is to ensure sufficient protections for the privacy of personal information as agencies implement citizen-centered electronic Government." *Id*. § 208(a). To promote that purpose, section 208 requires an "agency" to conduct, review and, "if practicable," publish a privacy impact assessment before it collects "information in an identifiable form permitting the physical or online contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, 10 or more persons." *Id*. § 208(b)(1). A party with standing can make a claim under that provision for relief under the APA's direction to courts to "compel agency action unlawfully withheld," 5 U.S.C. § 706(1), and to "set aside agency action . . . not in accordance with law," *id*. § 706(2)(A).

In May 2017, the President established the Commission as a "solely advisory" body. Exec. Order No. 13799, § 3. He charged it with studying and submitting a report about the "integrity of" and "vulnerabilities in" the voting systems and procedures used in federal elections. *Id*. Thirty days after

---

is *ipso facto* unlikely to succeed, *Food & Water Watch*, 808 F.3d at 913; *Klayman*, 800 F.3d at 565, 568 (opinion of Williams, J.); and when the plaintiff is unlikely to succeed, "there is no need to consider the remaining factors," *Greater New Orleans Fair Hous. Action Ctr. v. HUD*, 639 F.3d 1078, 1088 (D.C. Cir. 2011).

5

the Commission submits its report, it will cease to exist. *Id*. § 6.

In June 2017, Kris Kobach—Secretary of State of Kansas and Vice Chair of the Commission—wrote a letter to the chief election officer of each state and the District of Columbia. Each letter "request[ed]" that the addressee

> provide to the Commission the publicly-available voter roll data for [your state], including, if publicly available under the laws of your state, the full first and last names of all registrants, middle names or initials if available, addresses, dates of birth, political party (if recorded in your state), last four digits of social security number if available, voter history (elections voted in) from 2006 onward, active/inactive status, cancelled status, information regarding any felony convictions, information regarding voter registration in another state, information regarding military status, and overseas citizen information.

JA 61-62. Each letter stated that "any documents" a state submits to the Commission "will also be made available to the public," JA 62, but Kobach clarified in district court that "the Commission intends to de-identify" any voter data it receives so that "the voter rolls themselves will not be released to the public," JA 52. As far as the record shows, only Arkansas has submitted any data and it "has been deleted without ever having been accessed by the Commission." JA 235.

EPIC filed its complaint in July 2017, naming as defendants the Commission, Kobach and other entities and

6

officials.[3] As relevant here, the complaint raised two related claims. Count One alleged "unlawful agency action," i.e., that the defendants "initiate[d] collection of voter data" without first "creating, reviewing, and publishing a privacy impact assessment" under the E-Government Act. Compl. 12 (capitalization altered). Count Two alleged "agency action unlawfully withheld," i.e., that the defendants "have failed to create, review, and/or publish a privacy impact assessment for [their] collection of voter data, as required by" the E-Government Act. *Id*. at 12-13 (capitalization altered). EPIC asked the district court to remedy the alleged violations by (*inter alia*) "halt[ing] collection of personal voter data" and ordering the defendants "to promptly conduct a privacy impact assessment prior to the collection of personal voter data." *Id*. at 15.

EPIC later moved for a preliminary injunction. It asked the district court to prohibit the defendants "from collecting state voter data prior to the completion of a privacy impact assessment." Mem. in Support, Dkt. No. 35-1 at 41. The court denied the motion. *EPIC*, 2017 WL 3141907, at *14. Based on the available evidence, the court held (*inter alia*) that EPIC has standing, *id*. at *6-*10, but that the Commission lacks "'substantial independent authority'" and so is not "an 'agency' for purposes of the APA," *id*. at *11 (quoting *Citizens for Responsibility & Ethics in Washington v. Office of Admin.*, 566 F.3d 219, 222 (D.C. Cir. 2009)). The court was also unpersuaded that any other defendant likely to be involved in

---

[3] The complaint also named Vice President Michael Pence; Charles Herndon, Director of White House Information Technology; the Executive Office of the President; the Office of the Vice President; the Department of Defense; the General Services Administration; the Executive Committee for Presidential Information Technology; and the United States Digital Service.

7

collecting voter data is an agency under the APA. *Id*. at *12-*13. Accordingly, the court concluded, EPIC "has not demonstrated a likelihood of success on the merits." *Id*. at *13.

