# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| UNITED TO PROTECT DEMOCRACY, *et al.* | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 17-2016 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 10, 22, 24 |
| | : | | |
| PRESIDENTIAL ADVISORY COMMISSION | : | | |
| ON ELECTION INTEGRITY, *et al.* | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

**GRANTING DEFENDANTS' MOTION TO DISMISS; DENYING AS MOOT PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DENYING AS MOOT PLAINTIFFS' MOTION FOR LEAVE TO FILE DECLARATION**

## I. INTRODUCTION

In May 2017, the President of the United States signed Executive Order 13,799, which established the Presidential Advisory Commission on Election Integrity (the "Commission"). Approximately one month later, that Commission issued letters to each of the 50 states and the District of Columbia requesting that they provide certain publically available voter roll information so that the Commission might "fully analyze vulnerabilities and issues related to voter registration and voting" in the United States. These requests have been the subject of substantial public attention and have generated several lawsuits challenging their legality. This is but another one of those lawsuits. In this case, Plaintiffs, United to Protect Democracy and The Protect Democracy Project, Inc., challenge the Commission's failure to adhere to the notice and comment procedures specified by the Paperwork Reduction Act, 44 U.S.C. §§ 3501 *et seq*. Now pending before the Court are Plaintiffs' Motion for a Preliminary Injunction (ECF No. 10) and Defendants' Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules

of Civil Procedure (ECF No. 22).  For the reasons stated below, the Court grants Defendants'

Motion to Dismiss and denies as moot Plaintiffs' Motion for a Preliminary Injunction.

## II.  BACKGROUND

### A.  The Paperwork Reduction Act

The Paperwork Reduction Act (44 U.S.C. § 3501, *et seq.*) ("PRA") sets standards for

federal agencies when collecting information from the public.  "The Paperwork Reduction Act

was enacted in response to one of the less auspicious aspects of the enormous growth of our

federal bureaucracy: its seemingly insatiable appetite for data."  *Dole v. United Steelworkers of*

*Am.*, 494 U.S. 26, 32 (1990).  Thus, in 1980, Congress enacted the PRA to institute a

comprehensive scheme for federal information collection and "designated [the Office of

Management and Budget ("OMB")] the overseer of other agencies with respect to paperwork."

*Id.*  Under the PRA, an agency is required to submit any proposed collection of information to

the OMB for review and approval.  *See* 44 U.S.C. § 3507(a)(1)(C).  In addition, the agency must

publish notice of its proposed collection in the Federal Register, stating that it is seeking

approval from the Director of OMB and soliciting comments from the public.  *See id.* at

§ 3507(a)–(b).  In that notice, the agency must set forth (1) a title for the collection of

information, (2) a summary of the collection of information, (3) a brief description of the need

for the information and the proposed use of the information, (4) a description of the likely

respondents and proposed frequency of response to the collection of information, and (5) an

estimate of the burden that shall result from the collection of information.  *Id.* at

§ 3507(a)(1)(D)(ii)(I)–(V).  After providing the public an opportunity to comment on the

collection for at least 30 days, the Director may then decide whether to approve the proposed

collection.  *See id.* at § 3507(b).  If the Director approves, the agency may proceed with its

collection and the Director will issue a control number that must be displayed on the collection of information.  *See id.* at § 3507(a)(2), (3).

### B.  The Presidential Advisory Commission on Election Integrity

On May 11, 2017, President Donald Trump signed Executive Order 13,799, which established the Commission.  *See* Exec. Order No. 13,799, 82 Fed. Reg. 22,389 (May 11, 2017). The Commission is chaired by the Vice President of the United States and may include an additional fifteen members appointed by the President.  *Id.* at § 2.  The President's Executive Order charged the newly constituted Commission with "study[ing] the registration and voting processes used in Federal elections" and mandated that the Commission submit a report to the President on various topics, including "vulnerabilities in voting systems and practices used for Federal elections that could lead to improper voter registrations and improper voting, including fraudulent voter registrations and fraudulent voting."  *Id.* at § 3(c).  The Commission, however, is to be "solely advisory" and must dissolve within thirty days after it submits its report.  *Id.* at §§ 3, 6.

On June 28, 2017, in furtherance of its mandate, the Commission sent substantially similar letters to Secretaries of State and other election officials in all 50 states and the District of Columbia.  These letters invited recipients to provide information and opinions on seven broad policy questions relating to the administration of elections.  Compl. ¶¶ 28–29.  For example, the Commission sought opinions on potential changes to federal election law related to election integrity, "evidence or information" relating to voter fraud, information on "convictions for election-related crimes" since November 2000, and recommendations for preventing voter intimidation or disenfranchisement.  Compl. ¶ 29.  In addition, the Commission requested that recipients voluntarily "provide to the Commission the publicly-available voter roll data for [their

states].'' Compl. ¶ 30.  Specifically, the Commission requested "the full first and last names of all registrants, middle names or initials if available, addresses, dates of birth, political party (if recorded in [that] state), last four digits of social security number if available, voter history (elections voted in) from 2006 onward, active/inactive status, cancelled status, information regarding any felony convictions, information regarding voter registration in another state, information regarding military status, and overseas citizen information."  Compl. ¶ 30; *see also* Decl. Kris W. Kobach, Ex. 3 ("June 28 Letter"), ECF No. 21-2.  The Commission purportedly sought this data "in order for the Commission to fully analyze vulnerabilities and issues related to voter registration and voting."  *See* June 28 Letter.  The Commission requested that recipients respond to the letter by July 14, 2017 and directed recipients to submit their responses either via email or through a secure electronic file transfer protocol site that the federal government uses for transferring large data files.  Compl. ¶ 31.

The Commission's request for voter data has become a subject of significant public debate.  For example, voting rights experts have articulated a broad set of concerns about how the requests might be used to suppress voters and cybersecurity experts have identified risks inherent in consolidating sensitive voter data without a clear security plan.  *See* Compl. ¶¶ 37–38.  These requests have also been the topic of several legal challenges.  *See* Compl. ¶ 40.  And the recipients of the letters have been far from unanimous in how they plan to respond.  Indeed, as of September 27, 2017, seventeen states had indicated that they would provide the requested data while eight states had declined.  Compl. ¶ 33.  An additional eleven states had stated that they would only release data subject to certain restrictions.  Compl. ¶ 33.