## II. ANALYSIS

"The judicial Power" of the federal courts extends only to "Cases" and "Controversies," U.S. CONST. art. III, § 2, cl. 1, "and there is no justiciable case or controversy unless the plaintiff has standing," *West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998)). To establish standing, the plaintiff must show (1) it has suffered a "concrete and particularized" injury (2) that is "fairly traceable to the challenged action of the defendant" and (3) that is "likely" to be "redressed by a favorable decision," i.e., a decision granting the plaintiff the relief it seeks. *Id*. (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

The plaintiff bears the burden of establishing all three elements of standing. *Lujan*, 504 U.S. at 561. The "manner and degree of evidence required" depends on the "stage[] of the litigation." *Id*. In the context of a preliminary injunction motion, we require the plaintiff to "show a 'substantial likelihood' of standing" "under the heightened standard for evaluating a motion for summary judgment." *Food & Water Watch*, 808 F.3d at 912-13 (quoting *Klayman*, 800 F.3d at 568 (opinion of Williams, J.)); *see Nat'l Wildlife Fed'n v. Burford*, 835 F.2d 305, 328 (D.C. Cir. 1987) (Williams, J., concurring and dissenting). Thus, the plaintiff cannot "rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts" that, if "taken to be true," demonstrate a substantial likelihood of standing. *Lujan*, 504 U.S. at 561 (internal quotation omitted).

8

"Because 'standing is not dispensed in gross' but instead may differ claim by claim," "we address seriatim" EPIC's likelihood of standing on each of its two APA claims. *West*, 845 F.3d at 1235 (quoting *Davis v. FEC*, 554 U.S. 724, 734 (2008)). We conclude that EPIC has not made the requisite showing on either claim.[4] To simplify the analysis, we start with Count Two.

## A. FAILURE TO PRODUCE PRIVACY IMPACT ASSESSMENT

Count Two alleges "agency action unlawfully withheld," namely, the defendants' failure to produce a privacy impact assessment under the E-Government Act. Compl. 12-13 (capitalization altered). EPIC asserts that this inaction causes it two types of injury: (1) "informational injury" through the lack of an assessment to which the law allegedly entitles it, Appellant's Reply Br. 4; and (2) "[o]rganizational . . . injury" in that the inaction conflicts with EPIC's mission "to focus public attention on emerging privacy and civil liberties issues," *id*. at 5 (internal quotation omitted).[5] As relief for the

---

[4] We owe no deference to the district court's contrary conclusion. *O'Hara v. Dist. No. 1-PCD*, 56 F.3d 1514, 1522 (D.C. Cir. 1995) (to extent preliminary injunction decision "hinges on questions of law," we review it de novo (internal quotation omitted)); *see Teton Historic Aviation Found. v. Dep't of Def.*, 785 F.3d 719, 724 (D.C. Cir. 2015) (per curiam) (standing is question of law to be assessed de novo).

[5] In district court, EPIC also advanced a theory of "associational standing." Reply in Support, Dkt. No. 39 at 19-23. The court rejected it, *EPIC*, 2017 WL 3141907, at *4-*6, and EPIC does not renew it here, Appellant's Reply Br. 2 n.2 ("associational standing" is "not related to any issue on appeal"). We therefore do not consider it. *See Scenic Am., Inc. v. Dep't of Transp.*, 836 F.3d 42, 53 n.4 (D.C. Cir. 2016) (party forfeits theory of standing if it fails to advance any argument about it).

9

inaction, EPIC asks that the defendants be ordered "to promptly conduct a privacy impact assessment prior to the collection of personal voter data." Compl. 15. We conclude that EPIC lacks standing to obtain such relief because it has suffered no cognizable informational or organizational injury. We analyze and reject those two asserted types of injury in turn without necessarily agreeing that they are in fact analytically separate here. Indeed, as will be seen, EPIC identifies no organizational harm unrelated to its alleged informational injury. *See infra* p. 11.

### 1. Informational injury

Following *FEC v. Akins*, 524 U.S. 11 (1998), "we have recognized that a denial of access to information can," in certain circumstances, "work an 'injury in fact' for standing purposes," *Am. Soc'y for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 22 (D.C. Cir. 2011) (*Feld*) (internal quotation omitted). To carry its burden of demonstrating a "sufficiently concrete and particularized informational injury," the plaintiff must show that "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016); *see Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016) ("judgment of Congress" is "important" to "whether an intangible harm," including informational harm, "constitutes injury in fact").

We need not consider the first component of the requirement for informational injury because EPIC does not satisfy the second: it has not suffered the type of harm that section 208 of the E-Government Act seeks to prevent.

10

Indeed, EPIC is not even the type of plaintiff that can suffer such harm. *See Friends of Animals*, 828 F.3d at 992 (whether "plaintiff suffers the type of harm Congress sought to remedy" sometimes depends on whether "Congress, in mandating disclosure, sought to protect individuals or organizations like" plaintiff).