### C.  The Present Suit

On September 29, 2017, Plaintiffs, United to Protect Democracy and The Protect Democracy Project, Inc., filed suit in this Court asserting that the Commission's request for voter data constituted a violation of the PRA.  According to Plaintiffs' Complaint, the Commission violated the PRA when it failed to undertake the appropriate notice and comment procedures prior to issuing its request for voter data.  *See* Compl. ¶¶ 60–76.  As non-profit advocacy organizations engaged in public education and outreach, Plaintiffs claim that they have been injured by the Commission's failing because they have been deprived of certain information that they claim the Commission was required to disclose pursuant to the terms of the PRA.  Compl. ¶ 73.  Although Plaintiffs premise their claims on the text of the PRA, the PRA does not provide for a private right of action.  Thus, Plaintiffs instead seek declaratory relief under 28 U.S.C. §§ 2201–02 and mandamus relief under 28 U.S.C. § 1361.  *See* Compl. ¶¶ 60–76, 84–87.

Plaintiffs' Complaint also challenges the inaction on the part of the OMB and the Director of OMB (collectively the "OMB Defendants").  *See* Compl. ¶¶ 77–83.  Under 44 U.S.C. § 3517(b), "[a]ny person may request the Director [of OMB] to review any collection of information conducted by or for an agency to determine, if, under [the PRA], a person shall maintain, provide, or disclose the information to or for the agency."  The statute further directs that, "[u]nless the request is frivolous, the Director shall, in coordination with the agency responsible for the collection of information (1) respond to the request within 60 days after receiving the request, unless such period is extended by the Director to a specified date and the person making the request is given notice of such extension; and (2) take appropriate remedial action, if necessary."  44 U.S.C. § 3517(b).  On July 3, 2017, Plaintiff United to Protect Democracy allegedly sent a letter to the Director of OMB explaining the ways in which the

Commission had allegedly violated the PRA's procedural requirements and, pursuant to § 3517, requested that the Director review the matter and take necessary remedial action as soon as possible. Compl. ¶ 80. Because more than 60 days have elapsed since United to Protect Democracy sent its letter and the Director has neither responded nor taken any other remedial action, Plaintiffs seek declaratory and injunctive relief against the OMB and its Director under section 706(1) of the APA for unlawfully withholding or unreasonably delaying action on its request. *See* Compl. ¶¶ 77–87.

Two motions are now pending before the Court. First, on October 11, 2017, Plaintiffs filed a Motion for a Preliminary Injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. *See* Pls.' Mot. Prelim. Inj. Plaintiffs request that this Court issue a preliminary injunction requiring that (1) the Commission cease its collection of data and delete and/or sequester any information collected unless and until it satisfies the procedures prescribed by the PRA; and (2) the Director of OMB to review the Commission's alleged violation of the PRA and take appropriate remedial action to cure that violation. *See* Pls.' Mot. Prelim. Inj. Defendants opposed the motion and simultaneously filed their own motion to dismiss the action on various grounds. *See* Defs.' Mem. Opp'n Pls.' Mot. Prelim. Inj. & Defs.' Mot. Dismiss ("Defs.' MTD"), ECF No. 21. Both motions have been fully briefed by the parties and are now ripe for decision.

## III. ANALYSIS

Before the Court can reach Plaintiffs' Motion for Preliminary Injunction, Plaintiffs must first overcome two fundamental obstacles presented by Defendants' Motion to Dismiss. First, Plaintiffs must demonstrate that they have somehow been injured by Defendants' actions and that they have standing to bring this suit at all. The Court is satisfied that Plaintiffs have met this burden, having alleged that they have been deprived of certain information that works a

particularized and concrete harm upon them.  Next, Plaintiffs must allege facts from which this

Court can determine that the Commission is actually subject to the PRA's requirements, as the

Plaintiffs claim.  On this second obstacle, however, Plaintiffs stumble.  The PRA applies only to

"agencies," as it defines that term.  Based on the current state of the record, the Court cannot find

that the Commission is an "agency" for purposes of the PRA because the pleadings and other

evidence provided to the Court support the notion that the Commission works solely to advise

and assist the President and there has been no allegation or other showing that the Commission

has any substantial authority independent of the President.  Accordingly, the Court cannot find

that the Commission is subject to the terms of the PRA and thus Plaintiffs' claims—all of which

are based on this premise—must be dismissed.

### A. Standing

The Court must first begin with the threshold question of whether Plaintiffs have

constitutional standing to assert their claims at all.  Article III of the United States Constitution

grants the Judiciary authority to adjudicate only "Cases" and "Controversies."  U.S. Const. Art.

III.  One of the hallmarks of the "'Case[s]'" and 'Controversies' that are of the justiciable sort

referred to in Article III . . . is the doctrine of standing."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555,

560 (1992).  Indeed, "the requirement that a claimant have 'standing is an essential and

unchanging part of the case-or-controversy requirement of Article III.'"  *Davis v. FEC*, 554 U.S.

724, 733 (2008).

This "irreducible constitutional minimum of standing contains three elements."  *Lujan*,

504 U.S. at 560.  First, plaintiffs must demonstrate that they have suffered an "injury in fact,"

meaning the "actual or imminent" invasion of a legally protected interest that is both "concrete

and particularized."  *Id.*  Second, they must show a causal connection between the injury and the

challenged conduct such that the injury is fairly connected to the challenged conduct. *Id.* Third, they must make a showing that it is "likely," rather than "speculative," that the injury will be "redressed by a favorable decision." *Id.* at 561. The "burden of establishing these elements falls on the party invoking federal jurisdiction, and at the pleading stage, a plaintiff must allege facts demonstrating each element." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016) (citing *Lujan,* 504 U.S. at 561) (hereinafter, *"Friends of Animals II").* In this case, only the first element—injury in fact—is in doubt.