Section 208, a "Privacy Provision[]" by its very name, declares an express "purpose" of "ensur[ing] sufficient protections for the privacy of personal information as agencies implement citizen-centered electronic Government." E-Government Act § 208(a). As we read it, the provision is intended to protect *individuals*—in the present context, voters—by requiring an agency to fully consider their privacy before collecting their personal information. EPIC is not a voter and is therefore not the type of plaintiff the Congress had in mind. Nor is EPIC's asserted harm—an inability to "ensure public oversight of record systems," Appellant's Reply Br. 9—the kind the Congress had in mind. Instead, section 208 is directed at individual *privacy*, which is not at stake for EPIC.

## 2. Organizational injury

For similar reasons, EPIC has suffered no organizational injury. Under *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), "an organization may establish Article III standing if it can show that the defendant's actions cause a 'concrete and demonstrable injury to the organization's activities' that is 'more than simply a setback to the organization's abstract social interests.'" *Feld*, 659 F.3d at 25 (quoting *Havens*, 455 U.S. at 379). "Our case law, however, establishes two important limitations on the scope of standing under *Havens*." *Id*. First, the plaintiff must show that the defendant's "action or omission to act injured the organization's interest." *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087,

11

1094 (D.C. Cir. 2015) (*PETA*) (internal quotation and brackets omitted). Second, the plaintiff must show that it "used its resources to counteract that harm." *Id.* (internal quotation omitted). EPIC's assertion of organizational standing fails twice over.

EPIC's sole theory of organizational injury is that the defendants' failure to produce a privacy impact assessment injures its interest in using the information contained in the assessment "to focus public attention on emerging privacy and civil liberties issues." Appellant's Reply Br. 5 (internal quotation omitted). As we have discussed, however, section 208 of the E-Government Act does not confer any such informational interest on EPIC. EPIC cannot ground organizational injury on a non-existent interest. *See Feld*, 659 F.3d at 24-25 (abstract social interest does not give rise to organizational injury).

It follows that any resources EPIC used to counteract the lack of a privacy impact assessment—an assessment in which it has no cognizable interest—were "a self-inflicted budgetary choice that cannot qualify as an injury in fact." *Feld*, 659 F.3d at 25 (internal quotation omitted). EPIC's evidence of expenditures only reinforces the point. It relies exclusively on the declaration of an EPIC "Law Fellow" who before and during this lawsuit submitted Freedom of Information Act (FOIA) requests to (*inter alia*) the Commission and the Department of Justice (DOJ).[6] JA 236-37. EPIC offers no

---

[6] In its rebuttal oral argument, EPIC contended that it has organizational standing not only because of the FOIA requests but because it "contacted the state secretaries to warn them that [an assessment] had not been completed" and because it "launched an internet-based campaign to alert voters that their information was not being protected." Oral Arg. Recording 30:28-30:59. EPIC did not advance that contention in its briefs or even during the opening

12

"specific facts" demonstrating that the lack of an assessment *caused* it to submit the requests, *Lujan*, 504 U.S. at 561 (internal quotation omitted); *see* Appellant's Reply Br. 5-6, 10, so we can only speculate. Speculation is ordinarily fatal to standing, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006) (it cannot establish injury); *West*, 845 F.3d at 1237-38 (it cannot establish causation or redressability), and that is the case here. EPIC's wide-ranging FOIA requests sought information about (*inter alia*) DOJ's data-collection efforts under the National Voter Registration Act; DOJ's legal views about the Commission's authority; and various potentially privileged government communications. An assessment would not likely disclose such information. *See* E-Government Act § 208(b)(1)(C), (b)(2)(B). Presumably, then, EPIC would have made similar FOIA requests even if the defendants had produced an assessment.[7]

---

portion of its oral argument. It thereby forfeited the contention, the merits of which we decline to consider. *See Coal. of Battery Recyclers Ass'n v. EPA*, 604 F.3d 613, 623 (D.C. Cir. 2010) (argument raised "for the first time during rebuttal oral argument" is "forfeited").

[7] This fact readily distinguishes *PETA*, 797 F.3d 1087, on which EPIC relies. There, at the dismissal stage, PETA sufficiently alleged that the USDA's failure to apply Animal Welfare Act regulations to birds caused PETA "to undertake . . . extensive efforts"—and to spend more than $10,000—investigating cruelty to birds and submitting animal-protection complaints under alternative local, state and federal laws. *Id*. at 1096; *see id*. at 1093-97. Here, "under the heightened standard for evaluating a motion for summary judgment," *Food & Water Watch*, 808 F.3d at 912, EPIC has not established any equivalently direct causal link between the defendants' inaction and EPIC's own expenditures.

13

In short, not only does EPIC have no cognizable interest in a privacy impact assessment but the resources it spent were not even demonstrably attributable to the lack of an assessment. It has suffered no organizational injury, much less an injury caused by the defendants.