Plaintiffs' sole contention on the issue of injury in fact is premised on a purported informational injury. Pls.' Mot. Prelim. Inj. at 16–20. Informational injuries arise "only in very specific statutory contexts." *Animal Legal Def. Fund, Inc. v. Espy*, 23 F.3d 496, 502 (D.C. Cir. 1994). In *FEC v. Akins*, the Supreme Court explained that a plaintiff "suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." *FEC v. Akins*, 524 U.S. 11, 21 (1998). For example, in that case, the Court held that plaintiffs had suffered an informational injury because they had been denied certain information that was subject to disclosure under their interpretation of the Federal Election Campaign Act ("FECA"). *See id.* Likewise, in *Public Citizen v. U.S. Department of Justice,* the Supreme Court held that a purported advisory committee's refusal to disclose certain records, reports, and meeting minutes, which plaintiffs claimed were subject to disclosure under the Federal Advisory Committee Act ("FACA"), "constitute[d] a sufficiently distinct injury to provide standing to sue." *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989).

The courts in this Circuit have found cognizable informational injuries in several additional statutory contexts. For example, courts have found such injuries based on provisions of the Emergency Planning and Community Right-to-Know Act, *see Waterkeeper All. v. Envtl.*

*Prot. Agency*, 853 F.3d 527, 534 (D.C. Cir. 2017), and the Endangered Species Act, *see Friends of Animals v. Jewell,* 824 F.3d 1033, 1042 (D.C. Cir. 2016). No case, however, has found a plaintiff to have suffered an informational injury based on a claim under the PRA. To assess whether such a claim might exist, the Circuit has advised that a "plaintiff suffers sufficiently concrete and particularized informational injury where the plaintiff alleges that: (1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals II*, 828 F.3d at 992. In this case, Plaintiffs meet both elements necessary to show informational injury.

First, under the Plaintiffs' interpretation of the PRA, the Commission was required to disclose certain information prior to issuing its request for voter data and materials, but it failed to do so. Section 3507(a)(1)(D)(ii) of the PRA states, in unequivocal terms, that an agency "shall not conduct or sponsor the collection of information unless in advance . . . of the collection of information the agency has . . . published notice in the Federal Register . . . setting forth a title for the collection of information; a summary of the collection of information; a brief description of the need for the information and the proposed use of the information; a description of the likely respondents and proposed frequency of response to the collection of information; an estimate of the burden that shall result from the collection of information . . . ."[1] 44 U.S.C. § 3507(a)(1)(D). If, as Plaintiffs contend, the Commission constitutes an "agency" and its requests for voter data constituted a "collection of information," as those terms are defined under

---

[1] Plaintiffs also argue that a disclosure requirement can be inferred from two provisions found in 44 U.S.C. § 3506. Nevertheless, because the materials that Plaintiffs allege must be disclosed under that provision are substantially the same as what is explicitly required under § 3507(a), the Court finds it sufficient to limit its discussion to § 3507(a).

the statute, then the Commission would have had a statutory obligation to disclose this information prior to making its requests.  It is undisputed, however, that the Commission made no such disclosures.  Thus, plaintiffs have made a sufficient showing that they have been deprived of information that, under their interpretation of the law, they were entitled to obtain.  This is sufficient to satisfy the first prong of the informational injury inquiry.[2]

The Court thus turns to the second prong of the test—whether denial of information caused Plaintiffs to suffer the type of harm that Congress sought to prevent by requiring disclosure.  The D.C. Circuit has explained that "the second part of the [informational injury] inquiry may depend on the nature of the statutory disclosure provision at issue."  *Friends of Animals II*, 828 F.3d at 992.  "In some instances, a plaintiff suffers the type of harm Congress sought to remedy when it simply 's[eeks] and [is] denied specific agency records.'"  *Id.* (quoting *Pub. Citizen*, 491 U.S. at 449–50).  This is the case when, for example, a government agency

---

[2] As the D.C. Circuit has recognized, a plaintiff need only "*espouse a view of the law* under which the defendant (or an entity it regulates) is obligated to disclose certain information that the plaintiff has a right to obtain."  *Am. Soc. for Prevention of Cruelty to Animals v. Feld Entm't, Inc.*, 659 F.3d 13, 23 (D.C. Cir. 2011) (emphasis added).  That view, however, need not necessarily be the correct view of the law in order to find the existence of standing under a theory of informational injury.  For example, in *Akins*, the plaintiffs in that case challenged the Federal Election Commission's determination that the American Israel Public Affairs Committee ("AIPAC") was not a "political committee" for purposes of the FECA and, consequently, that it did not have to disclose information concerning its donors and contributions.  *See Akins*, 524 U.S. at 13.  Plaintiffs challenged that legal determination and argued that AIPAC was both a political committee and subject to the law's disclosure requirements concerning its donors and contributions.  *See id.* at 21.  The Supreme Court held that plaintiffs in that case had standing to challenge the agency's interpretation, but did not actually resolve the predicate question of whether the AIPAC was, in fact, a political committee.  *See id.*  Rather, the Court was able to find an injury in fact consisting of plaintiffs' inability to obtain information based purely on their "view of the law" which would require the disclosure plaintiffs sought.  *See id.*  Thus, even though the Plaintiffs in this case have espoused a view sufficient to find an informational injury, that view is not necessarily the correct view of the law.  And, in fact, as described in greater detail *infra*, the Court finds Plaintiffs' view is not correct because the Commission does not constitute an "agency" for purposes of the PRA.

denies a request under the Freedom of Information Act ("FOIA"). *See Pub. Citizen*, 491 U.S. at 449–50. However, in other contexts, "a plaintiff may need to allege that nondisclosure has caused it to suffer the kind of harm from which Congress, in mandating disclosure, sought to protect individuals or organizations like it." *Friends of Animals II*, 828 F.3d at 992. For example, in *Nader v. FEC*, the D.C. Circuit noted that litigants can have informational standing under the FECA "if the disclosure they seek is related to their informed participation in the political process." *Nader v. FEC*, 725 F.3d 226, 230 (D.C. Cir. 2013). But in *Nader*, the plaintiff sought disclosure of information "in the hope of showing that [certain lawyers and law firms] violated prohibitions on 'contributions' and 'expenditures' found in [the FECA]." *Id.* Because the plaintiff did "not seek information to facilitate his informed participation in the political process," but instead to "force the FEC to get the bad guys," the Court found that he did not have standing to bring his claim under a theory of informational injury. *Id* (internal quotations omitted).