### B. ATTEMPTING TO COLLECT VOTER DATA WITHOUT FIRST PRODUCING PRIVACY IMPACT ASSESSMENT

Count One alleges "unlawful agency action," namely, the defendants' attempted collection of voter data without first producing a privacy impact assessment under the E-Government Act. Compl. 12 (capitalization altered). As relief for this asserted violation, EPIC asks that the defendants be ordered "to halt collection of personal voter data." *Id.* at 15. We again conclude that it lacks standing to obtain such relief.

To repeat, EPIC is not a voter. And as far as the record shows, it has no traditional membership, let alone members who are voters. Unsurprisingly, then, it does not claim standing on behalf of any voter whose data is likely to be collected. *See supra* note 5. Instead, in seeking to halt collection of voter data, it advances the same theories of informational and organizational standing that it asserts in seeking to compel a privacy impact assessment. We see no reason to "accept[] a repackaged version" of those "failed theor[ies]." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). As explained above, EPIC has suffered no informational or organizational injury from the defendants' failure to produce an assessment. *A fortiori*, it has suffered no informational or organizational injury from the defendants' attempt to collect voter data without first producing an assessment.

14

Moreover, halting collection of voter data would not "likely" redress any informational or organizational injury, even had EPIC suffered one. *Lujan*, 504 U.S. at 561 ("[I]t must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." (internal quotation omitted)); *West*, 845 F.3d at 1235 ("The key word is 'likely.'"). Assuming arguendo that the Commission or another defendant is an agency subject to the E-Government Act, it need not prepare a privacy impact assessment unless it plans to collect information. E-Government Act § 208(b)(1)(A). Accordingly, ordering the defendants *not* to collect voter data only *negates* the need (if any) to prepare an assessment, making it *less* likely that EPIC will obtain the information it says is essential to its mission of "focus[ing] public attention on emerging privacy and civil liberties issues." Appellant's Reply Br. 5 (internal quotation omitted).

\* \* \* \* \*

The doctrines of informational and organizational standing do not derogate from the elemental requirement that an alleged injury be "concrete and particularized." *Lujan*, 504 U.S. at 560; *see Akins*, 524 U.S. at 24-25 (informational); *Havens*, 455 U.S. at 379 (organizational). On this record, EPIC's asserted injuries do not meet that requirement. Because EPIC does not show a substantial likelihood of standing to press its claims that the defendants have violated the E-Government Act, we affirm the district court's denial of a preliminary injunction.

*So ordered*.

WILLIAMS, *Senior Circuit Judge*, concurring in part and concurring in the judgment: Because it "has not suffered the type of harm that § 208 of the E-Government Act seeks to prevent," Maj. Op. at 9, EPIC has failed to allege a legally cognizable injury-in-fact. So I agree that EPIC lacks standing. But given that EPIC claims only organizational standing and "identifies no organizational harm unrelated to its alleged informational injury," *id.*, I see no need for any separate discussion of "organizational injury." *Id.* at 10-13. Nor, indeed, do I see any need for a separate discussion of EPIC's alternative reformulation of its merits claim as an objection to defendants' effort to collect data without previously filing a Privacy Impact Statement ("PIA"). *Id.* at 13-14.

\* \* \*

As an organization, EPIC has in principle two potential paths to establish standing: "associational," on behalf of its members, and "organizational," on behalf of itself. Before us, it doesn't renew the associational standing claim made in district court. That leaves only organizational standing. For those purposes, of course, it must establish an injury that qualifies under Article III, along with the requisite causation and redressability. See, e.g., *PETA v. U.S. Department of Agriculture*, 797 F.3d 1087, 1106 (D.C. Cir. 2015) (Millett, J., *dubitante*).

To establish organizational standing, EPIC asserts only a single injury: that the defendants' omissions have caused it to go without information—the contents of a PIA—that it could use to educate the public.

Where an organization's only asserted injury is an informational one, we have not engaged in a separate analysis of informational and organizational injury. See, e.g., *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016)

2

(addressing organization's claim of informational injury as such). If an organization's only claimed injury is informational, additional discussion of the same facts under the "organizational" rubric will not clarify the court's reasoning.

In cases where the plaintiff claims organizational injuries of various types (including informational ones), we have analyzed the informational injury as such and the other alleged injuries as organizational. See, e.g., *Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 22 (D.C. Cir. 2011) (rejecting organization's claim of informational standing, *id*. at 22-24, and its claims that Feld's use of chains and bullhooks afforded organizational standing by fostering, plaintiffs argued, "a public impression that these practices are harmless," *id*. at 24-28). My guess—only a guess—is that the practice arose because organizations found informational injury a comparatively easy way to show standing.

But organizational standing is merely the label assigned to the *capacity* in which the organization contends it has been harmed; it is not a separate *type* of injury. In its capacity as an organization, EPIC has alleged one harm, packaged as two theories (perhaps in the hope that such packaging will increase the odds of success). There is no need for us to accept that packaging; doing so is a step away from, not towards, legal clarity.