Under the facts alleged here, the Court is persuaded that Plaintiffs have suffered the type of harm that Congress sought to prevent by requiring disclosure. In passing the PRA, Congress enumerated nearly a dozen purposes that it was meant to serve. Two are of particular relevance here. First, Congress sought to "improve the quality and use of Federal information to strengthen . . . *openness in Government and society*." 44 U.S.C. § 3501(4) (emphasis added). Second, Congress sought to "improve the responsibility and accountability of the [OMB] and all other Federal agencies to Congress *and to the public* for implementing the information collection review process, information resources management, and related policies and guidelines established under [the PRA]." 44 U.S.C. § 3501(11) (emphasis added). These statements evince

Congress's clear intent that information concerning the government's data collection efforts be shared with the public so that the public might hold the government to account.

Plaintiffs are non-profit organizations that use advocacy, research, and public education to confront perceived threats to democracy. Compl. ¶¶ 7–8. These are activities in which Plaintiffs devote substantial resources and have spent substantial resources in connection with the work of the Commission. Compl. ¶ 73. Plaintiffs also allege that the information that the PRA supposedly required the Commission to disclose "would have facilitated Plaintiffs' mission." Compl. ¶ 73. Indeed, they claim that "[h]ad [they] received the information to which they were entitled, they would have sought to educate the public on the implications of that information, and would have organized their own advocacy strategies to respond appropriately to those disclosures." Compl ¶ 73. Accordingly, the Court is convinced that Plaintiffs have suffered the same injury meant to be prevented under the statute.[3] *See Friends of Animals I*, 824 F.3d 1033, 1041 (D.C. Cir. 2016) (holding that "there is no reason to doubt [plaintiff's] [informational] standing" when it claimed that "information provided by Section 10(c) [of the

---

[3] In a related case, *Electronic Privacy Information Center. v. Presidential Advisory Commission*, the D.C. Circuit recently held that an advocacy organization did not have informational standing to challenge the Commission's purported violation of the E-Government Act because that statute was intended only to protect individual privacy, which was not at issue for the organization. *See Elec. Privacy Info. Ctr. v. Presidential Advisory Commission*, No. 17-5171, 2017 WL 6564621 at *4 (D.C. Cir. Dec. 26, 2017). In this case, the Court does not believe that the purpose of the PRA is limited in quite this same way. The text of the statute itself demonstrates that the PRA was not solely limited to protecting individuals. *See* 44 U.S.C. § 3501(a) (one of the purposes of the PRA includes "minimiz[ing] the paperwork burden of individuals, small businesses, educational and nonprofit institutions, Federal Contractors, State, local and tribal governments, and other persons resulting from the collection of information by or for the Federal Government"). Nor is there any reason to believe that only individuals may be harmed by a deprivation of information when the PRA speaks in terms of "openness in Government and *society*" and improving responsibility and accountability "*to the public.*" *See id.* at §§ 3501(4), (11).

Endangered Species Act] helps it meaningfully participate in the Act's permitting process, as well as engage in related advocacy efforts to protect [certain animals]").

Defendants argue, however, that Plaintiffs purported injury is not an informational injury, rather it is, if anything, an infringement of a bare procedural right, which is not sufficient to confer standing. *See* Defs.' MTD at 13–14; Defs.' Reply at 6–8, ECF No. 28. The seminal case on this issue is the Supreme Court's decision in *Summers v. Earth Island Institute*, 555 U.S. 488 (2009). In that case, environmental organizations brought action seeking to enjoin the U.S. Forest Service from exempting certain agency decisions from the notice, comment, and appeals process used for significant land management decisions. *See id.* at 490. Plaintiffs argued that they had standing "because they ha[d] suffered procedural injury, namely, that they ha[d] been denied the ability to file comments on some Forest Service actions and will continue to be so denied." *Id.* at 496. But the Court held that "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Id.* That is, "[o]nly a 'person who has been accorded a procedural right to protect *his concrete interests* can assert that right without meeting all the normal standards for redressability and immediacy." *Id.* (emphasis in original) (quoting *Defenders of Wildlife*, 504 U.S. at 572, n.7). Plaintiffs in that suit, however, were not "claiming that but for the allegedly unlawful abridged procedures they would have been able to oppose [a] project that threatened to impinge on their concrete plans to observe nature in [a] specific area." *Id.* at 497. Because the plaintiffs had failed to connect any concrete injury underlying a particular project for which they were unable to comment, the Court held that plaintiffs lacked standing. *Id*

Here, Defendants focus on the fact that the particular disclosures at issue are related to the PRA's notice and comment procedures. *See* Defs.' MTD at 13–14; Defs.' Reply at 6–8. For

this reason, Defendants contend that Plaintiffs' injury is necessarily a procedural one like that in *Summers*, rather than an informational injury. *See* Defs.' MTD at 13–14; Defs.' Reply at 6–8. While this argument certainly carries some facial appeal, the Court is ultimately unpersuaded. Nothing in *Summers* prohibits a finding of informational injury merely because the statute conferring the right to information also happens to be associated with the statute's notice and comment procedures. In *Summers*, the sole injury alleged by plaintiffs was the deprivation of a right to *comment* in a proceeding. *See Summers*, 555 U.S. at 456. While the Plaintiffs here might also share that pure procedural injury, they are also uniquely and concretely harmed by the deprivation of *information* to which they are allegedly entitled under the PRA. Such an injury was not present in *Summers*.

Furthermore, the case law of this Circuit simply does not support Defendants' position.[4] Indeed, the D.C. Circuit has held on multiple occasions that litigants have adequately alleged informational injuries based solely on notice statutes. For example, in *Ethyl Corp. v. EPA*, the D.C. Circuit considered a challenge to an EPA rule that allowed automobile manufacturers to establish their own emissions test procedures and methods, which the EPA would then evaluate

---

[4] Defendants rely principally on the Ninth Circuit opinion, *Wilderness Society, Inc. v. Rey*, 622 F.3d 1251 (9th Cir. 2010). That case addressed whether a plaintiff could assert informational standing based on the notice provision of the Appeals Reform Act ("ARA")—the same statute that was at issue in *Summers*. The Ninth Circuit held that plaintiffs could not allege a cognizable informational injury under the ARA because "Congress's purpose in mandating notice *in the context of the ARA* was not to disclose information, but rather to allow the public opportunity to comment on the proposals." *Id.* at 1259 (emphasis added). Contrary to Defendant's intimations, this case does not stand for the broad proposition that there can *never* exist a right to information if that right is conferred by a statute setting forth notice and comment procedures. As its language suggests, the case addressed only the particular circumstances underlying the ARA. The present suit, of course, does not concern the ARA and, as described above, the Court is satisfied that at least part of PRA's purpose *was* to disclose information to the public. Moreover, the case law in the D.C. Circuit has found informational injuries based on notice statutes on multiple occasions, which critically undermines Defendants' absolutist position.

and approve in individual, closed proceedings. *Ethyl Corp. v. EPA*, 306 F.3d 1144 (D.C. Cir. 2002). The plaintiff argued that this was a violation of the Clean Air Act, which required the EPA to establish emissions tests by regulation pursuant to typical notice and comment procedures. *Id.* at 1146. The closed-door procedure at issue allegedly harmed the plaintiff "because the mechanism adopted by the EPA deprive[d] it of the opportunity to observe the rulemaking process and thus gain information useful in its efforts both to develop and improve its products and to key them to the certification tests." *Id.* Based on this informational deprivation, the D.C. Circuit found the plaintiff's Article III standing to be "clear." *Id.* at 1148.

Moreover, the D.C. Circuit has continued to find informational standing predicated on notice statutes even after *Summers* was decided. Indeed, just last year, the Circuit found informational standing under circumstances very similar to those presented at bar. In *Friends of Animals I*, the D.C. Circuit held that a non-profit organization had standing under § 10(c) of the Endangered Species Act. *See Friends of Animals I*, 824 F.3d at 1041. That provision provides, in relevant part:

> The Secretary shall publish notice in the Federal Register of each application for an exemption or permit which is made under this section. Each notice shall invite the submission from interested parties within thirty days after the date of the notice, of written data, views, or arguments with respect to the application . . . . Information received by the Secretary as part of any application shall be available to the public as a matter of public record at every stage of the proceeding."

*Id.* (quoting 16 U.S.C. § 1539(c)) (emphasis omitted). While the statute plainly requires the release of information as part of notice and comment procedures, the Court found that this provision "clearly creates a right to information upon which a claim of informational standing may be predicated." *Id.* The Court observed that the plaintiff in that case "regularly participate[d]" in the permitting process and had claimed that the "information provided by Section 10(c) helps it meaningfully participate in the Act's permitting process, as well as engage

in related advocacy efforts to protect [certain] antelope species." *Id.* Accordingly, the Court had "no reason to doubt" its informational standing.

Here, like *Ethyl Corp* and *Friends of Animals I,* Plaintiffs' right to information may be based on a statute tied to notice and comment procedures, but they have sufficiently alleged that the deprivation of that particular information has caused them particularized and concrete injury in fact. Based on the foregoing, the Court is satisfied that, at this stage in the proceedings, Plaintiffs have adequately alleged a concrete and particularized informational injury. Consequently, the Court finds that Plaintiffs have standing to bring their claims.

## B. Defendants' Motion to Dismiss

Although the Court finds that Plaintiffs have demonstrated standing, their claims ultimately do not withstand scrutiny under a motion to dismiss. The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim" in order to give the defendant fair notice of the claim and the grounds upon which it rests. Fed. R. Civ. P. 8(a)(2); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam). A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982). A court considering such a motion presumes that the complaint's factual allegations are true and construes them liberally in the plaintiff's favor. *See, e.g., United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000). Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This means that a plaintiff's factual allegations "must be

enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are therefore insufficient to withstand a motion to dismiss. *Iqbal*, 556 U.S. at 678. A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of the legal conclusions that are couched as factual allegations. *See Twombly*, 550 U.S. at 555. Under this standard, Plaintiffs fail to state a claim against either the Commission or the OMB Defendants.

### 1. Claims against the Commission

The PRA does not provide for a private cause of action and, consequently, Plaintiffs seek relief from the Commission's actions under the Mandamus Act, 28 U.S.C. § 1361. "[C]onsideration of any mandamus petition 'starts from the premise that issuance of the writ is an extraordinary remedy, reserved only for the most transparent violations of a clear duty to act.'" *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (quoting *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000)); *accord Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002) ("The remedy of mandamus is a drastic one, to be invoked only in extraordinary circumstances." (internal quotation marks omitted)). "To show entitlement to mandamus, plaintiffs must demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016) (citing *United States v. Monzel*, 641 F.3d 528, 534 (D.C. Cir. 2011)). "These three threshold requirements are jurisdictional; unless all are met, a court must dismiss the case for lack of jurisdiction." *Id.* (citing *In re Medicare Reimbursement Litigation*, 414 F.3d 7, 10 (D.C. Cir. 2005)). But, "[e]ven

when the legal requirements for mandamus jurisdiction have been satisfied, however, a court may grant relief only when it finds compelling equitable grounds." *Id.* "The party seeking mandamus has the burden of showing that its right to issuance of the writ is clear and indisputable." *Power*, 292 F.3d at 784 (internal quotation marks omitted).

The critical question for Plaintiffs' claims is whether, in fact, the PRA applies to the Commission. If not, then the Commission cannot be found to have violated a "clear duty to act" and Plaintiffs' claim must necessarily be dismissed.

By its terms, the PRA only applies when an "agency" conducts or sponsors the collection of information. *See* 44 U.S.C. § 3507(a). With the exception of certain enumerated exclusions not applicable here, the PRA defines the term "agency" to mean "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency." 44 U.S.C. § 3502(1). The Commission quite clearly does not fall into most of these categories. Indeed, it is readily apparent that the Commission is not one of the fifteen executive departments, *see* 5 U.S.C. § 101, any of the three military departments, *see* 5 U.S.C. § 102, does not fall within the definitions of "Government corporation" or "Government controlled corporation" *see* 5 U.S.C. § 103, and is not one of several enumerated "independent regulatory agenc[ies]," *see* 44 U.S.C. § 3502(5). Accordingly, whether the Commission constitutes an "agency" for purposes of the PRA will necessarily turn on whether it falls within the PRA's catchall category of "other establishment[s] in the executive branch of the Government (including the Executive Office of the President)."

The parties fundamentally disagree, however, about whether or not the Commission actually falls within that group. Notably, the PRA does not specify what that category includes

or excludes and no court has previously addressed whether the PRA may be interpreted to reach entities such as the Commission. Nevertheless, Plaintiffs argue that the text and purpose of the PRA suggest that the Commission should be considered an "agency" under the PRA. *See* Pls.' Mot. Prelim. Inj. at 21. Plaintiffs contend that the Commission is most certainly an establishment in the executive branch given that the Commission was established by Executive Order, is chaired by the Vice President, and is charged with producing a report for the President himself. *See* Pls.' Mot. Prelim. Inj. at 21. Plaintiffs also contend that the PRA's definition of agency should be viewed broadly given that Congress's overarching purpose in enacting the PRA was to reign in government collection activities, which the PRA sought to accomplish in part by extending its applicability to more agencies than its predecessor statute, the Federal Reports Act of 1942. *See* Pls.' Mot. Prelim. Inj. at 21–22. Defendants, on the other hand, point out that the PRA's definition of "agency" is nearly identical to the definition of "agency" under FOIA. Defs.' MTD at 17. For this reason, Defendants urge that the terms should be interpreted coextensively. Because FOIA has been interpreted not to include staff and units that serve solely to advise the President, Defendants argue that this limitation should apply equally to the PRA. The Court finds that Defendants have the better of the arguments.

"There is a presumption that Congress uses the same term consistently in different statutes." *Nat'l Treasury Emps. Union v. Chertoff*, 452 F.3d 839, 857 (D.C. Cir. 2006). Indeed, the Supreme Court has held that when two statutes contain the same language, it is a "strong indication" that they "should be interpreted *pari passu*," that is, on equal footing. *Northcross v. Bd. of Ed. of Memphis City Sch.*, 412 U.S. 427, 428 (1973) (per curiam). Thus, under circumstances where statutes parallel one another, ordinarily a "common term should be construed consistently under each statute." *Nat'l Treasury Emps. Union*, 452 F.3d at 858; *see*

*also Kooritzky v. Herman*, 178 F.3d 1315, 1319–20 (D.C. Cir. 1999) (explaining that similar language in different statutes is a strong indication that the language should be interpreted alike). In this case, the definitions of "agency" under the PRA parallels the definition of that term under FOIA. Indeed, under FOIA, the term "agency" "includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency." 5 U.S.C. § 552(f). Given the parallel nature of the FOIA's and the PRA's definitions of "agency," they are most naturally understood to be coextensive.

Reading the PRA consistently with FOIA sheds light on the otherwise undefined contours of the term "other establishment in the executive branch of the Government (including the Executive Office of the President)." Indeed, it is well settled that, while the text itself does not admit of any limitations, it does not extend to "the President's immediate personal staff or units in the Executive Office [of the President] whose sole function it is to advise and assist the President." *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980). Significantly, this "advise and assist" limitation was the settled law at the time the PRA was enacted. The Supreme Court has advised that "when judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its . . . judicial interpretations as well." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (alteration in original, internal citations and quotation marks omitted). Thus, there is added force to the argument that Congress intended the "advise and assist" limitation to apply equally to the PRA when it invoked the FOIA's definition of "agency."

Plaintiffs attempt to resist this conclusion by seizing on a single distinction between the PRA's definition of "agency" and FOIA's definition of that term. Specifically, Plaintiffs point out that FOIA's definition cross-references 5 U.S.C. § 551(1), which is the Administrative Procedure Act's ("APA's") definition of "agency." *See* Pls.' Opp'n at 19. According to Plaintiffs, this additional reference means that "agency" under the PRA should not be read coextensively with the definition under FOIA, despite all other language being equal. To fully comprehend Plaintiffs' argument, one must first understand the history and relation between FOIA and the APA.

In 1966, Congress enacted FOIA as an amendment to the APA. *See* Pub. L. 89-487, 80 Stat. 250 (1966). At that time, FOIA did not specify its own definition of "agency," but instead relied upon the APA's definition, which was codified at 5 U.S.C. § 551(1). Under the APA's definition, which remains unchanged today, an "agency" is "each authority of the Government of the United States, whether or not it is within or subject to review by another agency." 5 U.S.C. § 551(1). In 1971, the D.C. Circuit issued an opinion in *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971), which held that this definition extended only to those administrative units "with substantial independent authority in the exercise of specific functions." *Id.* at 1073. Thus, organizations whose "sole function[s] were to advise and assist the President . . . [are] part of the President's staff and not [] separate agenc[ies]." *Id.* at 1075. Then, in 1974, Congress amended FOIA to expand its definition of "agency" without expanding the overall definition of the term under the APA. *See* Pub. L. No. 93–502, 88 Stat. 1561 (1974). That amendment clarified that, for purposes of FOIA, an "'agency' as defined in section 551(1)" of the APA "includes any executive department, military department, Government corporation, Government controlled

corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency." 5 U.S.C. § 552(f).

While Plaintiffs concede, as they must, that the definition of agency under the PRA is nearly identical to this amendment, Plaintiffs focus on the fact that the FOIA amendment, unlike the PRA, cross-references the APA's definition of "agency" under 5 U.S.C. § 551(1). This is critical, Plaintiffs contend, because FOIA's "exemption for units in the Executive Office that 'advise and assist' the President derives solely from" that provision. *See* Pls.' Opp'n at 20, ECF No. 26. Unfortunately for Plaintiffs, this is simply not the case. While FOIA does reference the APA's definition of agency under § 551(1) and the language of that provision is the source of *the APA's limitation* on staff and units that advise the President, § 551(1) is *not* the source of FOIA's limited applicability. Indeed, the limitation on FOIA's definition of "agency" comes from how Congress intended the term "Executive Office of the President" to be interpreted under § 552(f) of FOIA. The Conference Report for the 1974 FOIA amendments indicates that "[w]ith respect to the meaning of the term 'Executive Office of the President[,]' the conferees intend the result reached in *Soucie v. David . . . .*" H.R. Conf. Rep. No. 93-1380, at 15 (1974). Thus, it made clear that "*[t]he term* [was] not to be interpreted as including the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President." *Id.* (emphasis added). As this history shows, FOIA's limited applicability comes—not from any interpretation of § 551(1)—but from how Congress intended the term "Executive Office of the President" to be interpreted under § 552(f)—FOIA's definition of "agency."[5] This is confirmed

---

[5] Plaintiffs also argue that it would be "unnecessary and superfluous to understand the language of § 552(f) to incorporate the 'advise and assist' limitation, when the limitation was already present and operative for FOIA in § 551(1) at the time Congress passed § 552(f)." Pls.' Opp'n at 21–22. The Plaintiffs are wrong on this score. The FOIA Amendments expressly expanded the definition of "agency" so that it would extend *beyond* the constraints imposed by

by the Supreme Court's decision in *Kissinger*, which based its understanding of FOIA's limited

applicability on this very legislative history.  *See Kissinger*, 445 U.S. at 156.  Because the source

of the "advise and assist" limitation under FOIA is derived from the term "Executive Office of

the President," a term that is shared by the PRA, Plaintiffs have failed to show why FOIA's

reference to § 551(1) requires the Court to reject the normal presumption that common terms in

parallel provisions should be construed consistently.[6]  Based on the foregoing, the Court is

---

§ 551(1).  *See* H.R. Conf. Rep. No. 93-1380, at 14–15 (1974) ("The conferees state that they intend to include within the definition of 'agency' those entities encompassed by 5 U.S.C. 551 *and other entities,* including [list of entities] . . . .  Expansion of the definition of 'agency' in this subsection is intended to broaden applicability of the Freedom of Information Act . . . .") (emphasis added).  It would be illogical to understand § 552(f) as both broadening § 551(1)'s definition of "agency" while simultaneously being constrained by its restrictions.  Indeed, the only logical understanding of FOIA's "advise and assist" limitation is that it emanates from § 552(f) itself.

[6]  Plaintiffs other arguments are also unavailing.  First, Plaintiffs argue that "Congress knew how to indicate that a subsequent statute should follow both parts of FOIA's definition, bud did not include an indication of that sort here."  Pls.' Opp'n at 23.  As evidence of their claim, they point to the Privacy Act, which incorporates FOIA's definition of 'agency' by cross-reference.  *See* Pls.' Opp'n at 23 (citing 5 U.S.C. § 552a).  As an initial matter, the Court finds the Privacy Act's use of a cross-reference rather unsurprising given that the APA, FOIA, and the Privacy Act all reside within Title 5 of the U.S. Code.  The PRA, on the other hand, is found in Title 44.  Nevertheless, there is no rule of construction suggesting that, absent a cross-reference, statutes with similar language must be interpreted differently.  And the mere fact that Congress did not include a cross-reference in this instance does not seem to otherwise suggest that Congress perceived a difference between agencies for purposes of FOIA and the PRA when, in fact, Congress used the exact same words for both statutes.  Plaintiffs also contend that Congress "did not indicate in any way that it intended to minimize burdens imposed on the public only by those segments of the federal government that wield substantial independent authority from the President."  Pls.' Opp'n at 24.  This is plainly incorrect.  As discussed above, Congress adopted the same language that it had crafted for purposes of FOIA, which it had enacted only a few years earlier, and did so only after its terms had been settled by the Supreme Court.  So, while Congress may not have explicitly stated its intentions as succinctly as Plaintiffs might like, the import of Congress's actions is undeniable.  Finally, Plaintiffs argue that a finding that the PRA's definition of "agency" does not extend to the President's advisors would somehow undermine the purpose of the PRA.  *See* Pls.' Opp'n at 23–24.  But, Plaintiffs do not point to anything indicating that Congress intended the PRA to apply to every establishment in the Executive Branch without exception or that Congress specifically wanted the PRA to reach the President's advisors.  Thus, it is hard to understand how the Court's finding in this regard necessarily does harm to the PRA's broader purpose.  Congress intended FOIA to apply broadly

convinced that the term "agency" under the PRA should be construed conterminously with that term under FOIA and that FOIA's "advise and assist" limitation applies equally to the PRA.

Having found that the definition of agency in the PRA is to be construed conterminously with the definition of "agency" found in FOIA, the Court must determine whether the Commission constitutes an agency under that definition. In the years since the Supreme Court's decision in *Kissinger*, the D.C. Circuit has propounded various tests designed to answer the question of whether a unit within the Executive Office of the President ("EOP") is subject to FOIA. *See Citizens for Responsibility and Ethics in Washington v. Office of Administration*, 566 F.3d 219, 222 (D.C. Cir. 2009). But, "[h]owever the test has been stated, common to every case in which [the D.C. Circuit has] held that an EOP unit is subject to FOIA has been a finding that the entity in question 'wielded substantial authority independently of the President.'" *Id.* (quoting *Sweetland v. Walters*, 60 F.3d 852, 854 (D.C. Cir. 1995) (per curiam)). Likewise, the Court has "consistently refused to extend FOIA to an EOP unit that lacks substantial independent authority." *Id.* at 223. Consequently, the Court finds that this is the same inquiry that should control whether or not the Commission constitutes an "agency" for purposes of the PRA.

Based on the present record and the relevant case law, the Court cannot conclude that the Commission constitutes an "agency" for purposes of the PRA. The Executive Order at issue indicates that the Commission is purely advisory in nature and that it shall disband shortly after it delivers a report to the President. Moreover, the Order does not grant the Commission any authority independent of the President and there is no evidence that it has ever exercised any such authority. The Commission's request for information from state officials is not a command

---

but, similarly, was not troubled that not applying it to the President's advisors would undermine its purpose.

for information that state officials must obey and there is no evidence that the Commission has sought to compel compliance by any means.  This Court finds that these considerations lead to the inescapable conclusion that the Commission is not an "agency" for purposes of the PRA.[7]

Plaintiffs allege no additional facts in their complaint or provide any other information that would otherwise persuade this Court to reach a different result.  Indeed, Plaintiffs all but concede this point, having made no argument that the Commission in fact exercises any authority independent of the President.  Because the Court cannot conclude that the Commission is an "agency" for purposes of the PRA, it also cannot find that the Commission was under any "clear duty to act" in accordance with the PRA's mandates.  Without the showing of such a duty, Plaintiffs' claims for mandamus relief must necessarily be dismissed.  *See, e.g., Baptist Mem'l Hosp. v. Sebelius*, 603 F.3d 57, 63 (D.C. Cir. 2010) (affirming dismissal of mandamus action because, among other reasons, the statute at issue "cannot provide the 'clear duty to act' necessary to sustain the hospitals' requests for mandamus relief.").  Likewise, Plaintiffs cannot sustain a claim for declaratory relief, so those claims must be dismissed as well.

---

[7] This conclusion is in accord with how the Court of Appeals has addressed similar bodies that advise the President in the FOIA context.  *See Rushforth v. Council of Economic Advisors*, 762 F.2d 1038, 1042–43 (D.C. Cir. 1985) (holding that Council of Economic Advisors' "sole function is to advise and assist the President" and "should not be considered an agency for purposes of the FOIA" because it "has no regulatory power," "it cannot fund projects," "nor can it issue regulations"); *Meyer v. Bush*, 981 F.2d 1288, 1294 (D.C. Cir. 1993) (holding that President's Task Force on Regulatory Relief was not an agency under FOIA because it lacked substantial authority independent of the President to "direct executive branch officials"); *Armstrong v. Executive Office of the President*, 90 F.3d 553, 565 (D.C. Cir. 1996) (holding that National Security Council "is not an agency subject to the FOIA" because it plays no "substantive role apart from that of the President, as opposed to a coordinating role on behalf of the President").

2. Claims against the OMB Defendants

Plaintiffs' claims against the OMB fare no better than their claims against the Commission. Indeed, the same finding that the Commission is not an agency pursuant to the PRA necessarily dooms these claims too. Plaintiffs' claims against the OMB Defendants rely upon 44 U.S.C. § 3517(b), which states that "[a]ny person may request the Director to review any collection of information conducted by or for an *agency* to determine if, under this subchapter, a person shall maintain, provide, or disclose the information to or for the *agency*." (emphasis added). Unless the request is frivolous, the Director of OMB is typically required to respond to such a request within 60 days and to take any appropriate remedial actions if necessary. *See id.* at § 3517(b). Plaintiffs allege that they submitted a request to the Director of OMB to review the Commission's requests for voter data, but that the Director of OMB has, to this day, taken no action. Pls.' Opp'n at 28–29.

Plaintiffs bring suit against the OMB Defendants pursuant to § 706(1) of the APA and also seek judgment pursuant to 28 U.S.C. §§ 2201–02 declaring that the OMB Defendants have violated the APA. *See* Compl. ¶¶ 77–83, 86–87. Under § 706(1) of the APA, courts can compel an agency "to take a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness Alliance,* 542 U.S. 55, 64 (2004). This requires, however, that "a federal agency has a 'ministerial or non-discretionary' duty amounting to 'a specific, unequivocal command.'" *Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016) (quoting *Norton*, 542 U.S. at 63–64). Plaintiffs' claim against the OMB Defendants must fail because the PRA only requires the Director to take action when requested to review a collection of information conducted "by or for [an] agency," as defined under the PRA. Because the Court has already concluded that Plaintiffs have not met their burden to show that the Commission satisfies that

26

definition, they have also necessarily failed to show that the OMB Defendants were under any obligation to take any action under the statute.[8]  Accordingly, Plaintiffs' APA and declaratory judgment claims against the OMB Defendants must be dismissed.

## IV.  CONCLUSION

Because the Court finds that it is appropriate to grant Defendants' motion to dismiss, there is therefore no need to reach Plaintiffs' Motion for Preliminary Injunction.  Accordingly, for the foregoing reasons, the Court **GRANTS** Defendants' Motion to Dismiss (ECF No. 22) and **DENIES AS MOOT** Plaintiffs' Motion for a Preliminary Injunction (ECF No. 10).  The Court also **DENIES AS MOOT** Plaintiffs' Motion for Leave to File a Declaration in support of its Motion for Preliminary Injunction (ECF No. 24).  As discussed above, the basis for the Court's decision is that Plaintiffs have failed to adequately allege or otherwise show that the Commission constitutes an "agency" subject to the PRA.  Plaintiffs have requested that, in the event that the Court makes just such a finding, that it be granted leave to file an amended complaint to demonstrate the reasons why the Commission meets the standard that the Court adopts today.  *See* Pls.' Opp'n at 21, n.6.  Plaintiffs also note that this very question is pending in parallel litigation in this Circuit.  *See* Pls.' Opp'n at 21, n.6.  Based on these representations, the Court is satisfied that leave should be given.  Accordingly, the Court will **GRANT** Plaintiffs request for leave to amend their Complaint orders that they file their amended complaint within 30 days.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  December 29, 2017                                    RUDOLPH CONTRERAS
                                                             United States District Judge

---

[8] Because the Court resolves the claims against the OMB Defendants on the basis that Plaintiffs have not shown the Commission to be an "agency," the Court need not resolve Defendants' additional grounds for dismissal.